**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

VIRGINIA L. FOLEY, *et al.*,
            Plaintiffs

            v.                                    Civil Action No. 11-699 (CKK)

SYRIAN ARAB REPUBLIC, *et al.*,
            Defendants.

---

**MEMORANDUM OPINION**
(April 13, 2017)

This case arises from the deaths of three Americans—Laurence Michael Foley, Sr., Keith Matthew Maupin and Kristian Menchaca—in Iraq and Jordan between 2002 and 2006. Plaintiffs—the estates and family members of the deceased—allege that all three were killed by a terrorist organization led by Abu Mus'ab al-Zarqawi (the "Zarqawi Terrorist Organization"). Proceeding under the Foreign Sovereign Immunities Act ("FSIA"), Plaintiffs allege that Defendants Syrian Arab Republic ("Syria"), Syrian Military Intelligence, Syrian President Bashar al-Assad and Syrian General Asif Shawkat, provided material support and resources to the Zarqawi Terrorist Organization and accordingly should be held liable for these deaths. The Court agrees.

Defendants have not answered or otherwise participated in this litigation, with the exception of filing an opposition to a motion filed by Plaintiffs regarding the sufficiency of service. The case accordingly proceeded in a default setting. The Court held a liability hearing on November 16 and 17, 2016. Upon consideration of the pleadings, the relevant legal authorities, and the record as a whole, the Court now determines that Plaintiffs have established their claims by evidence satisfactory to the Court, and will accordingly GRANT default judgment against Defendants. The Court will refer the issue of damages to a Special Master.

1

# I. BACKGROUND

Plaintiffs filed this lawsuit on April 8, 2011.  Compl., ECF No. 1.  An Amended

Complaint was filed on September 13, 2011.  Am. Compl., ECF No. 11.  Plaintiffs then struggled

for years to effectuate service because of the civil war in Syria and the attendant breakdown in

diplomatic relations between that country and the United States.  On the Court's order, between

November 2011 and February 2015 Plaintiffs filed a series of status reports updating the Court

on their efforts to effectuate service on Defendants.  ECF Nos. 20-38, 44.  On April 23, 2015,

Plaintiffs moved this Court for an order that service had been completed under 28 U.S.C. §

1603(a)(3).  ECF No. 48.  Defendant Syrian Arab Republic filed an opposition to this Motion,

the only pleading filed by any Defendant in this matter.  ECF No. 49.   On January 21, 2016, the

Court granted Plaintiffs' motion.  ECF No. 51 at 11.  The Court found that Plaintiffs had

accomplished service and ordered the Clerk of the Court to enter a default as to each Defendant

pursuant to Fed. R. Civ. P. 55(a).  *Id.*  The Clerk of the Court entered default on January 22,

2016.  ECF No. 52.

The Court held a liability hearing on November 16 and 17, 2016, at which Plaintiffs

offered documentary, photographic and video evidence, and presented the testimony of fact and

expert witnesses.  This hearing was limited to Defendants' liability—Plaintiffs were not required

to present evidence of damages.  At the close of the hearing Plaintiffs filed Proposed Findings of

Fact and Conclusions of Law.  ECF No. 71.

# II. LEGAL STANDARD

The entry of default judgment is governed by Fed. R. Civ. P. 55.  "The determination of

whether a default judgment is appropriate is committed to the discretion of the trial court."

*Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 150 (D.D.C. 2011) (citing *Jackson*

*v. Beech,* 636 F.2d 831, 836 (D.C. Cir. 1980)).  Before granting default judgment, the Court must satisfy itself of its jurisdiction, and "[t]he party seeking default judgment has the burden of establishing both subject matter jurisdiction over the claims and personal jurisdiction over the defendants."  *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016).

Under the FSIA specifically, this Court cannot enter default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); *see Roeder v. Islamic Republic of Iran,* 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief.").  "[T]he FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014), and "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true," *Thuneibat*, 167 F. Supp. 3d at 33.

## III. FINDINGS OF FACT

The following Findings of Fact recount horrific events.  They detail the torture and assassination of three American citizens who were purposefully targeted because of the services they were performing for their country abroad.  As discussed further below, in addition to expert testimony received by the Court, a family member of each of the deceased testified at the Court's liability hearing regarding the circumstances surrounding the deaths of their loved ones.  The Court appreciates that giving that testimony was extremely difficult for each witness, as it required them to publicly revisit what was likely the most tragic event in their lives.  The Court also acknowledges that, as Plaintiffs' counsel stated at the outset of the liability hearing, the current legal proceedings cannot make these family members whole again or even ease their pain.  Plaintiffs represent that they had another purpose in bringing this suit.  Plaintiffs state that

they "would like to use this proceeding to send out a very clear message of deterrence" to those "who are contemplating funding or otherwise material[ly] supporting terrorist organizations that would murder United States citizens, particularly United States citizens who are killed in service to the United States."  The Court hopes that Plaintiffs find some solace in that purpose.

## A.  Judicial Notice of Facts Found in Other Cases

As a threshold matter the Court will grant Plaintiffs' [61] Motion for Judicial Notice ("Pls.' Mot.").  Plaintiffs ask this Court to take judicial notice of findings made in two similar cases brought against Syria, *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22 (D.D.C. 2016) and *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008), *aff'd,* 646 F.3d 1 (D.C. Cir. 2011).  Both cases found that Syria materially supported Zarqawi's Terrorist Organization during the timeframe that is relevant to this case.  *See Thuneibat*, 167 F. Supp. 3d at 36 ("The plaintiffs have supplied satisfactory proof that the defendants provided material support to Zarqawi and AQI"); *Gates*, 580 F. Supp. 2d at 67 ("Syria in fact did provide material support and resources to Zarqawi and al-Qaeda in Iraq which contributed to hostage taking, torture, and extrajudicial killings").  Plaintiffs argue that the findings in those cases can serve as evidence of Syrian support for Zarqawi's organization in this case as well.  Pls.' Mot. at 2.  Plaintiffs concede that taking judicial notice of these findings does not conclusively establish the facts found in those cases.  *Id*. at 5.  They merely ask that the Court take notice of these findings and consider them alongside the evidence Plaintiffs have presented in this case.  *Id*. at 6.

The Court finds this approach appropriate and will take judicial notice of the requested findings.  Under Federal Rule of Evidence 201, the Court "may judicially notice a fact that is not subject to reasonable dispute" because it "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot

4

reasonably be questioned." Fed. R. Evid. 201(b).  "This ability to take notice of adjudicative

facts extends to judicial notice of court records in related proceedings." *Rimkus v. Islamic*

*Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (citing cases).  "Because of the

multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have thus

frequently taken judicial notice of earlier, related proceedings." *Id.*  Specific to the request here,

"when a court has found facts relevant to a FSIA case involving material support to terrorist

groups, courts in subsequent, related cases may 'rely upon the evidence presented in earlier

litigation . . . without necessitating the formality of having that evidence reproduced.'" *Harrison*

*v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012).  Moreover, courts have taken notice

of facts found in earlier proceedings in this District even when those proceedings have taken

place in front of a different judge. *See Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54

(D.D.C. 2009) ("[r]elying on the pleadings and the . . . findings of other judges in this

jurisdiction").

 "At the same time, taking *notice* of another court's finding of fact does not necessarily

denote *adoption* or *finding* of that fact." *Harrison*, 882 F. Supp. 2d at 31.  Instead, "courts in

subsequent related cases [may] rely upon the evidence presented in earlier litigation," but must

still "reach their own, independent findings of fact in the cases before them." *Rimkus*, 750 F.

Supp. 2d at 172; *see also Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C.

2010) ("The taking of judicial notice of the *Peterson* opinion, therefore, does not conclusively

establish the facts found in *Peterson* for, or the liability of the defendants in, this case . . . . In

rendering default judgment against defendants, the Court was . . .  required to, and did, find facts

and make legal conclusions anew.").

Accordingly, the Court GRANTS Plaintiffs' motion to take judicial notice of the findings in *Thuneibat* and *Gates*. However, although the Court has considered these findings, it has made its own independent findings of fact based on the evidence presented in this case. These findings now follow.

## B. The Court's Findings of Fact

The Court's Findings of Fact are based on testimony presented at the liability hearing held in this matter on November 16 and 17, 2016, as well as evidence submitted at and after that hearing.[1] They are also supported, where appropriate, by the findings of fact made in *Thuneibat* and *Gates.* The Court's findings fall into two overarching categories: (1) the Zarqawi Terrorist Organization and Syria's material support for it, and (2) how that support resulted in the deaths of the three Americans in this case.

### 1. Syria's Material Support for the Zarqawi Terrorist Organization

The Court finds that Syria provided material support to the Zarqawi Terrorist Organization throughout the relevant time period—roughly 2002 through 2006. During this period, Syria lent support to a number of terrorist groups by, among other things, providing them safe haven, weaponry, financial support, and even allowing them to open headquarters within Syria. Schenker T2-116-17[2]; Ex. 39 (U.S. Dep't of State, *Patterns of Global Terrorism*), at 3 ("Syria continued to provide safehaven and support to several terrorist groups, some of which maintained training camps or other facilities on Syrian territory"); Ex. 46 (U.S. Dep't of State,

---

[1] Citations to testimony from the liability hearing are in the following format: "name T-# - page," *i.e.,* witness name, transcript volume, and then page number.

[2] Having considered the requirements set forth in Federal Rule of Evidence 702 for the admission of expert testimony, the Court qualified David K. Schenker as an expert in Syrian government support for terrorist organizations from 1998 to 2008. Schenker T2-116; Ex. 38 (David K. Schenker Curriculum Vitae).

*Country Reports on Terrorism 2005*), at 21 ("Syria was used as a facilitation hub for terrorist groups operating in Iraq").[3]

One particularly significant way that Syria provided support to such groups was by allowing them to freely move through Syria and into neighboring countries, such as Iraq and Jordan, for the express purpose of killing Americans.  Schenker T2-116-17; Ex. 54 (Expert Report of David Schenker), at 5 ("Syria was involved in a systematic process of moving Al Qaida fighters to Iraq").  This support was not hidden: Syria allowed the opening of a "special interest section" in downtown Damascus, directly across the street from the United States Embassy, where individuals could sign up and board a bus to Baghdad to "wage the jihad" against Americans.  Schenker T2-134.  Syrian border checkpoints would allow foreign insurgents to pass through freely, stamping their passports with phrases such as "volunteer for jihad."  Schenker T2-136-39; Ex. 42 (2003 Statement of Paul Wolfowitz, Deputy Secretary of Defense to U.S. Senate Committee on Armed Services), at 12 ("Here is another one who came into Iraq through Syria, the same crossing point.  The entry permit said 'to join the Arab volunteers.'").  Aware of Syria's support, foreign fighters from various neighboring countries who sought to join the insurgency in Iraq would take extended routes so as to be able to enter through the Syrian-Iraqi border.  Schenker T2-159-61; Ex. 48 (2007 Statement of Gen. David H. Petraeus to a Joint Hearing Before the Senate Committee on Armed Services and the House Committee on Foreign Affairs), at 55 ("the last Saudi foreign fighter we captured had actually

---

[3] In addition to the testimony of Plaintiffs' three expert witnesses, the Court cites in its Findings of Fact a number of documents that Plaintiffs' experts relied on and that were introduced as exhibits during their testimony at the liability hearing.  To the extent any of these documents constitute hearsay, the Court determined that they were proper material upon which the experts' opinions were based because "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject."  Fed. R. Evid. 703.

had to take a bus to Damascus and then got into the network that eventually brought him into

[Iraq]").  Congress officially recognized this support that Syria was providing to terrorist groups

in the Syria Accountability and Lebanese Sovereignty Restoration Act of 2003.  Schenker T2-

141-42.  In that Act Congress declared that:

> It is the sense of Congress that—
> . . .
> (2) the Government of Syria should—
>> (A) immediately and unconditionally stop facilitating transit from Syria to Iraq of individuals, military equipment, and all lethal items, except as authorized by the Coalition Provisional Authority or a representative, internationally recognized Iraqi government;
>> (B) cease its support for "volunteers" and terrorists who are traveling from and through Syria into Iraq to launch attacks; and
>> (C) undertake concrete, verifiable steps to deter such behavior and control the use of territory under Syrian control;

Ex. 43 (Syria Accountability and Lebanese Sovereignty Restoration Act of 2003, Pub. L. No.

108-175, § 3(2), 117 Stat. 2482).

As primarily relevant to this case, the support described above was crucial to the Zarqawi

Terrorist Organization.  The Zarqawi Terrorist Organization, led by Jordanian born Abu Mus'ab

Al-Zarqawi, was a group dedicated to what it viewed as the earliest principles of Islam and

committed to a strategy of fomenting unrest in Middle Eastern countries through terrorist acts

with the goal of eventually establishing religious governance.  Gartenstein-Ross T2-59-62.[4]

Although effectively the same organization throughout, the Zarqawi Terrorist Organization

operated under various names during the time period relevant to this case, including, among

others, "Jamaat al-Tawhid wal-Jihad" ("JTJ"), "al-Qaeda in Iraq" ("AQI") and "Mujahidin Shura

---

[4] Having considered the requirements set forth in Federal Rule of Evidence 702 for the admission of expert testimony, the Court qualified Daveed Gartenstein-Ross as an expert in the evolution of the history of terrorist organizations and their claims of responsibility for acts of terrorism.  Gartenstein-Ross T2-56; Ex. 27 (Gartenstein-Ross Curriculum Vitae).

Council" ("MSC").  Despite these name changes, Plaintiffs presented undisputed expert testimony that the Zarqawi Terrorist Organization's ideology, strategy and leadership remained consistent throughout this period.  Gartenstein-Ross T2-59; Ex. 37 (Expert Report of Dr. Daveed Gartenstein-Ross), at 1 ("At no point from 1999-2007 did the Zarqawi organization undergo such a fundamental transformation that its various iterations during this period cannot be considered a continuation of one another.").  The Court accordingly continues to refer to this group uniformly as the Zarqawi Terrorist Organization.

In addition to the types of support described generally above, Syria also allowed key Zarqawi officials to reside and operate within Syria during this period with apparent impunity. Schenker T2-150-51; Ex. 54 at 7 ("Because Syria was the leading node for AQI, several of Zarqawi's key deputies and supporters based their operations out of the state").  For example, Sulayman Khalid Darwish, a "close associate of Zarqawi" and a "member of the Advisory (Shura) Council of the Zarqawi organization," collected funds for Zarqawi in Syria and sent those funds—as well as suicide bombers—from within Syria to Zarqawi in Iraq.  Schenker T2-151-53; Ex. 44 (U.S. Dep't of the Treasury, *Treasury Designates Individual Financially Fueling Iraqi Insurgency, al Qaida*) ("Sulayman Khalid Darwish, who is located in Syria, was designated under Executive Order 13224 for providing financial and material support to the al-Zarqawi Network . . .").  After Darwish's death, his successor, Badran Turki Hishan Al Mazidih, played a similar role for the Zarqawi Terrorist Organization, again from within Syria.  Schenker T2-153-56; Ex. 52 (U.S. Dep't of the Treasury, *Treasury Designates Members of Abu Ghadiyah's Network Facilitates Flow of Terrorists, Weapons, and Money from Syria to al Qaida in Iraq*) ("Syrian-based Badran Turki Hishan Al Mazidih . . . runs the AQI facilitation network, which controls the flow of money, weapons, terrorist, and other resources through Syria into Iraq").

The Syrian government also had a number of direct ties to the Zarqawi Terrorist Organization. Schenker T2-129.  For example, Abu Qaqa, a cleric who helped Zarqawi found AQI, ran a Syrian government school and was on the Syrian government's payroll.  Schenker T2-129-30.  Additionally, Fawzi Mutlaq Al Rawi was appointed by Defendant Assad to be the head of the Syrian wing of the Iraqi Ba'th party, and in that role went on to directly provide material support to AQI, including funding, weapons and suicide bombers.  Schenker T2-130-33.  Al Rawi met with Syrian intelligence director, Asif Shawkat, and evidence suggests that he acted under the direction of the Syrian state.  Schenker T2-132; Ex. 50 (U.S. Dep't of the Treasury, *Treasury Designates Individuals with Ties to Al Qaida, Former Regime*) ("Al Rawi is supported financially by the Syrian Government, and has close ties to Syrian Intelligence" and has acted "[u]nder the authorization of the Syrian government.").

Finally, the Court is satisfied by Plaintiffs' showing that Syria's support for the Zarqawi Terrorist Organization was a matter of Syrian policy known and dictated from the highest levels, including Defendants Assad and Shawkat.  During the relevant time period, the Syrian government had firm control throughout its country and was a world-class police state, in which nothing of political significance occurred without the knowledge and authorization of the state.  Schenker T2-117, 122, 170.  The movement of people throughout the country was tightly controlled and monitored.  Schenker T2-148-50.  Under these conditions, the support and safe haven given to the Zarqawi Terrorist Organization, which was a matter of sensitive foreign policy for Syria, could not have been accidental—it was instead a matter of Syrian policy, directed by Defendant Assad and Shawkat.  Ex. 54 at 3 ("Syria was a world-class police state" and Syria's more than a dozen overlapping security agencies "had no discretion to act without authorization from Assad himself on issues of critical importance to the regime, such as state

sponsorship of terrorists"); Ex. 62 (Supplemental Expert Report of David Schenker), ECF No. 73, at 5 ("Shawkat and Syrian Military Intelligence played a central role in the decision making to support [Zarqawi] and the operations necessary to actually supply support to Zarqawi and his organization").

In short, the Court finds that Syria, including all named Defendants, provided material support to the Zarqawi Terrorist Organization's terrorist activity throughout the time period at issue in this case. *See Thuneibat*, 167 F. Supp. 3d at 28 (finding that "Zarqawi and AQI's efforts have been supported by Syria"); *Gates*, 580 F. Supp. 2d at 59 (finding that "Syria supported Zarqawi and his organization by: (1) facilitating the recruitment and training of Zarqawi's followers and their transportation into Iraq; (2) harboring and providing sanctuary to terrorists and their operational and logistical supply network; and (3) financing Zarqawi and his terrorist network in Iraq.").

### 2. The Zarqawi Terrorist Organization, Materially Supported by Syria, Killed Laurence Michael Foley, Keith Mathew Maupin and Kristian Menchaca

Next, the Court finds that the Zarqawi Terrorist Organization, supported by Syria, is responsible for the deaths of all three men in this case. Gartenstein-Ross T2-59 ("the Zarqawi organization is responsible for the deaths of all three men").

#### a. The Assassination of Laurence Michael Foley

Three months after Laurence Michael Foley sat down next to Virginia Foley at a graduate school program at San Francisco State University the two were married. Foley T1-23. They would go on to have three children and remain together for the next 34 years. Foley T1-24. Around 1990, Foley joined the United States Agency for International Development ("USAID") and was first assigned to a posting in Bolivia. Foley T1-26. Both Laurence and Virginia Foley had been Peace Corps volunteers earlier in their lives, and accordingly working for USAID

seemed to be a natural progression.  Foley T1-23, 26.  In 2000, Foley was reassigned to Jordan, where he and Virginia lived for the final two years of his life in a residential neighborhood in Amman.  Foley T1-27-30.  Foley was a man of habit who rose and left for work each morning at approximately the same time, and took approximately the same route to work every day.  Foley T1-32.

On the morning of October 28, 2002, Foley brought his wife a cup of coffee, gave her a kiss and walked out the door to his car.  Foley T1-33.  Virginia remained in their bedroom.  *Id.*  She soon "heard a shout and a pop, pop, pop, pop."  *Id.*  Virginia went to the window and looked out, and saw her husband lying on the ground surrounded by blood.  *Id.*  She also witnessed an individual running from the scene.  *Id.*  After calling the local Marines, Virginia went outside, determined that her husband was dead, and sat down next to him on their front yard.  Foley T1-34-35.

Laurence Foley's autopsy concluded that the cause of his death was homicide by seven gunshot wounds.  Mallak T1-137-40[5]; Ex. 18 (Foley Autopsy Report).  It also concluded that Foley was likely alive and conscious for several minutes after being shot, during which time he would have experienced a great deal of pain and terror as one of his punctured lungs collapsed.  Mallak T1-141-44.  The Court finds Virginia Foley's testimony credible and concludes that she too has suffered an immense amount of pain and suffering as a result of both the immediate experience of her husband's death, and, more generally, the loss of her long-time life partner.  Virginia received condolences after Laurence's death from, among others, Jordanian King

---

[5] Having considered the requirements set forth in Federal Rule of Evidence 702 for the admission of expert testimony, the Court qualified Dr. Craig Thomas Mallak as an expert in forensic pathology.  Mallak T1-130.  Dr. Mallak was the Armed Forces Medical Examiner during the period of time in which the Armed Forces Medical Examiner System conducted the autopsies of the victims in this case.  Mallak T1-105-30; Ex. 17 (Mallak Curriculum Vitae).

Abdullah and Queen Rania, as well as Colin Powell.  Foley T1-39-40.  Before Virginia left

Jordan, a procession of her Jordanian neighbors came to her house to introduce themselves, give

their condolences and leave burning candles and flowers in her front yard.  Foley T1-39.

Virginia wore a Palestinian jacket given to her by her husband for two weeks upon her return to

the United States, as well as during her testimony at the liability hearing, to convey to the

Jordanian people that she does not blame them for his death.  Foley T1-41-42.

The Zarqawi Terrorist Organization was responsible for Foley's murder.  Gartenstein-

Ross T2-63-69, 97-99; Ex. 29 (U.S. Dep't of State, *Rewards for Justice Program: Abu Mus'ab

Al-Zarqawi*) (stating that Zarqawi "direct[ed]" international terrorist operations including "the

murder of the USAID officer in Amman, Laurence Foley"); Ex. 40 (U.S. Dep't of the Treasury,

*Treasury Designates Six Al-Qaida Terrorists*) (stating that Zarqawi "provided financial aid and

other support to the terrorist who assassinated U.S. diplomat Laurence Foley").  A Zarqawi

associate smuggled Foley's killer into Syria where he met with Zarqawi to plan the attack.

Gartenstein-Ross T2-98.  Zarqawi provided the killer's cell with weapons and money, and both

of the two individuals who directly carried out Foley's assassination subsequently confessed

their connection to the Zarqawi Terrorist Organization.  Gartenstein-Ross T2-98-99; Ex. 40

(Excerpts from Remarks to the UN Security Council by Secretary of State Colin Powell), at 3

("[t]he captured assassin says his cell received money and weapons from Zarqawi for [Foley's]

murder").  Moreover, after Foley's murder, another individual involved, Shaker Absi, fled to

Syria.  Schenker T2-163.  The government of Jordan sentenced Absi to death in absentia, but

Syria refused to extradite him, claiming that he was in prison in Syria.  Schenker T2-163.  A

major newspaper in the Arab world reported that Absi was not in prison but was in fact at the

time running a terrorist training camp for Zarqawi on Syrian soil.  Schenker T2-164.

### b.  The Torture and Execution of Keith Mathew Maupin

After his first year of college studying aerospace engineering, Keith Mathew Maupin came home one day and told his mother Carolyn that he had joined the Army Reserve.  Maupin T1-50-51.  When his mother asked him why he had done that, Mathew replied "because I wanted to help my country, and I also would like to have help with my education."  *Id.*  Mathew's mother, a dispatcher for the local school district, told him that the family could have managed with his education, but he insisted: "I just didn't want to manage, I want to do it myself."  *Id.*  Matthew was eventually called up to active duty in Iraq.  *Id.*  Over Easter Weekend in 2004, a soldier arrived at Carolyn's house to inform her that Mathew had gone missing.  Maupin T1-52.

On April 9, 2004, Staff Sergeant Keith Mathew Maupin's convoy was ambushed west of Baghdad, Iraq.  Maupin T1-53, 55-56; Ex. 3 (Maupin AR 15-6 Investigative Materials).  Several of Maupin's fellow soldiers were killed during the attack.  *Id.*  Maupin himself was abducted.  *Id.*  Shortly after the ambush and Maupin's disappearance, Al Jazeera aired a video depicting Maupin sitting surrounded by several armed men.  Ex. 57.  In the video, Maupin made a brief statement and one of the masked gunmen offered to release Maupin in exchange for prisoners held captive by U.S. forces.  Maupin T1-59; Ex. 37 at 18; Ex. 57.  The Court finds that Maupin experienced mental pain and suffering—in that he feared his imminent death—during the filming of this video.

Mathew remained missing for approximately four years after the release of that video.  During this period Carolyn sent 90,000 pictures of her son to Iraq, as well as computers with screensavers depicting Mathew and pins with his face on them, to try to facilitate his return.  Maupin T1-62-64.

On March 20, 2008, roughly 500 grams of skeletal remains were found in Iraq that were later identified through forensic examination to belong to Maupin.  Mallak T1-152-56; Maupin T1-64-65; Ex. 19 (U.S. Dep't of Defense, *Examination and Positive Identification of SSG Keith Mathew Maupin, USA*).  An examination of Maupin's skeletal remains uncovered fractures to his jaw bone consistent with a forceful blow that occurred at the time of his death.  Mallak T1-156, 159-61; Ex. 20 (Maupin Autopsy Report).  That examination also indicated that Maupin's death occurred shortly after he was captured.  Mallak T1-161-62.  The Court is satisfied with the evidence presented by Plaintiffs that Maupin was executed by his captors while being held prisoner.  Mallak T1-157-58; Ex. 20 at 3 ("there is no evidence to support that he did not die at the hands of another" and "[g]iven the totality of the circumstances, the cause of death is best ruled homicide by unspecified means and the manner of death homicide."); Ex. 19 at 1 ("[a]ccording to military intelligence reports SSG. Maupin was later executed by his captors").  Maupin was awarded the Purple Heart and Prisoner of War Medal, among numerous other awards and decorations.  Maupin T1-61; Ex. 7 (U.S. Dep't of the Army, *Memorandum Regarding Awards and Decorations for SSG Maupin, Keith M.*).

The Court also finds Carolyn Maupin's testimony credible and concludes that she suffered a nearly immeasurable amount of pain and suffering both while waiting for years to find out what had happened to her son, and then again upon learning of his death.

The Zarqawi Terrorist Organization was responsible for Maupin's murder.  The United States Department of Defense attributed Maupin's abduction to the Zarqawi Terrorist Organization based on the grievances announced in Maupin's hostage video and the identification of one of the militants in that video as Haji Hammadi, a Zarqawi leader in the geographic area where Maupin was ambushed.  Gartenstein-Ross T2-69-82; Ex. 34 (November

20, 2008 Press Conference of Brigadier General David G. Perkins) ("Last week, on the 11th of November, coalition forces killed a terrorist positively identified as Haji Hammadi.  Hammadi has been affiliated with al-Qaida in Iraq since its inception and, in 2004, became the emir of Karmah and Abu Ghraid, west of Baghdad. . . . Hammadi's history of terrorist activity includes the abduction and murder of United States Army Staff Sergeant Matt Maupin in 2004.").  Based on the same, the United States also attributed Maupin's murder to Zarqawi because he was killed while being held prisoner.  The Court agrees with this assessment.

Finally, although there is no direct evidence of what occurred during Maupin's captivity beyond the video described above, based on evidence regarding the Zarqawi Terrorist Organization's treatment of other American prisoners, the Court also finds that Maupin was subjected to psychical torture prior to his death.  Plaintiffs have presented the expert testimony of Dr. Craig Mallak, who was the Armed Forces Medical Examiner during the time frame in which all three deaths at issue occurred.  Throughout this period, Dr. Mallak led the Armed Forces Medical Examiner System, which investigates all military deaths.  Mallak T1-113-15.  Dr. Mallak also investigated, for example, the deaths of Saddam Hussein's sons, potential war crimes in Bosnia, allegations of torture at Abu Ghraib prison, and the torture and beheading of reporter Daniel Pearl.  Mallak T1-118-19; Mallak T2-9.  In his role, Dr. Mallak has regularly been required to make official determinations as to whether deceased individuals were subjected to torture.  Mallak T2-8-13.  In this case, Dr. Mallak testified that he had "[n]o doubt that at some point there was physical torture,[ ] just based on my experience with all these cases." Mallak T2-13.

### c.   The Torture and Execution of Kristian Menchaca

Christina Menchaca and Kristian Menchaca first met while Kristian was at Boot Camp in Fort Benning, Georgia.  Menchaca T1-78.  Christina saw Kristian in the background of a webcam feed over which she was talking with her older brother, who was also stationed at Fort Benning.  Menchaca T1-78-79.  By the time Kristian was stationed at his next posting in Fort Campbell, Kentucky, the two were married.  Menchaca T1-80-81.  One week after their marriage, Kristian was deployed to Iraq.  Menchaca T1-82-84.  Roughly seven months after that, two soldiers came to Christina's house and informed her that Kristian's vehicle had been attacked and that he was missing.  Menchaca T1-88-89.

On June 16, 2006, while manning an observation position, Private First Class Kristian Menchaca and two other soldiers were attacked by small arms fire.  Menchaca T1-91-92; Ex. 11 (Menchaca AR 15-6 Investigative Materials).  By the time other members of their platoon arrived at their location, one of the three soldiers was dead and two, including Menchaca, were missing.  *Id.*  A search for the two missing soldiers began that day and concluded on June 19, 2006, when the two soldiers' remains were recovered.  *Id.*

Menchaca's autopsy indicated that the cause of his death was homicide by multiple blunt force injuries.  Mallak T2-22; Ex. 21 (Menchaca Autopsy Report).  Menchaca was not killed quickly.  His autopsy indicated that prior to his death, Menchaca had his tongue cut out and his right eye removed with a sharp instrument.  Mallak T2-26-29; Ex. 21 at 7 ("evidence supports traumatic loss of the right eye and portion of the tongue prior to death").  Also prior to his death, Menchaca suffered a blunt force injury to his face that tore a four inch-by-four inch hole in his cheek and shattered his jaw, was violently strangled, and kicked in the back with "enormous amounts of force."  Mallak T2-26-32.  Finally, Menchaca's body demonstrated injuries

consistent with being dragged over a very rough surface, doused with a flammable liquid and set

on fire.  Mallak T2-32, 36.  Menchaca was tortured and suffered an enormous amount of pain

and suffering before his death.  Mallak T2-38.  In fact, Dr. Mallak—who has investigated

numerous instances of torture—testified that what was done to Menchaca was "beyond torture."

Mallak T2-39-40.  He explained that:

> My opinion is that this is definitely torture, but it wasn't just -- it was total disregard
> for PFC Menchaca for his pain and his suffering, but it was also in a time of social
> media and placed for the whole world to see to terrorize an entire nation, bring
> incredible pain and suffering to his family, and go well beyond just total disregard
> for PFC Menchaca.

Mallak T2-39.  Menchaca was awarded the Purple Heart, Prisoner of War Medal, and numerous

other awards and decorations.  Menchaca T1-96; Ex. 16 (U.S. Dep't of the Army, *Memorandum*

*Regarding Awards and Decorations for PFC Menchaca, Kristian*).

The Zarqawi Terrorist Organization was responsible for Menchaca's murder.  On July 10,

2006, the MSC released a video depicting the mutilated corpses of Menchaca and his fellow

captured soldier.  Menchaca T1-99; Ex. 37 at 21-22.  In the video, one individual shakily holds a

camera up to the corpses while shifting them around, rolling them over and placing his foot on

Menchaca's head, while another holds up the other deceased soldier's decapitated head by the

hair.  Ex. 36.  The Court finds that the purpose of this video was to terrorize the American people

and weaken their resolve.  Christina Menchaca, however, specifically requested that this video be

played in Court during her testimony.  Menchaca T1-99.  When asked why, she explained that:

> I want you to know what we're dealing with. I want you to know the evil that they
> are, and I want the world to see how they killed him, and so it doesn't happen to
> anyone else. So no one has to go through the pain that I'm going through.

Menchaca T1-100.  The video displays an MSC logo and includes the voice of Osama bin

laden, linking it ideologically to AQI.  Gartenstein-Ross T2-82-91.  Menchaca's death was

also expressly claimed by the MSC in a separate written public statement.  Ex. 35 (Mujahedeen Shura Council of Iraq – Press Release 19-06-2006) ("Mujahideen Shura council of Iraq succeeded in kidnapping two American soldiers in a place near to al-Yosofiah area").  The Court accordingly finds that the Zarqawi Terrorist Organization tortured and murdered Kristian Menchaca.

The Court also finds Christina Menchaca's testimony credible and concludes that she too experienced, and continues to experience, an extreme degree of pain and suffering as a result of her husband's death and the public abuse of his body thereafter.  Christina is a 29 year old receptionist at a doctor's office in a small town in Texas.  Menchaca T1-75-76.  Two years after her husband's death, Christina's older brother, Conrad, also died in Iraq when his truck ran over an explosive device.  Menchaca T1-78.  Christina has a son from a relationship she had before she met Kristian, with whom Kristian bonded and lived with for a period of time.  Menchaca T1-79-80, 84, 86-88.

In sum, the Court finds that the Zarqawi Terrorist Organization is responsible for the deaths of all three individuals in this case.  The Court also finds that these terrorist actions would not have been possible without the material support provided to this organization by Syria.  Schenker T2-174 ("I've determined that the Assad regime was key, was essential, was critical, to Zarqawi, Mujahideen Shura Council, AQI, and directly or indirectly, was responsible for the terrorism that took the lives of the people that we're talking about"); Ex. 54 at 13 ("Without Syria, there would not have been a developed foreign fighter transit pipeline and an advanced funding network underwriting terrorist operations in Iraq and Jordan.").

## IV. CONCLUSIONS OF LAW

The Court's Conclusions of Law proceed in three parts.  First, the Court concludes that it has subject matter jurisdiction over Plaintiffs' claims pursuant to the FSIA's terrorism exception, and that Plaintiffs have satisfactorily established their claims for relief under the federal cause of action associated with that exception.  Second, the Court concludes that it has personal jurisdiction over each of the Defendants.  Finally, the Court refers the question of damages for further proceedings before a Special Master.

### A.  Subject Matter Jurisdiction and Liability

First, the Court concludes that it has subject matter jurisdiction over Plaintiffs' claims and that Plaintiffs have established their claims for relief under the private cause of action provided for in 28 U.S.C. § 1605A(c).  "The FSIA provides a basis for asserting jurisdiction over foreign nations in the United States."  *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002).  Pursuant to the FSIA, the Court has "original jurisdiction" over "nonjury civil action[s]" against foreign states "without regard to amount in controversy" if the claims seek "relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement."  28 U.S.C. § 1330(a).

Most of these elements are clearly satisfied in this case and require little discussion.  Plaintiffs do not demand a jury trial, assert civil causes of action, and seek in personam relief against Defendants.  Plaintiffs' claims are also brought against a "foreign state."  Plaintiffs bring claims against Syria, Syrian Military Intelligence, Syrian President Assad and Syrian General Shawkat.  Am. Compl. ¶¶ 15-21.  The Court has already determined in its January 21, 2016 Memorandum Opinion and Order that both Syria and Syrian Military Intelligence are considered

the "foreign state" itself.  ECF No. 51 at 4.  The Court further held that the foreign state of Syria

is also the real party in interest with respect to claims against President Assad and General

Shawkat, which are only brought against these individuals in their official capacities and for acts

performed within the scope of their offices.  *Id.* at 5.  In accordance with those earlier findings,

the Court views Plaintiffs' claims against all Defendants as claims against a "foreign state" for

the purposes of subject matter jurisdiction.

The question of Defendants' immunity is more involved.  "[A] foreign state is

presumptively immune from the jurisdiction of United States courts; unless a specified exception

applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."

*Saudi Arabia v. Nelson,* 507 U.S. 349, 355 (1993).  "[E]ven if the foreign state does not enter an

appearance to assert an immunity defense, a District Court still must determine that immunity is

unavailable under the [FSIA]."  *Verlinden B.V. v. Cent. Bank of Nigeria,* 461 U.S. 480, 493 n.20

(1983).  In this case, Plaintiffs claim that the FSIA's terrorism exception to foreign sovereign

immunity applies.  That exception states that:

> A foreign state shall not be immune from the jurisdiction of courts of the United
> States or of the States in any case not otherwise covered by this chapter in which
> money damages are sought against a foreign state for personal injury or death that
> was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage
> taking, or the provision of material support or resources for such an act if such act
> or provision of material support or resources is engaged in by an official, employee,
> or agent of such foreign state while acting within the scope of his or her office,
> employment, or agency.

28 U.S.C. § 1605A(a)(1).  Additionally, for this exception to apply, the foreign state defendant

must have been designated a state sponsor of terrorism at the time of the act and remain so-

designated when the claim was filed or in the preceding six months, § 1605A(a)(2)(A)(i); the

claimant or the victim in the case must have been a national of the United States, a member of

the Armed Forces or otherwise employed by the United States, § 1605A(a)(2)(A)(ii); and "in a

case in which the act occurred in the foreign state against which the claim has been brought, the

claimant [must] afford[ ] the foreign state a reasonable opportunity to arbitrate the claim in

accordance with the accepted international rules of arbitration," § 1605A(a)(2)(A)(iii).

Again, some of these elements are clearly satisfied and require little discussion.  Syria has

been designated as a state sponsor of terrorism at all relevant times, U.S. Dep't of State, *State*

*Sponsors of Terrorism*, https://www.state.gov/j/ct/list/c14151.htm (last visited April 13, 2017);

the deceased were nationals of the United States and/or service members, Foley T1-24; Maupin

T1-51; Menchaca T1-82; and the killings at issue did not take place in Syria and accordingly

Plaintiffs had no obligation to afford Syria an opportunity to arbitrate.

More analysis is required to determine whether the personal injury and deaths in this case

were caused by "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision

of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  Plaintiffs assert that

the murders of Foley, Maupin and Menchaca all constituted extrajudicial killings, and that

Maupin and Menchaca were additionally tortured.  Plaintiffs further assert that these acts were

caused by Syria's material support for the Zarqawi Terrorist Organization.  The Court concludes

that Plaintiffs have presented satisfactory evidence to support each of these assertions.

Under the FSIA, the terms "extrajudicial killing" and "torture" have the meanings given

to them in section 3 of the Torture Victim Protection Act of 1991 ("TVPA").  28 U.S.C. §

1605A(h)(7).  With respect to "extrajudicial killing," the TVPA states that:

> For the purposes of this Act, the term "extrajudicial killing" means a deliberated
> killing not authorized by a previous judgment pronounced by a regularly constituted
> court affording all the judicial guarantees which are recognized as indispensable by
> civilized peoples. Such term, however, does not include any such killing that, under
> international law, is lawfully carried out under the authority of a foreign nation.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73.  With respect

to "torture," the TVPA states that:

(1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and

(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
> (C) the threat of imminent death; or
> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Pub. L. No. 102-256, § 3(b), 106 Stat. 73.

First, Plaintiffs have presented evidence satisfactory to the Court that Laurence Michael Foley was the victim of an extrajudicial killing. The Court is satisfied by the evidence presented, as outlined in detail in the Court's Findings of Fact, that Foley was shot down and murdered on his front lawn by agents of the Zarqawi Terrorist Organization. Clearly this killing was not authorized by a prior judgment affording judicial guarantees or due process, nor is the deliberate killing of a diplomat lawful under any international law. It is a quintessentially extrajudicial killing. *See Han Kim*, 774 F.3d at 1050 ("[w]ith respect to extrajudicial killing, the Kims need demonstrate only that the DPRK killed the Reverend without due process.").

Second, the Court concludes that Kristian Menchaca was the victim of both an extrajudicial killing and torture. As outlined in detail above, Menchaca was beaten to death

while he was held prisoner by the Zarqawi Terrorist Organization.  Like the death of Foley, this killing clearly was not authorized by a prior judgment affording judicial guarantees or due process, nor is the deliberate killing of a prisoner lawful under any international law.  The horrific treatment of Kristian Menchaca before his death—including various blunt force injuries, strangulation, and the removal of his eyes and tongue—also easily satisfies the standard set for "torture" under the TVPA.  Mallak T2-39 ("My opinion is that this is definitely torture").  These deliberate acts inflicted great pain and suffering, both physical and mental, and were taken for the purpose of either punishing Menchaca for his presence in Iraq or terrorizing and intimidating others, including his family, who would later find his body or watch the publicly-released video in which his corpse is desecrated.

Third, although the Court was presented with less direct evidence regarding the fate of Keith Matthew Maupin than regarding the fates of the other individuals in this case, the Court is also satisfied that he was subjected to extrajudicial killing and torture.  As described in the Court's Findings of Fact, the Court concludes that the Zarqawi Terrorist Organization took Maupin prisoner, briefly held him captive at gunpoint in an attempt to trade him for prisoners held by U.S. forces, and then murdered him through unspecified means involving the application of "significant force" to his jaw.  The Court is satisfied by this evidence that Maupin was killed in a manner not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples, nor was his killing lawful under any international law.

The Court is also satisfied that Maupin was subjected to torture.  Dr. Craig Mallak, who performed and oversaw numerous autopsies of deceased soldiers during the relevant time period

and has regularly been required to determine whether deceased individuals were tortured prior to

death, testified that:

> We saw videos of [Maupin] alone, unarmed, surrounded by insurgents who were
> holding weapons, and they were verbally and mentally abusing him throughout that
> time. And I have no doubt that at some point there was physical torture, also just
> based on my experience with all these cases. Unfortunately, we don't have all the
> bones, but if I had to say whether he was tortured or not, I would say, yes, that he
> was most likely tortured. I mean, definitely emotionally, but most likely physically,
> too.

Mallak T-2-13. The Court agrees with Dr. Mallak's assessment. At a minimum, Maupin was

tortured in that he was purposefully subjected to mental pain and suffering—in particular the fear

of imminent death—during the filming of the publicly-released video in which he sat in front of

a line of armed, masked captors. Moreover, even absent more direct evidence of how Maupin

was killed or the sorts of physical and mental torture he was subjected to, the Court deems it

appropriate under the circumstances—given the evidence the Court has been presented with

regarding the Zarqawi Terrorist Organization's practices generally—to infer that Maupin was

physically tortured as well. In so concluding, the Court is guided by the Court of Appeals'

opinion in *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014).

In *Han Kim*, the district court had denied default judgment in an FSIA suit brought under

the terrorism exception because plaintiffs "had failed to produce 'first-hand evidence' of what

happened" to a Reverend who was allegedly tortured and killed by the North Korean

government. 774 F.3d at 1045. The Court of Appeals reversed. It held that "[a]dmissible record

evidence demonstrates that North Korea abducted Reverend Kim, that it invariably tortures and

kills political prisoners, and that through terror and intimidation it prevents any information

about those crimes from escaping to the outside world." *Id.* In such a situation, the Court of

Appeals found that "[r]equiring a plaintiff to produce direct, firsthand evidence of the victim's

torture and murder would [ ] thwart the purpose of the terrorism exception: holding state sponsors of terrorism accountable for torture and extrajudicial killing." *Id.* Accordingly, the Court of Appeals held that "where 'it has not been directly shown that [the victim] was physically tortured, his kidnapping and imprisonment by governmental authorities, who have been shown to subject detainees to indignities, cruelty and torture, [may] constitute' proof of that treatment." *Id.* at 1049 (quoting *Velásquez–Rodriguez v. Honduras,* Merits, Judgment, Inter–Am. Ct. H.R. (ser.C) No. 4, ¶ 187 (July 29, 1988)).

The Court is presented with a similar situation here. The evidence in this case shows that the Zarqawi Terrorist Organization regularly tortured and killed its prisoners. Mallak T2-13 (with respect to Mathew Maupin, concluding that "I have no doubt that at some point there was physical torture . . . just based on my experience with all these cases."); Mallak T2-26-32 (explaining that Kristian Menchaca, also abducted by the Zarqawi Terrorist Organization during this time period, was tortured by his captors, including having his eye and tongue removed); Gartenstein-Ross T2-62 (Zarqawi was known for "absolutely extreme acts of brutality and torture"). The evidence also shows that this organization captured Keith Matthew Maupin and held him prisoner before killing him. We cannot know with certainty precisely what occurred between Maupin's capture and his death, in part because Defendants prevented discovery into precisely what befell Maupin by refusing to participate in this case. Nonetheless, based on the inferences the Court can reasonably draw from the circumstances and other known conduct of the Zarqawi Terrorist Organization, the Court concludes that Maupin was physically tortured and then killed.[6]

---

[6] "If [Syria] is unhappy with that outcome and has evidence" to rebut it, "like any defendant in default," it may ask the Court to vacate this judgment under Federal Rule of Civil Procedure 60(b). *Han Kim*, 774 F.3d at 1051.

Finally, the Court is satisfied that Syria, through its officials acting within the scope of their official duties, provided material support or resources to the Zarqawi Terrorist Organization, and that the torture and deaths at issue were "caused by" this support.  The FSIA defines "material support or resources" broadly, as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).  As outlined in the Court's Findings of Fact, Syria provided material support to the Zarqawi Terrorist Organization by, among other things, allowing that organization to operate within Syria with impunity, giving its members safe haven, and allowing its members and supporters to pass freely through its borders and into other countries.  Moreover, individuals associated with the Syrian regime played more direct roles in providing resources to, and even helping to create, the Zarqawi Terrorist Organization.

With respect to the requirement that the torture and killings in this case be "caused by" this material support, "[t]he FSIA's causation requirement is satisfied by a showing of proximate cause."  *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 54 (D.D.C. 2008) (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya,* 376 F.3d 1123, 1128-29 (D.C. Cir. 2004)).  "Proximate causation may be established by a showing of a 'reasonable connection' between the material support provided and the ultimate act of terrorism."  *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 151 (D.D.C. 2011).  There is far more than a "reasonable connection" between the material support described above and the acts of terrorism in this case.  Plaintiffs presented expert testimony that Syria's support for the Zarqawi Terrorist Organization was given for the purpose of allowing this group to commit precisely the types of terrorist attacks

at issue, so as to cause unrest in Syria's neighboring countries which Syria viewed as being to its political advantage.  Schenker T2-116-17 ("the Government of Syria facilitated the movement of insurgents, jihadees, al-Qaeda, Zarqawi, AQI, and MSC insurgents through Syria into Iraq [and Jordan] with the express purpose of killing Americans."); Schenker T2-118 ("the former Vice-President of Syria, who I interviewed in France in 2008 [ ] told me that prior to the U.S. invasion of Iraq, that the Government of Syria struck an agreement with the Government of Iran to flood Iraq with insurgents to kill Americans.").  Additionally, the Court heard expert testimony that, without this support, the terrorist acts at issue in this case would likely not have been possible. Schenker T2-174 ("I've determined that the Assad regime was key, was essential, was critical, to Zarqawi, Mujahideen Shura Council, AQI, and directly or indirectly, was responsible for the terrorism that took the lives of the people that we're talking about"); Ex. 54 at 13 ("Without Syria, there would not have been a developed foreign fighter transit pipeline and an advanced funding network underwriting terrorist operations in Iraq and Jordan.").  The Court is accordingly satisfied that the relationship between the material support Syria provided the Zarqawi Terrorist Organization and that organization's torture and killing of Foley, Maupin and Menhaca satisfies the FSIA terrorism exception's causation requirement.  The Court notes that a number of other courts have reached similar conclusions as to the relationship between Syria and the Zarqawi Terrorist Organization.  *See Thuneibat*, 167 F. Supp. 3d at 36 (finding that Zarqawi terrorist attack was sufficiently caused by material support from Syria where Syria, among other things, provided a "transit pipeline" for foreign fighters and allowed Zarqawi supporters to operate in Syria); *Gates*, 580 F. Supp. 2d at 68 ("Syria provided substantial assistance to Zarqawi and al-Qaeda in Iraq and . . . this led to the deaths by beheading of Jack Armstrong and Jack Hensley.").

Having determined that Syria provided material support to the Zarqawi Terrorist Organization, and that this support caused the acts of extrajudicial killing and torture at issue in this case, the Court concludes that it has subject matter jurisdiction over Plaintiffs' claims under the FSIA's terrorism exception.  Moreover, the Court also concludes that Plaintiffs have proven their entitlement to relief under § 1605A(c).  Section 1605A(c) states that state sponsors of terrorism shall be liable "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages," in suits brought by four categories of individuals, including nationals of the United States.  § 1605A(c).  In other words, this section creates a cause of action for the same conduct that gives rise to jurisdiction under the terrorism exception.  This cause of action is available to Plaintiffs because they are nationals of the United States and, given the overlap between the elements of this cause of action and the terrorism exception to foreign sovereign immunity, Defendants' liability has already been established by the conclusions of law set forth above.

## B.  Personal Jurisdiction

The Court also has personal jurisdiction over each Defendant.  "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of this title."  28 U.S.C. § 1330(b).  The Court has already concluded that is has subject matter jurisdiction over the claims in this case.  Moreover, service has been made under section 1608.  On January 21, 2016 the Court issued a Memorandum Opinion and Order in which it found that each Defendant must be treated as a "foreign state" amenable to process under § 1608, and that Plaintiffs had accomplished service under § 1608(a)(3).  ECF No. 51.  The Court incorporates the analysis in

29

that Opinion here and accordingly concludes that the Court has personal jurisdiction over

Defendants.  There are no due process concerns raised by the Court's exercise of personal

jurisdiction over the Defendants because "foreign states are not 'persons' protected by the Fifth

Amendment."  *Price*, 294 F.3d at 96.

## C.  Damages

Lastly, Plaintiffs have moved this Court for an order authorizing the appointment of a

Special Master to administer the damages portion of these proceedings.  *See* Mot. for the Court's

Appointment of a Special Master to Administer Damages Proceedings, ECF No. 70.  Having

found in favor of Plaintiffs with respect to jurisdiction and liability, the Court finds it appropriate

to now GRANT Plaintiffs' Motion and appoint Mr. Alan L. Balaran as a Special Master to

conduct damages proceedings.  28 U.S.C. § 1605A(e) ("The courts of the United States may

appoint special masters to hear damage claims brought under this section.").  The Court will

enter a separate Order and Administrative Plan for these proceedings.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS default judgment against all Defendants in

this case and will refer this matter to a Special Master to administer damages proceedings.  An

appropriate Order accompanies this Memorandum Opinion.

           /s/                             
COLLEEN KOLLAR-KOTELLY
United States District Judge