**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **VIRGINIA L. FOLEY, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 11-00699 (CKK)** |
| ) | |
| **SYRIAN ARAB REPUBLIC, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## REPORT OF SPECIAL MASTER
## RE: LAURENCE FOLEY, SR.

This action is brought pursuant to 28 U.S.C. § 1605A. The estate and family members of

Laurence Michael Foley, Sr. seek damages for his murder. Pursuant to the Administrative Plan

Governing Special Masters and the provisions of Federal Rule of Civil Procedure 53, the Special

Master has reviewed testimonial and documentary evidence to assist in determining any damages

to which the claimants may be entitled.

## BACKGROUND AND PROCEDURAL HISTORY

On the morning of October 28, 2002, Laurence Foley, Sr., an employee of the United

States Agency for International Development ("USAID"), was gunned down by members of the

Zarqawi Terrorist Organization ("ZTO"), while standing outside of his family's home in

Amman, Jordan.

On April 8, 2011, Plaintiffs filed a complaint against the Syrian Arab Republic ("Syria"),

Syrian Military Intelligence, Syrian President Bashar al-Assad and Syrian General Asif Shawkat,

alleging they provided material support to the ZTO and thus were responsible for the murders of

Pfc. Menchaca and SSgt. Keith Maupin, in Iraq, and Laurence Foley, Sr., in Jordan. ECF No. 1.

Plaintiffs' Amended Complaint, and the one considered here, was filed on September 13, 2011. ECF No. 11.

Between June 2011 and January 2015, plaintiffs' attempts to serve the defendants were impeded by the ongoing Syrian civil war and the deterioration of diplomatic relations between Syria and the United States. On February 2, 2015, plaintiffs filed a Status Report, informing the Court they had effectively served all defendants on January 22. ECF No. 51. On April 23, 2015, plaintiffs moved for entry of default pursuant to Fed. R. Civ. P. 55(a), following defendants' failure to answer in a timely manner. ECF No. 48. Over Syria's objections, ECF No. 49, the Court granted plaintiffs' motion and ordered the Clerk of the Court to enter a default against the defendants. ECF No. 51. The Clerk did so on January 22, 2016, ECF No. 52, and, on November 16 and 17, 2016, the Court convened a hearing to determine liability with respect to each defendant.

Citing photographic, documentary, fact and expert testimony, and taking judicial notice of the findings set out in other FSIA cases brought against Syria, the Court found defendants liable for providing material support to the ZTO and thus accountable for the deaths of Pfc. Menchaca, SSgt. Maupin and Laurence Foley, Sr. (Memorandum Opinion dated April 13, 2017) ECF No. 76. The Court simultaneously issued an Order appointing the undersigned as Special Master to consider evidence and recommend "findings of fact and conclusions of law as to each Plaintiff's entitlement to damages, including the availability of causes of action for each Plaintiff." ECF No. 77 at 1-2.

In accordance with the Order, the Special Master presents his findings and recommendations based on a review of the transcripts and exhibits from the November 16 and 17, 2016 liability hearings; the deposition transcripts of Virginia Foley (and errata), Megan

Foley, Jeremie Foley Robenolt, Laurence Foley, Jr. and Craig Mallak, MD and exhibits thereto; Plaintiffs' May 26, 2017 Motion and Memorandum for Damage Awards with Points and Authorities in Support; Plaintiffs' July 20, 2017 Memorandum Regarding Inflation; and a copy of Plaintiffs' Brief in Response to Court Order Dated July 11, 2017 (*Burks v. Islamic Republic of Iran*, CA No. 16-cv-1102 (CRC)) (submitted on September 5, 2017); and Declaration of Virginia Foley (October 4, 2017).

**<u>Testimony of Virginia Foley – Laurence Foley, Sr.'s Wife</u>**

Virginia Foley testified during the November 16, 2016 liability hearing ("VF-LH"). She also supplied testimony via a deposition taken on April 21, 2017 ("VF-DT"). Letters of Administration issued by the Superior Court of California, Alameda County, issued on March 29, 2011, confirmed that Ms. Foley is the lawful administrator of her husband Laurence's estate.

Virginia Foley, born on May 1, 1942, is an American citizen currently residing in California. VF-LH at 21. By her own account, Virginia was raised in a "very healthy, happy home" and enjoyed a childhood she describes as "remarkable." VF-DT at 5. While growing up, her family moved frequently – predominately throughout the Mid-West. *Id.* She attended Hanover College in Indiana and upon graduating, joined the Peace Corps which assigned her to the Philippines. *Id.*

Following her stint overseas, Virginia returned to the United States where she studied counseling at San Francisco State University. VF-DT at 5-6. On the first day of class, she met Laurence Foley ("Larry"). VF-DT at 6. They were "married three months later." *Id.* Virginia recalls falling in love with Larry within "probably eight hours" of that first meeting. *Id.* Although he was different than the men she dated before – "he was kind of short and stocky, Irish, urban" – he "intrigued" her. *Id.* at 7. Both "became specialists in Myers-Briggs type

inventory," and shared a love for "travel, service" and "humor, fun." *Id.* The couple had three children – Megan, Jeremie Beth, and Laurence Michael Foley, Jr. ("Mike") – all born in Oakland, California. *Id.* at 10.

Virginia describes Larry as one of two children born in Boston and raised in a "typical Boston Irish Catholic" home. VF-DT at 8. His family lived in Roxbury, Mass., "a famous ghetto of Boston," where Larry "belonged to a street gang" he described as "unaggressive." *Id.* Virginia never met Larry's parents, who died before the couple met. *Id.* at 9.

After they married, Larry and Virginia lived in San Francisco and then in El Cerrito, California. VF-DT at 10-11. Both were employed as probation officers until the State of California "limited the funding of rehabilitation programs," at which point Larry suggested they return to an "international lifestyle," VF-LH at 26, and "wrote to the Peace Corps and said we were available." VF-DT at 11. Virginia and Larry spent the next five years stationed in the Philippines, following which they returned to California for three years before deciding they "were all ready to travel again." *Id.* Larry joined USAID in 1978, VF-LH at 26, and was assigned to Bolivia, Peru, Zimbabwe and Jordan. *Id.*

Virginia describes Larry as a "great" father who was acknowledged by their friends as a "truly remarkable" dad. VF-DT at 12. Virginia recalls how Larry addressed their children "as if they were adults," and how much "respect was a part of all of our relationships with each other." *Id.* Virginia testified that Larry and their daughter Megan "are the same types" – both "critical thinkers" who were "really, really really close." *Id.* at 14. She describes their son Mike as "a more even-keeled individual" who also had a "great relationship" with Larry." *Id.* Their daughter Jeremie was the "one kid that was hard to restrain" and although a "constant frustration to both of us," was also "a joy." *Id.* at 15.

Virginia remembers the family enjoying holidays overseas, melding American traditions with local customs. VF-DT at 16. She testified that she and Larry had a "really good marriage," and although they were "different in every category," they were also "complimentary" to one another. *Id*. at 18. As for Larry's relationship with friends and co-workers, Virginia recalls how "[p]eople loved Larry. I think his co-workers loved him too." *Id*. at 13.

Larry was an "executive officer" at USAID, a position "parallel to an administrative officer in the diplomatic side." VF-LH at 27. His job "was to hold the program together." *Id*. Larry was transferred to Jordan in 2000, where he and Virginia lived in Amman. *Id*. at 27-28. Their children did not move to Jordan with them as they "were all well launched on their professional adult lives." *Id*. at 30.

On the morning of October 28, 2002, Larry awoke early, brought Virginia a cup of coffee in bed, as was his habit, and left the house to get into his car. VF-DT at 20; VF-LH at 33. From the bedroom, Virginia heard a "shout and a pop, pop, pop, pop," VF-LH at 33, which she thought was "weird," but not "particularly alarm[ing]." VF-DT at 20. She recalls how she "went to the window in the bedroom and looked out and Larry was lying on the ground and some person was running around the corner of the house in an Arab kebaya [sic]." *Id*. At that moment, "all hell broke loose, right in my body and soul." *Id*. at 21.

Virginia immediately called the local Marine base "which is where the help was." VF-LH at 34. She was so rattled that the Marine with whom she spoke told her he could not help her unless she spoke "distinctly." *Id*. Virginia finally "got the message across." *Id*. She recalls thinking, "if it was me, Larry would not be – he would be out there. He wouldn't be on the phone calling the Marines." VF-DT at 21. Virginia "raced out with the phone and the phone list and he was dead." *Id*. Upon realizing Larry had been murdered "and there was absolutely no

possibility of any other condition," Virginia "called a friend of ours who lived a couple blocks away and said Larry has been shot." *Id.* Her friend rushed to the Foley residence where she, "came up, and I held onto Larry, and she held onto me and we waited." *Id.* at 22. Virginia recalls how Larry's eyes remained open the entire time. VF-LH at 35.

Virginia was both "shocked" and "stunned." VF-DT at 23. She recalls wishing that it was she would have been the shooter's target because she "knew Larry would know what to do. I didn't know what in the hell to do. Larry could adjust quickly. I couldn't adjust quickly." *Id.* Larry's boss as well as another colleague arrived at the scene followed by "American security and then Jordanian security." VF-LH at 35. She remembers the Jordanian officials "did some removal of bullets" and were about to take his body, telling her, "you don't want to see him, he's not presentable." *Id.* at 36. Virginia insisted they not remove Larry's body from the driveway until she had the opportunity to say good-bye. VF-DT at 24. Virginia explained: "I mean, I just had a cup of coffee and kissed him, you know, he couldn't just disappear like that. Granted I could accept the fact that he was gone, but I needed to connect with him." *Id.* After saying her good-bye to Larry, Virginia returned to the house. She remembers feeling the need to "call the kids" and began writing e-mails "to friends all over the world," informing them of Larry's death. *Id.* at 25. Virginia observed how, in those circumstances, "you don't know what to do with your body. You don't know what to do with your mind. Physically or emotionally, what do you do?" *Id.* at 26.

It "was about two days" before Virginia flew to the United States, accompanying Larry's body. VF-LH at 36. By that time, the murder gained considerable notoriety from the media. *Id.* at 26. "It was an international incident. There were press everywhere and there were people everywhere." *Id.* She recalls "[s]omebody – Jordanian security sent pictures of all these Arab

men who looked very threatening. So I looked at hundreds of slides," trying to identify the person she saw fleeing from the scene. *Id.* She remembers former American Ambassador to Jordan, William Burns, who was serving as "some sort of official spokesperson for the president in the Middle East," visiting her at home, and how his presence made her feel "so relieved and so safe." *Id.* at 36-37. Even then-U.S. Secretary of State Colin Powell "declared Larry a fallen hero." VF-DT at 27.

On the day Virginia was set to depart from Jordan, a ceremony was held at the Amman airport with the royal family in attendance. VF-LH at 38. Virginia specifically remembers King Abdullah and Queen Rania coming "to offer their condolences." VF-DT at 27. Accompanied by Ambassador Burns as well as her close friend, Debbie, Virginia returned home to the United States aboard a military transport plane. *Id.* The plane landed at Andrews Airforce base where "another ceremony took place." VF-LH at 38. This time, "[t]he kids were there and Larry's colleagues." *Id.* Approximately one month later, Virginia's friends and family held a "celebration of life" service in Larry's honor. VF-DT at 28-29. Virginia recalls how "everybody I had ever known and loved were there and the testimony of my kids about their dad, you know, was truly remarkable." *Id.*

At the time Virginia returned to the United States, her daughter, Megan, was living in Silver Spring, Maryland. VF-DT at 34. Megan lost her husband to illness eleven months prior and had recently moved from Minnesota to Maryland. *Id.* Virginia's son Mike was living with Megan at the time, helping care for her two children, *id.*, and Jeremie, Virginia's youngest daughter, was living in California. *Id.* at 35. Virginia initially moved in with Megan until she and Mike were able to rent a house. *Id.* at 34.

Virginia found returning to the United States difficult after a hiatus of "close to 20 years." VF-LH at 31. "I didn't know how to pump gas. I didn't know where to park . . . I didn't know what the rules were." *Id*. at 31-32. Not having been involved in the family's finances, Virginia's children had to help her "pay bills" and "manage papers." *Id*. at 33. Asked how her children were coping, Virginia testified: "I don't really know and I'm kind of regretful about that because I was so busy trying to survive that – and they were all doing the same. I think we all respected each other." *Id*.

Four years ago, Virginia found a job doing "short-term contract work for the State Department and USAID." VF-DT at 35. Upon turning 70, she quit, telling herself, "hey, I'm not going to do this. I'm going to buy a convertible and I'm going to move to California" where her daughter Jeremie, Jeremie's husband and two children lived. *Id*.

Virginia never sought professional treatment to ease her anxiety or to assist her in coping with Larry's death. VF-DT at 35. She explains that, as a "professional counselor" whose friends were almost all counselors, she was "surrounded by mental health experts" who were able to help her adjust. *Id*. She remembers being particularly comforted by Colin Powell's intervention on her behalf when she was embroiled in a dispute over her entitlement to Workers' Compensation benefits. *Id*. at 37, 38.

Virginia describes her "biggest burden" is "not having Larry here." VF-DT at 41. And while "[l]ife is just not as much fun, *id*., Virginia testified: "I'm grateful I had him and I miss him. I love him." *Id*. at 47.

Jordanian authorities launched a formal criminal investigation into Larry's death. VF-DT at 42. Virginia recalls how the United States Ambassador to Jordan kept her apprised of its progress. *Id*. at 43. At one point, she learned that several of the perpetrators had been caught

and were sentenced to be executed.  Virginia and Megan, opposed to capital punishment, "sent a message to King Abdullah and said that we did not want them to be executed in our name."  *Id.* Virginia knew, however, that their plea "wouldn't stop the execution because it was an international incident and because that's how Jordan handled things."  *Id.*

**Testimony of Megan Leigh Foley – Laurence Foley, Sr.'s Daughter**

Megan Foley was deposed on April 21, 2017 ("MF-DT").

Megan was born in Oakland, California, where she lived with her parents until she was eight years old, when the family moved to the Philippines for five years.  MF-DT at 4.  She recalls that a year prior to her graduation from high school, her parents moved to Washington, D.C., "and then after that, they moved quite a lot."  *Id.* at 4-5.  Megan spent her senior year of high school in California.  *Id.* at 12.  After graduation she traveled overseas to visit her parents. *Id.*  Megan attended college in Massachusetts and worked for two summers in Bolivia while her parents were stationed there.  *Id.* at 13.  Megan testified that her family was close – "we all liked each other.  You know, when you're raised overseas, you have to rely on each other a lot, which we did."  *Id.* at 14.

Megan recalls how much her father's co-workers "really liked him.  He was fun.  He had his head on straight."  MF-DT at 10.  She describes her parents as having had "this amazing love story relationship," and although "they had very different personalities . . . they had common, like, goals for living."  *Id.* at 10-11. Megan feels "closer to my father in personality than [to her] mom."  *Id.* at 11.

Megan learned of her father's murder when her mother called her in the middle of the night, and said "your father has been shot and killed and then she told me a story about how they had just been talking about how happy they – or my father had been talking about how happy he

was that they had been able to live this life together." MF-DT at 20. The news was "shocking" and all the more difficult to bear as she was still "in a grief process from my husband" who only recently had passed away. *Id.* at 21. Her mother told her that Mike was on his way from D.C. to see her. *Id.*

Megan describes the days following her father's death as "chaos," with many people coming and going. MF-DT at 22. At one point, agents from the FBI arrived at Megan's home to conduct interviews as part of a criminal investigation into her father's death. *Id.* Megan was pleased the government was taking an interest. *Id.* at 23. In her mind, it was "very much felt like the government, like, various arms of the government wanted to make this right for us." *Id.* The press was also "very involved." *Id.* at 24.

Two months prior to her father's death, Megan began to attend services at a Unitarian Church in Maryland. MF-DT at 27. After learning that her father was killed, Megan contacted the minister and arranged to have services for her father at that church because her parents "hadn't live in the states for 20 years and they had nowhere to go. And they weren't religious. They didn't have a church community or even a town to go to." *Id.* She recalls that the church administrators "were amazing about" hosting the service and how people from "around the world" attended the celebration of Megan's father's life. *Id.* at 28.

Megan testified: "I know he loved me and I loved him. I am quite physically continuing on his legacy, like, in my personality and in the way I look and in my children." *Id.* at 32.

Megan admits being "in therapy many times since that year," for "loss and trauma that he's a part of" and she because "need[s] to be in various kinds of therapy in order to become a minister." *Id.* at 33.

**Testimony of Jeremie Foley Robenolt – Laurence Foley, Sr.'s Daughter**

Jeremie Foley Robenolt was deposed on April 20, 2017 (JR-DT").

Jeremie was born in California, JR-DT, at 4, 6, and was five years old when the family moved to the Philippines with the Peace Corps. *Id.* at 7. Jeremie remembers that period in her life as "so adventurous," and how each of her siblings accompanied their father on his field trips. *Id.* On one such trip, Jeremie and her father were on an island "in a Nipa hut" when "a typhoon hit" and struck their area. *Id.* at 8. The typhoon passed the next day and Jeremie recalls how she and her father had to wade through water that was up to her chests to get to the plane. *Id.* She remembers feeling that this was "just part of the adventure." *Id.*

Upon completion of Laurence's tour in the Philippines, the Foleys returned to Oakland. Jeremie says it was "a culture shock once again. I think it was at that time that I was starting to struggle a little bit with all the change." JR-DT at 9. Jeremie believes her father was working for a rehabilitation center, but "hated it." *Id.* When he learned that USAID was hiring, he applied and was hired. *Id.* The family then moved to Bethesda, Maryland for her father's language and other USAID training while Jeremie attended her first two years in high school. *Id.* at 10.

At the completion of her father's training, the family was sent to Bolivia, JR-DT at 10. There, Jeremie repeated her sophomore year and completed her junior year of high school. *Id.* She recounts how, in both the Philippines and in Bolivia, her father's colleagues "were very attracted to him because he had a great sense of humor and he was just really sweet." *Id.* at 11-12.

After two years in Bolivia, USAID transferred the family to Peru. JR-DT at 14. Jeremie was upset about the move, as she was enjoying her social life in Bolivia. *Id.* She changed her mind following an incident that took place while her parents were on a scouting trip to Peru. *Id.*

Jeremie was "out having fun and [her brother] was home alone," when he suffered an "epiglottis event where his throat swelled closed." *Id*. By the time she returned home, her brother "was blue and we had to rush him to the hospital, where he had a trach put in." *Id*. at 15. After this, Jeremie realized "there's nothing more important than being with my family. I don't care if it's my last year of high school. I'm going to move with them to Peru and not stay behind." *Id*.

Jeremie recalls life in Peru being very different than Bolivia and much more dangerous. At the time, Shining Path, a Maoist revolutionary group, was terrorizing the region by launching a violent campaign "against westernization." JR-DT at 17. According to Jeremie, the group "would bomb anything that looked western." Jeremie says her father reassured her that she would be safe and taught her that "fear can eat you up and it can be more painful than the actual event that you're afraid of and so to be mindful of that, that fear can be just as damaging as what you're afraid of, and that was very useful to me." *Id*. at 19-20.

Jeremie remembers her father as "incredibly warm and cuddly and silly and playful with us always." JR-DT at 21. She recalls being "in trouble all the time," *id*., and acting in a way that her mother charitably characterized as "colorful and imaginative." *Id*. at 22. She believes her dad "understood that this was my way of figuring things out, that I – I had to do it differently." *Id*. He told her, "you're going to find your passion one day and that's going to drive you and then you will be able to use your smartness." *Id*.

Jeremie describes her parents' relationship as "kind of unreal." JR-DT at 26. She believes it stemmed from "the joy of travel and the adventures together and, you know, they – they had so much respect for each other." *Id*. They "complemented each other in other ways, too. You know, my mom is an introvert and my father was an extreme extrovert, and so I think that that worked also for them." *Id*. at 27.

Jeremie considers her entire family to be "close" and describes she and Mike as "particularly close." JR-DT at 28. Jeremie attributes her particular fondness of Mike to the difficulties they both faced upon their return to the States. She remembers the "huge culture shock for me being an American without really being American." *Id*. at 30. She recalls how "people would look at me like I'm an idiot because I just didn't get it yet. And I looked American and I spoke like an American so that didn't help." *Id.* Jeremie returned to Peru on several occasions to visit her parents. She similarly visited her parents when they moved to Zimbabwe, spending "three summers and Christmases" together. *Id*. at 33. Jeremie was unable, however, to visit her parents when they were stationed in Jordan. *Id*. at 35.

Jeremie learned her father had been killed while she was travelling cross country with her current husband. JR-DT at 35. They were staying with a friend in California, when Jeremie's mother called and said: "I need you to sit down or go someplace where you can listen to me because I need to tell you something that's going to be very hard to hear." *Id*. at 36. Very calmly, her mother told her, "there's been an incident and your father was shot and he is no longer alive." *Id.* Jeremie started crying and "just fell apart. It was really hard. It was a really hard time." *Id*. "Equally as hard" was "turning on the news and seeing my dad's blood on the driveway. To have it be that public, you know, far away but yet about my dad, it was really hard." *Id*. at 37. The story of her dad's death "was all over the news." Jeremie recalls speaking that evening with her sister, Megan, who was "calm and sad." *Id*. at 38. She cannot recall whether she spoke with her brother at the time. *Id*.

Jeremie traveled to Washington, D.C. to meet with her brother and sister before their mother arrived with their father's body. JR-DT at 39. She recalls being annoyed at the political protocol in place when her mother's flight landed. *Id*. at 39-40. The service for their father was

held at a Unitarian church Megan had identified.  *Id*. at 40.  "The space felt good and it was big.  And I remember there were probably 300 people that came from all over the world to be there."  *Id*.

In the months following her father's death, Jeremie "wasn't doing very well."  She was "drinking a lot," "crying a lot," and "having these horrible migraines."  JR-DT at 42.  Jeremie has been in therapy for the last "year and a half," *id*. at 43, which she has found "very helpful."  *Id*.  She sought therapy because of her father's death and marital issues.  *Id*. at 44.  She is currently taking medication for anxiety and depression.  *Id*.  She often thinks about her father and, at times, finds "it is very, very painful and it comes up and it surprises me."  *Id*. at 47.  Jeremie finds her father's absence particularly difficult at certain moments, like when she received a promotion at work.  She wishes he could have been there.  *Id*.  She believes she and her siblings were deeply influenced by their parents, *id*. at 48, and is sad "her children will never get to know her father."  *Id*. at 49.

Jeremie is unaware of the particulars of the investigation into her father's death although she is aware of her mother and sister's opinions concerning the Jordanian prosecution of the perpetrators – opinions she does "not necessarily" share."  JR-DT at 46.

In support of her claim, Jeremie submitted a letter dated April 21, 2017 signed by Therese Smith, "a licensed Marriage and Family Therapist," who verified that Jeremie began "counseling sessions" with her on February 4, 2016, with the primary focus to work on "strengthening [her] marriage."  The therapist notes Jeremie reports "grief and loss due to the complex loss of her father in 2002" and states she was originally diagnosed with "adjustment disorder with mixed anxiety and depressed mood," which was later updated as "general anxiety disorder."

**Testimony of Laurence Foley, Jr. ("Mike") -Laurence Foley, Sr.'s Son**

Mike Foley was deposed on April 20, 2017. Mike was born "in 1977 in Oakland, California," Laurence Michael Foley, Jr. Transcript ("LMF-DT")), at 6, and has two sisters – Megan and Jeremie who are six and three years older, respectively. LMF-DT at 16. Mike confirms that he, and his sisters are United States citizens. *Id*. at 8.

Mike recalls his father working as a probation officer in California when his parents "decided they both wanted to go back overseas and so [his father] got a job with the Peace Corps." MF-DT. at 7. When Mike was "two and a-half in 1980," the family "moved to the Philippines and we lived in Manila for five years." *Id*. at 8. Mike has fond memories of the family traveling throughout the Philippines. *Id*. at 10.

Mike describes his parents as "really close," and "very good parents" with "complementary skill sets." LMF-DT at 12. The entire family, he testified, was "really close," which he attributes as a "kind of the side effect of the lifestyle, the transitions that we made." *Id*. Mike believes the "shared experience" of living overseas brought the family together as they shared a "different perspective than that of the people we were interacting with." *Id*. at 18. Mike describes his father as "a very attentive dad," i*d*. at 19, who "did a good job of – of maintaining communication with each of us individually." *Id*. at 20.

In 1988, Mike's father began working at USAID and, in 1990, the family moved to Bolivia for two years and then to Peru, where they lived until 1996. LMF-DT at 16. From Peru, his parents spent four years in Zimbabwe, after which they moved to Jordan. *Id*. Mike, who was in college at the time, "spent a lot of time in Zimbabwe" with his parents – summers and Christmas. *Id*. at 26. He did not visit them in Jordan because Megan had two children at the

time and was living in Minnesota which make it more convenient for the family to meet there. *Id.*

In October 2002, Mike was living in D.C., house-sitting for family friends, when he was awakened by a telephone call from his mother, who "told me that she had something very important to tell me and that something bad had happened, that I should sit down. LMF-DT at 28. Mike recalls his mother telling him: "your father has been shot and he was – he was killed going to work and the people who did it are gone, they fled . . ." *Id.* Mike remembers his mother "sound[ing] very concise," as she was telling him the tragic news. Upon reflection, Mike believes his mother was "concerned about my emotional state." At his mother's suggestion, Mike went to see Megan in Silver Spring, Md. *Id.* at 29.

Soon after, he and Megan spoke to Jeremie on the telephone, MF-DT at 31, during which Mike recalls feeling "really numb" and "compartmentalizing" things, whereas Jeremie was "very in touch with her emotions" and asking questions. *Id.* at 32.

Mike soon moved in with Megan, sleeping on her couch in the basement. LMF-DT at 33. Mike recalls his mother returning to the States on a military plane transporting his father's body. *Id.* She, too, moved in with Megan. *Id.* Jeremie arrived a few days later from California. *Id.* Mike remembers "there was a lot to do and it was easier to focus on that than to really spend a lot of time thinking about how I was feeling." *Id.* at 34.

The family held "a celebration of life" for Mike's father, LMF-DT at 35, at a Unitarian church. *Id.* Mike remembers how "the turnout was amazing," with people who "came from all over." *Id.* at 37. He recalls feeling "strange" having "80 percent of all the important people in my life [] in the same place." *Id.* During the service, Mike, Megan and others shared stories

about his father that seemed "a lot of larger than life" because "that's who he was.  People really liked my dad a lot.  He was really smart, but – but really very funny and very real."  *Id.* at 38.

Mike felt "weird" having his father die abruptly and then to be "reminded of it on TV" and in the press. LMF-DT at39.  The family did not follow the investigation into Laurence Foley's death "proactively," *id.* at 44, and did not consent to journalist Connie Chung's request for an interview.  *Id.*  Mike says his mother made some statements early on – she "wanted to make it clear that – that dad was a victim of terrorism and not in any way of victim of the people of Jordan." *Id.* at 45.  The curiosity and press attention dissipated after "about six months." *Id.* at 48.

Since his father's death, the family "looked out for each other a lot and we – and we talked a lot.  I mean, I think that was kind of, like, my counseling with [his mother]."  LMF-DT at 49.  His father's death set the family back, Mike explains, "it kind of changed everything, but, you know, it also brought us closer together, which was nice, physically and, you know, kind of emotionally."  *Id.* at 50.  Although Mike's mother had "to figure out her life again," *id.*, she "handled it so gracefully."  *Id.* at 54.  As for his own emotional state, Mike admits he has "not entirely" processed his father's death.  *Id.* at 56.  Mike notes that, although Megan and his mother were opposed to executing those responsible for his father's death, he had "mixed feelings about" it.  *Id.*

Mike, to this day, misses his father's "humor and his insight."  LMF-DT at 66.  He remembers his dad as a person who was "just great to be around."  *Id.*  The family makes an effort "to keep the humor alive in my family.  *Id.*  My sisters and I especially kind of all share dad's kind of weird perspective on things and so we laugh a lot together."  *Id.*  After college, Mike did not follow his parents' calling in international development and worked, instead, in the

private sector. After his father was killed, however, Mike realized this is not what he wanted, *id*. at 67, and is now involved in "international development," doing "work in Kyrgyzstan." *Id*. at 71. He regrets deeply that his father never met his wife. *Id*. at 68.

**Testimony of Craig Thomas Mallak, M.D.**

Dr. Craig Mallak is a forensic pathologist who currently serves as Chief Medical Examiner and Chief Trauma Officer for Broward County, Florida. Dr. Mallak testified during the November 16, 2017 liability hearing and was qualified by the court as an expert in the field of forensic pathology. *Id*. at 129 and 130. Dr. Mallak's testimony continued to the following day. ("Mallak T2"). He supplied additional testimony by deposition taken on April 13, 2017. Between 2002 and 2012, Dr. Mallak served as Chief of the Armed Forces Medical Examiner System, responsible for investigating military deaths. (Liability Hearing ("Mallak T1") at 113, Ex. 17. Dr. Mallak performed the autopsy on Laurence Foley. *Id*. at 122.

Dr. Mallak testified that Laurence Foley died on October 28, 2002 at 7:15 a.m., Mallak T1 132, and that he performed the autopsy on October 31, 2002 at 9:00 a.m. *Id*. at 133. Based on his examination of the body, Dr. Mallak concluded that Laurence Foley was shot "seven" times – one bullet "entered between his right ear and proceeded through his neck and into his chest cavity where it injured the right side of the heart and the upper and lower lobes of the left lung, and then it exited the chest cavity on the left side fracturing a rib." *Id*. at 139. The second bullet entered "the right side of the chest, and it followed along the chest wall, and then it exited so it never entered the chest cavity itself, it stayed in the muscle under the skin and then exited from the chest also." *Id*. Dr. Mallak uncovered four additional gunshot wounds in Laurence Foley's abdomen and in his right shoulder. *Id*.

As to the gravity of these injuries, Dr. Mallak testified:

None of these wounds are immediately fatal. The gunshot wound to the heart was on the right side of the heart, which is where the blood returns to the heart from the body and is under low pressure and would leak out from the heart very slowly. And the first autopsy [performed by Jordanian authorities] noted a great amount of hemorrhage in that area, and we concurred with that. And the only way for that to happen is if the heart's still pumping, and even though it's coming out slowly, it's still working."

Mallak T1 at 141.

It was Dr. Mallak's professional opinion that these observations demonstrate that Laurence Foley "was alive for several minutes after being shot." *Id*. And given "no injury to the brain," Dr. Mallak could find "no reason . . . to believe that he wasn't awake and alert during his dying process." *Id*. at 142.

Dr. Mallak stated further that the soft tissue injuries caused by the bullet wounds "would have caused a great deal of discomfort and pain," Mallak T1 at 143, and that the wounds to Foley's lung would have caused it to collapse. When these injuries occur, "it gets more and more difficult to breathe, and eventually, no matter what you do, you can't breathe, and air hunger is one of the – is described as one of the most frightening. It's not so much pain, it's just terror and fear because your inability to get air into your lungs and subsequently into the rest of your body." *Id*. at 144.

During his deposition, Dr. Mallak described the effects of "air hunger" in greater detail. He explained that persons experiencing "air hunger" are consumed with,

a fear of death that you're trying everything that you can to breathe, but no matter what you do, using the muscles between the ribs and the diaphragm, you're just not able to get any air in and it's an impending sense of the – describing it as – you feel like you are going to die, but almost – maybe this isn't the right term, doom, that your death is imminent and there is nothing you can do about it."

Craig Mallak, MD. Deposition Transcript ("CM-DT") at 12.

Dr. Mallak believes Laurence Foley "would have had a high degree of fear in knowing that he was going to die, and at some level understanding that he couldn't breathe, but not -- I

don't know if he would have really understood fully the physiological process of the dying sequence in this case, but it would have been terrifying." CM-DT at 13. And while the injuries to Laurence Foley's organs "would have been very painful," the air hunger is "going to be much worse than most pain that we would suffer or go through." *Id*. at 14.

## ANALYSIS

Plaintiffs seek damages under 28 U.S.C. § 1605A(c) for "the assassination of Laurence Foley." Amended Complaint, ECF No. 11 at 29. In addition to their statutory claims, plaintiffs allege defendants are liable for the common-law torts of assault, battery, false imprisonment, kidnapping and intentional infliction of emotional distress. ECF No. 11.

It is beyond the remit of the Special Master to consider the viability of plaintiffs' common-law claims, much less ascribe damages for any breaches thereof. Rather, the Special Master's inquiry is confined to analyzing plaintiffs' entitlement to those damages specifically delineated in the Foreign Sovereign Immunities Act ("FSIA"), namely, pain and suffering, solatium and those arising due to economic loss. *See* 28 U.S.C. § 1605A(c)(4). Before doing so, however, some preliminary observations are in order.

To recover under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent as any other default winner." *Hill v. Republic of Iraq,* 328 F.3d 680, 683-84 (D.C. Cir. 2003) (citation omitted). In the context of a default judgment, courts in this jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages." *Rhodes v. U.S.*, 967 F.Supp.2d 246, 313 (D.D.C. 2013) (emphasis in original) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)). For future damages, plaintiffs must prove entitlement to a "reasonable certainty," or by a preponderance of the evidence, and must prove the amount of damages by a "reasonable estimate." *Hill*, 328 F.3d at 684. For past losses,

a plaintiff must "prove the *fact* of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (emphasis added), yet need only "reasonably prove" the amount of damages. *Hill*, 328 F.3d at 684.

Upon consideration of the testimonial and documentary evidence presented, and in light of the legal framework set out below, the Special Master considers those damages for pain and suffering, solatium and loss of accretions available to Laurence Foley's estate and to members of his family.

### a. Pain and Suffering

Claims "for the conscious pain and suffering" inflicted on victims of terrorism are "actionable through their estates." *Gates v. Syrian Arab Republic*, 580 F.Supp.2d 53, 72 (D.D.C. 2008). And while "[p]utting a number on these kinds of harms can be difficult," *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F.Supp.2d 120, 134 (D.D.C. 2005), courts "will not simply award what it abstractly finds to be fair." *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 34 (D.D.C. 2002). Rather, they "will look at damage awards for pain and suffering in other cases brought under the FSIA." *Id.* In other words, "precedence guides its calculations." *Id.*

An examination of relevant precedents yields two principles relevant to this inquiry. The first is that, "[i]n the absence of evidence tending to show an attack resulted in the fatal but noninstantaneous injury of a victim and that the victim was conscious thereafter, . . . an award of pain and suffering is inappropriate." *Worley v. Islamic Republic of Iran*, 177 F.Supp.3d 283, 286 (D.D.C. 2016). The second principle to emerge is that for periods of pain and suffering lasting anywhere from less than a minute to a few hours after an attack but prior to death, courts have awarded damages of $1 million. *Braun v. Islamic Republic of Iran*, 228 F.Supp.3d 64, 83

(D.D.C. 2017). *See Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002) (awarding $1,000,000 for the several minutes after victim was shot and before he died); *Eisenfeld, et al. v. Islamic Republic of Iran*, 172 F.Supp.2d 1 (D.D.C. 2000), (where the Court awarded compensatory damages of $1 million each for "several minutes" of pain and suffering of two decedents who died at the scene of the same bombing); *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97 (D.D.C. 2000) ($1 million for 3 or 4 minutes of pain and suffering); *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1 (D.D.C. 1998) ($1 million for 3 to 5 hours of pain and suffering).

Dr. Mallak testified that not only was Laurence Foley, Sr. "alive for several minutes after being shot," but he experienced the "terror and fear" associated with "air hunger" – a condition brought about by an "inability to get air into your lungs and subsequently into the rest of your body." Based on Dr. Mallak's expert opinion, The Special Master recommends that Laurence Foley Sr.'s estate received compensatory damages for pain and suffering in the amount of $1 million.

### b. Economic Damages

28 U.S.C. § 1605A, like its statutory predecessor 28 U.S.C. § 1605(a) (7), establishes a cause of action for economic damages resulting from an act of state-sponsored terrorism. As a general rule, loss of accretion damages are calculated by estimating a decedent's future earning potential based on the individual's work and education and adjusting that amount to account for inflation, rise in productivity, job advancement, and personal consumption. *Stethem*, 201 F.Supp.2d at 87.

Virginia Foley, as administrator of Laurence Foley, Sr.'s estate, supports her prayer for economic losses with a report dated May 19, 2017 prepared by the Center for Forensic Economic

Studies ("Foley CFES Report"). The CFES Report concluded that "the total economic loss ranges from $1,101,618 to $1,309,517 depending on the percentage of time Mr. Foley was employed as a consultant after he retired. Foley CFES Report at 5.

The economists who generated the Foley CFES Report arrived at those numbers by extrapolating information from the April 8, 2011 Complaint, "USAID Pay Information," the Foley family tax returns" and Virginia Foley's testimony. They proceeded to overlay that information onto data supplied by the United States Office of Personnel Management; the United States Department of Labor, Bureau of Labor Statistics; the United States Federal Retirement Thrift Investment Board as well other professional and government publications.

Based on information gleaned from these sources, the CFES assumed that Mr. Foley, who was 60 years old when he was killed, would have continued his employment at USAID "through his statistical worklife expectancy, age 67.0" Foley CFES Report at 2. Relying on Virginia Foley's testimony that Laurence "planned to consult with USAID after his retirement, and that it is common for USAID employees of Mr. Foley's level to do so," *id.*, the CFES economists created two models. The first model assumed Mr. Foley would have worked 25% of his post-retirement years, through his "healthy life expectance" at age 76.2, as a consultant for USAID. The second model assumed he would have worked 50% of that time. To those estimates, the CFES deducted pre- and post-retirement taxes, using Federal and District of Columbia rates ranging between 4.6% and 18.1%; personal maintenance expenditures ranging between 17.3% and 42.7%; lost pension benefits based on a statistical life expectance of 81.7 years; and federal thrift savings plan contributions. Finally, the CFES discounted Laurence Foley's future earning to present value by 3.56% in accordance with the yield he might have received had he invested in high-grade Municipal Bonds. As Ms. Foley's Declaration was not

available at the time the Foley CFES Report was generated, the economists were unable to factor in Ms. Foley's statement that Laurence Foley would have worked "at least 50-75%" in his post-retirement years as before.

The Special Master finds the methodology employed by the CFES in calculating economic loss to be appropriate, including its assumptions as to taxes, personal consumption, and net earnings. The Special Master also finds the CFES's use of high-grade municipal bonds to calculate investment potential a conservative method to determine present value. Finally, the Special Master finds that the CFES model which assumed Mr. Foley would have worked 50% of the time during his retirement years to be the most reasonable in light of the estimates ranging from 25% to 75%.

The Special Master therefore recommends that this Court award the estate of Laurence Foley economic damages in the amount of $1,309,517, in accordance with the recommendation of the Foley CFES Report.

### c.  Solatium Damages

It is well established that, "[a]cts of terrorism by their very definition are extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran,* 667 F.Supp.2d 8 (D.D.C. 2009) (*citing Stethem,* 201 F.Supp.2d at 89). When a terrorist act results in death, that emotional distress, "with its attendant horrific surrounding circumstances, prevents the anguish [felt by a relative of the deceased] from subsiding." *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 31 (D.D.C. 1998). Solatium damages are therefore available as compensation for the "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort," *Baker v. Socialist People's Libyan*

*Arab Jamahirya*, 775 F.Supp.2d 48, 83 (D.D.C. 2011) (internal quotation marks and citation omitted), even though those plaintiffs were not "present at the place of outrageous conduct." *Heiser v. Islamic Republic of Iran,* 659 F.Supp.2d 20, 27 (D.D.C. 2009) ("*Heiser II*") (citing *Jenco,* 154 F.Supp.2d at 36).

Factors considered where the victim was killed include: "(1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e., closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimant's mental anguish in excess of that which would have been experienced following the decedent's natural death." *Stethem*, 201 F.Supp.2d at 89-90. Of these, courts place particular emphasis on the cause of death in terrorism cases, reasoning that "the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time." *Elahi*, 124 F.Supp.2d at 111.

Even with these guideposts, claims for solatium, unlike those for lost wages, are "undeniably difficult to quantify," *Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229, 254 (D.D.C. 2006) (*Heiser I*), and not readily susceptible to "models and variables." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000) (citations omitted). Accordingly, courts are often guided by remedial approaches and formulas employed in similar cases. And in cases where solatium damages are sought, most courts employ the damages model articulated in *Heiser I.* In accordance with that framework, "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse approximately $5 million to a parent whose child was killed and approximately $2.5 million to a plaintiff whose sibling

was killed." *Heiser I*, 466 F.Supp.2d 269.  Children of a deceased victim typically receive an

award of $3 million.  *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 47 (D.D.C. 2012)

(citing *Stern v. Islamic Republic of Iran*, 271 F.Supp.2d 286, 301 (D.D.C.2003)).

These baseline awards, while instructive, are "not set in stone," *Murphy v. Islamic

Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010), as "strict application of precedent could

lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*,

664 F.Supp.2d 43, 57 (D.D.C. 2009) (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d

40, 59 (D.D.C. 2006)).  Recognizing the flexibility inherent in these awards, courts have deviated

from these numbers where circumstances dictated.

Deviations in an upward direction, for example, have been warranted: (1) in the face of

"aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering,

such as cases involving torture or kidnaping of a spouse," *Greenbaum v. Islamic Republic of

Iran*, 451 F.Supp.2d 90, 108 (D.D.C. 2006); (2) where the "evidence establish[es] an especially

close relationship"; (3) in the presence of "medical proof of severe pain, grief or suffering on

behalf of the claimant"; or (4) where the "circumstances surrounding the terrorist attack

[rendered] the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of

Iran*, 768 F.Supp.2d 16, 26-27 (D.D.C. 2011).  Conversely, downward departures may be

provident where the evidence suggests an attenuated relationship between the victim and his

family members.  *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 86 (D.D.C. 2010).

Indeed, solatium awards have been denied "where no evidence is offered to show injury that an

award of solatium damages might compensate."  *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d

379, 405 (D.D.C. 2015).

Virginia Foley was not only present when her husband was murdered, she held him in her arms while he died.  In similar cases, courts have found a 25% enhancement to the *Heiser I* guidelines warranted.  *See, e.g., Thuneibat v. Syrian Arab Republic*, 167 F.Supp.3d 22 at 52 (D.D.C. 2016) ("[The plaintiff's] presence at the scene of the attack and the extremity of her mental distress . . . warrant an upward departure of . . . 25%."); *Braun*, 228 F. Supp.3d 64 at 86 (parents of infant who were present during the terrorist attack awarded an enhancement of 25% for solatium damages).  The Special finds no reason to deviate from this line of cases.

The testimony given by Laurence Foley's children makes clear that they were each anguished over their father's death.  The absence of "medical proof of severe pain, grief or suffering on behalf of the claimant," or evidence of an "especially close relationship" with their father, constrains a finding that no enhancement is warranted.  And although Megan and Jeremie were treated by therapists, Megan's treatment was a requirement of her work as a minister and Jeremie, whose treatment began in 2016, appears to have sought counseling for her marriage.  No evidence was submitted that Mike sought therapeutic treatment aside from counseling he received from his mother.

Accordingly, the Special Master recommends that Virginia Foley be awarded $6,250,000 and that Megan Foley, Jeremie Foley Robenolt and Laurence Foley, Jr. each be awarded $3 million in compensatory damages for loss of solatium.

### d. Prejudgment Interest

Plaintiffs seek prejudgment interest on their damages awards.  On May 25, 2017, plaintiffs filed with the Special Master a Motion and Memorandum for Damage Awards with Points and Authorities in Support ("Motion for Damages") asking that prejudgment interest be added to any damage awards.  Motion for Damages at 59-61. The Motion for Damages

represents the first instance in which plaintiffs have asked for prejudgment interest. Notably, plaintiffs neither specify the damages for which they are seeking prejudgment interest nor do they indicate the time period for which this enhancement should be added. More significantly, the Motion for Damages was not filed with the Court and the requested relief was not prayed for in the Amended Complaint. For the reasons set out more fully below, plaintiffs' motion is procedurally and, for the most part, substantively infirm and the Special Master recommends it be denied.

Plaintiffs' failure to seek prejudgment interest in its pleadings runs afoul of the rules of civil procedure and precludes them from relief.

Fed. R. Civ. P. 54(c) provides, in relevant part, that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." *See Boland v. Yoccabel Const. Co*., 293 F.R.D. 13, 17 (D.D.C. 2013) ("the relief available on default [should] be such as is within the fair scope of the allegations of the complaint and, when money judgment is sought, the specific amount demanded") (citation omitted)). Two months ago, a court in this jurisdiction denied a party's request for prejudgment interest raised solely in its proposed findings of fact and conclusions of law. *See Cohen v. Islamic Republic of Iran*, CA No. 12–cv–01496 (CRC), --- F.Supp.3d ---, 2017 WL 3207693 at *3 n.2 (July 27, 2017). Citing Rule. 54(c), the court explained that it "will consider only the relief requested in the Complaint and will not award prejudgment interest on the compensatory damages award." *Id.* at. Similarly, in a case decided only six months ago, the court in *Gill v. Islamic Republic of Iran*, CA No. 15–2272 (RBW), --- F.Supp.3d ---, 2017 WL 1289938 (D.C. Apr. 6, 2017), declined an award of prejudgment interest prayed for in plaintiffs' proposed findings of fact and conclusions of law. *Id.* at *10 n.7. Citing

Rule 54(c), the court held it could "consider only the damages requested in the plaintiff's Complaint." *Id.*

Plaintiffs did not request prejudgment interest in any of their filings before the court. As stated, the only document requesting such relief was in plaintiffs' Motion for Damages filed only with the Special Master. Plaintiffs "could easily have drafted a complaint that included a distinct claim . . . in the demand clause . . . . [their] failure to do so, intentional or not, ran the risk that his damages would be limited in the event of default." *Salmeron v. District of Columbia*, 77 F.Supp.3d 201, 212 (D.D.C. 2015), *judgment vacated on other grounds by*, *Salmeron v. District of Columbia*, 113 F.Supp.3d 263 (D.D.C. 2015) (quoting *Silge v. Merz*, 510 F.3d 157, 159, 160 (2d Cir.2007)).

For each of the nine causes of action pressed in the Amended Complaint, plaintiffs ask compensation "for the damages they suffered, *including, but not limited to*, pain, suffering, mental anguish, and pecuniary losses all other relief the Court deems just." (Emphasis added.) Even according the phrase "including but not limited to" its broadest possible construction, its "formulaic language cannot substitute for the meaningful notice called for by Rule 54(c)." *Silge*, 510 F.3d at 160. *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1277 n. 6 (9th Cir. 2006) ("language . . . seeking 'such other and further relief as the court may deem proper' is mere boilerplate, meant to cover all bases as to the claims asserted in the complaint").

In the final analysis, "[i]t would be fundamentally unfair to have the complaint lead defendant to believe that only a certain type and dimension of relief was being sought and then, should defendant attempt to limit the scope and size of the potential judgment by not appearing or otherwise defaulting, allow the court to give *a different type of relief* or *a larger damage award*." *Boland v. Yoccabel Const. Co.*, 293 F.R.D. at 19 (emphases added). Plaintiffs' request

for prejudgment interest "differ[s] in kind from" their asserted claims for compensatory damages. As such, the "amended complaint's demand for compensatory damages, without specifically requesting pre-judgment interest, does not provide adequate notice to [defendants], as an award for compensatory damages will not necessarily include pre-judgment interest." *ExxonMobil Oil Corporation v. Black Stone Petroleum Inc.*, 221 F. Supp. 3d 755, 767-68 (E.D. Va. 2016). Keeping in mind that prejudgment interest does not fall within of the scope of FSIA damages and that the decision whether to award and the amount of such an award is always "discretionary," *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997), there is no guarantee that adding prejudgment interest to the compensatory damage calculus will not "exceed in amount" plaintiffs' individual prayers for relief.

In addition to the aforementioned infirmities, plaintiffs' request fails to demonstrate an entitlement to prejudgment interest for punitive, economic and solatium damages, as a matter of law. Should plaintiffs overcome the aforementioned procedural hurdles, the Special Master finds, for the reasons set out below, they would be entitled only to receive prejudgment interest for the award of pain and suffering.

Prejudgment interest is intended "to compensate the plaintiff for any delay in payment resulting from the litigation," *Price*, 384 F.Supp.2d at 135, and to avoid the unsupportable circumstance of [a defendant] profiting from its terrorist acts." *Pugh*, 530 F.Supp.2d at 264. Here, plaintiffs presumably seek an enhancement for all remedies allowed under the FSIA, namely, "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). The Special Master will address each in turn.

An award of prejudgment interest apropos of economic damages is inappropriate as the Special Master's recommendation has already been discounted to present value, rendering, "a

separate award of prejudgment interest . . . duplicative." *Thuneibat*, 167 F.Supp.3d at 54-55.

*See Roth*, 78 F.Supp.3d at 407 ("The Court concludes, however, that it cannot award such

interest . . . . the economic loss damages awarded to the estate of [the deceased] have already

been discounted to present value"); *Amduso v. Republic of Sudan*, 61 F.Supp.3d 42, 53 (D.D.C.

2014) ("Because some of the economic loss figures recommended by the special masters have

already been adjusted to reflect present discounted value, . . the Court will not apply the

prejudgment interest multiplier to the economic loss amounts") (internal citation omitted); *Doe v.

Islamic Republic of Iran*, 943 F.Supp.2d 180, 185 (D.D.C. 2013) ("Because the figure is already

in 2012 dollars, no further award of prejudgment interest is appropriate").

Similarly, prejudgment interest is not warranted with respect to solatium damages in light

of the Special Master's express reliance on the guidelines established in *Heiser I* in formulating

his recommendation. In *Oveissi*, the court determined that "values set by [the *Heiser*] scale

represent the appropriate level of compensation, regardless of the timing of the attack." 768

F.Supp.2d at 30 n. 12. Responding to the plaint that "such interest is necessary to fully

compensate Mr. Oveissi for the enormous loss he sustained," the court observed" that the upward

adjustments from the *Heiser* valuation fulfill this very function." *Id.* (internal quotation marks

omitted).

This holding and its underlying rationale enjoy considerable support in this jurisdiction.

*See, e.g., Harrison*, 882 F.Supp.2d at 51 (rejecting prejudgment interest request on the grounds

there was not only no evidence of delay but it conflicted with the court's use of the *Heiser*

framework); *Wultz v. Islamic Republic of Iran*, 864 F.Supp.2d 24, 43 (D.D.C. 2012) ("Because

this Court has applied the framework in *Heiser* to its calculation of solatium damages,

prejudgment interest is not appropriate for these awards"); *Brown*, 872 F.Supp.2d at 45 ("When

this Court applies the *Heiser* and *Peterson II* damages framework, it does not typically award prejudgment interest"); *Roth*, 78 F.Supp.3d at 407 ("the Court does not award prejudgment interest on solatium damage awards that are based on the *Heiser* framework").

To the extent plaintiffs seek an enhancement for punitive damages, their request is unsustainable in light of *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), barring punitive damages for conduct preceding the enactment of the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"). *Id.* at 817*, rehearing denied*, October 3, 2017. Here, the underlying conduct took place in 2002 – six years before the NDAA was enacted. Even in the absence of a statutory bar, "prejudgment interest does not apply to punitive damages because prejudgment interest is an element of complete compensation and punitive damages are non-compensatory." *Thuneibat*, 167 F.Supp.3d at 55 (internal quotation marks and citation omitted).

Plaintiffs may, however, have a colorable claim for prejudgment interest for the award of pain and suffering provided they demonstrate their procedural entitlement to assert such a claim.

In the context of the FSIA, prejudgment interest purports to redress those situations "where plaintiffs were delayed in recovering compensation for their injuries – including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants." *Pugh*, 530 F.Supp.2d at 263. As one court explained:

> Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks. Because plaintiffs were unable to bring their claims immediately after the attacks, they have lost use of the money to which they were entitled upon incurring their injuries. Denying prejudgment interest on these damages would allow defendants to profit from the use of the money over the last fifteen years. Awarding prejudgment interest, on the other hand, reimburses plaintiffs for the time value of money, treating the awards as if they were awarded promptly and invested by plaintiffs.

*Khaliq v. Republic of Sudan*, 33 F.Supp.3d 29, 34-35 (D.D.C. 2014).

As the decision to award prejudgment interest is a question resting within the court's "discretion, subject to equitable considerations," *Pugh*, 530 F.Supp.2d at 263, courts have applied different formulas for computing the "delay" necessary to trigger an enhancement. In *Price*, the court held that "[t]he purpose of such awards is to compensate the plaintiff for any delay in payment *resulting from the litigation*." 384 F.Supp.2d at 135 (emphasis added). In that spirit, several courts have confined their inquiry to whether plaintiffs were obstructed in any way in prosecuting the claims. *See, e.g., Pugh*, 530 F.Supp.2d at 265 (awarding prejudgment interest "because of the substantial delay in judgment for these plaintiffs caused by Libya's *persistent delay tactics over the course of this litigation*") (emphasis added); *Wultz*, 864 F.Supp.2d at 43 (denying prejudgment interest after finding that since the case was filed, "Iranian Defendants, having never even appeared in this case, *have not prolonged the litigation*" and any delay on the part of Iran "was not unreasonable for a complicated case involving a number of sovereign foreign entities and banks") (emphasis added); *Harrison v. Republic of Sudan*, 882 F.Supp.2d 23, 51 (D.D.C. 2012) (denying prejudgment interest, noting that, since plaintiffs filed their claim "Sudan, having never even appeared in this case, *has not prolonged the* litigation") (emphasis added); *Brown v. Islamic Republic of Iran*, 872 F.Supp.2d 37, 45–46 (D.D.C. 2012) (refusing prejudgment interest, finding the delay attributable not to defendants but to plaintiffs' failure to tender timely submissions).

Other decisions define delay by calculating the time between the date of the injury and the date of judgment. *See Amduso v. Republic of Sudan*, 61 F.Supp.3d 42, 53 (D.D.C. 2014) ("Because plaintiffs were unable to bring their claims immediately after the attacks, they lost use of the money to which they were entitled upon incurring their injuries"); *Khaliq*, 33 F.Supp.3d at 34-35 (awarding prejudgment interest for the 15 year period between August 7, 1998, the date

the United States embassies in Nairobi, Kenya and Dares Salaam, Tanzania were bombed and the date of judgment); *Belkin,* 667 F.Supp.2d at 224 (awarding prejudgment interest to compensate for the time period between a March 4, 1996 bombing and a Sept. 30, 2009 final judgment); *Ben–Rafael v. Islamic Republic of Iran*, 540 F.Supp.2d 39, 59 (D.D.C. 2008) (awarding an interest enhancement for the period between a March 17, 1992 attack and a Feb. 25, 2008 judgment); *Dammarell v. Islamic Republic of Iran*, CA No. 01-22242006 (JDB), WL 2583043 *1 n. 2 (D.D.C. Sept.7, 2006) (awarding interest for injuries "sustained over the course of more than two decades").

The Special Master finds those decisions which look back to the date the claimants' causes of action accrued more compelling. In the first instance, awarding an enhancement based solely on what transpired during litigation appears in direct conflict with the proposition that "[p]rejudgment interest is an element of complete compensation." *West Virginia v. United States*, 479 U.S. 305, 310 (1987). Beyond this, none of the cases defining delay as "litigation delay" offer up any rationale for imposing this limitation.

Here, members of Laurence's family have waited 15 years to be compensated for his murder. Should they demonstrate a procedural entitlement to press their claim, the Special Master finds no precedent or equitable consideration that might justify denying them prejudgment interest for Laurence Foley's pain and suffering from the date their cause of action accrued. In that event, the Special Master recommends that "[a]n appropriate measure of what rate to use when calculating prejudgment interest is the prime rate." *Baker*, 775 FSupp2d. at 86 (citing *Oldham v. Korean Air Lines Co*., 127 F.3d 43, 54 (D.C. Cir. 1997)).

### e. Inflation

In their Motion for Damages, plaintiffs ask the Special Master to increase any recommended solatium award by an appropriate amount to account for inflation. They press the position that, in looking to prior judgments for comparative purposes, the Special Master should be mindful that past awards should be adjusted upwards for inflation. In other words: "A $1 million award in 2008 would be worth a great deal more money than a $1 million award today." Motion for Damages at 61-62.

On July 20, 2016, plaintiffs supplemented their argument in a subsequent filing captioned Memorandum Regarding Inflation ("Inflation Memorandum"). Repeating their request for an upward inflationary adjustment, plaintiffs argue: "Courts across the United States have routinely adjusted awards made in prior cases for the effects of inflation when using prior awards comparatively for the purpose of making their own damages determination, and also in other procedural context." Inflation Memorandum at 1. They urge that "[t]he practice is so routine, and often mentioned only in passing or in a footnote, that one could surmise that the inflationary adjustments are calculated without any official mention. *Id.* at n.1. In support, Plaintiffs cite no fewer than 12 cases from various jurisdictions for the proposition that courts "ma[ke] sure to account and adjust for the impact of inflation in [their] evaluation of prior comparable cases." *Id.* at 1.

The Special Master disagrees and finds plaintiffs' arguments in favor of prejudgment interest unpersuasive.

In the cases cited by plaintiffs, individual defendants formally challenged jury awards they believed excessive. And in each, the courts undertook a comparative analysis of the award under dispute with previous damage awards, adjusting the dollar value of the older decisions by inflation to arrive at a "present value." *See*, *e.g.*, *Wells v. City of Chicago*, 896 F. Supp. 2d 725,

742 n.1 (N.D. Ill. 2012) (comparing 2012 and 1990 jury awards after adjusting the latter "using the inflation calculator provided at the Bureau of Labor Statistics website"); *Bravo v. United States*, 532 F.3d 1154, 1163 n.5 (11th Cir. 2008) (noting a case cited by the dissent in which the court considered a number of verdicts and settlements, took the average dollar award and adjusted that amount for inflation); *DiSorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003) (when comparing jury awards rendered 10 years apart, the court held "we must take into account inflation"); *Dixon v. Agbai*, No. 15 Civ. 850 (AT) (AJP), 2016 WL 3702749 at *5 n.3 (S.D.N.Y. July 8, 2016) (When comparing awards in 16 cases, the court "note[d] that it has considered all of the awards at their present dollar value adjusted for inflation"); *Jean-Baptiste v. District of Columbia*, 931 F.Supp.2d 1, 17 (D.D.C. 2013) (finding jury verdict excessive "[e]ven adjusting for inflation"); *Menghi v. Hart*, 745 F.Supp.2d 89, 109 (E.D.N.Y. 2010) (comparing jury's $1 million award with a 2001 decision for $275,000 after adjusting for inflation); *Ocampo v. Paper Converting Machine Co.*, No. 02 C 4054 (JN), 2005 WL 2007144 at *4 n. 10 (N.D. Ill. August 12, 2005) (comparing awards after adjusting for inflation); *Ruhlmann v. Smith*, 323 F. Supp.2d 356, 364 (N.D.N.Y. 2004) (comparing case before it to four decided 1983, 1986, 1990 and 2001, adjusting the original dollar amount in each "only for inflation" to arrive at a "present-day value[]"; *Wade v. Colaner*, No. 06-3715 (FLW), 2010 WL 5479629 at *29 (D.N.J. December 28, 2010) (comparing $500,000 jury award to 2001 Third Circuit decision upholding a $375,000 compensatory damages award which, "when adjusted for inflation, is approximately equal to $462,000 in current dollars").

Unlike these cases, however, the Special Master is not determining whether a jury award "is beyond all reason, so as to shock the conscience" or whether a verdict "is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may

properly operate." *Jean-Baptiste*, 931 F.Supp.2d at 12-13 (citation omitted).  The Special Master is similarly not striving for uniformity between the solatium recommendations in this case and those awarded in other terrorist actions.  Rather, the Special Master's remit is to analyze the unique circumstances in this case and decide whether an entitlement to damages exists and, if so, in what amount.

With respect to solatium, the Special Master adopted the formula set out in *Heiser* and adjusted those baselines to accommodate the particular circumstances of this case.  Applying the same rationale courts have adopted when denying prejudgment interest to *Heiser*-based solatium awards, the Special Master finds the inherent flexibility of the *Heiser* formula more than adequate to compensate for any inflationary variable.  Apropos of plaintiffs' request for an inflationary enhancement to the recommended award of pain and suffering, it must be noted that, unlike the courts in those cases cited by plaintiffs, the Special Master did not arrive at a dollar amount simply by comparing awards.  To the contrary, the instant recommendation for pain and suffering is grounded on information unique to this case, such as trial and deposition transcripts, declarations, source documents and expert testimony.  In short, the recommended damage award is unique to this action as it is grounded on a constellation of factors of which prior awards is only one.  Accordingly, the Special Master denies plaintiffs' request to impose an inflationary enhancement to the recommended award for pain and suffering.

## CONCLUSION

In light of the foregoing, the Special Master recommends that the Estate of Laurence Foley, Sr. receive One Million Dollars ($1,000,000) in compensatory damages for pain and suffering and One Million Three Hundred and Nine Thousand Five Hundred and Seventeen Dollars ($1,309,517) in economic damages; that Virginia Foley be awarded Six Million Two

Hundred and Fifty Thousand Dollars ($6,250,000) in compensatory damages for loss of solatium and that Megan Foley, Jeremie Foley Robenolt, Laurence Foley, Jr., and each be awarded Three Million Dollars ($3,000,000) in compensatory damages for loss of solatium.  Finally, the Special Master recommends that plaintiffs' requests for prejudgment interest and an inflationary adjustment be denied.

Dated: October 6, 2017                              Respectfully submitted,


                                                    By:*/s/ Alan L. Balaran*
                                                        Alan L. Balaran, Esq.
                                                        Special Master