# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————

VIRGINIA L. FOLEY, et al.,       )
                               )
        Plaintiffs,        )
                               )
v.                            )        Case No. 11-00699 (CKK)
                               )
SYRIAN ARAB REPUBLIC, et al.,   )
                               )
        Defendants.      )
———————————————————————)

## REPORT OF SPECIAL MASTER
## RE: STAFF SERGEANT KEITH MATTHEW MAUPIN

This action is brought pursuant to 28 U.S.C. § 1605A. The estate and family members of

Staff Sergeant Keith Matthew Maupin are seeking damages for his capture, torture and murder.

Pursuant to the Administrative Plan Governing Special Masters and the provisions of Federal

Rule of Civil Procedure 53, the Special Master has reviewed testimonial and documentary

evidence to assist in determining any damages to which the claimants may be entitled.

## BACKGROUND AND PROCEDURAL HISTORY

On April 9, 2004, five vehicles of the 724th Transportation Company escorted a convoy

of 17 fuel trucks and two bobtail tractors operated by KBR, an American defense contractor.

Staff Sergeant Keith Matthew Maupin[1] ("SSgt. Maupin" or "Matt") was a member of that

convoy when it was ambushed by members of the Zarqawi Terrorist Organization ("ZTO"),

using rocket-propelled grenades and small-arms fire. ECF No. 76 at 14. Matt was kidnapped by

those insurgents and remained missing until March 20, 2008 when soldiers from 1st Battalion,

21st Infantry Regiment uncovered his remains in a primarily agricultural region 10 to 15 miles

---

[1] Matt was a private first class when captured. While missing, the Army promoted him in late April 2004 to the rank of specialist; in April 2005, to sergeant; and, in August 2006 to staff sergeant. *See* http://thefallen.militarytimes.com/army-staff-sgt-keith-m-maupin/3467430 (last viewed on August 14, 2017).

northwest of Baghdad by. *Id. See also http://thefallen.militarytimes.com/army-staff-sgt-keith-m-maupin/3467430* (last viewed on August 4, 2017). Matt's remains consisted of 308 grams of skeletal matter which included pieces of Matt's mandible, right rib, right radius and ulna, lumbar vertebra, and left fibula. ECF No. 76 at 12.

On April 8, 2011, Plaintiffs filed a complaint against the Syrian Arab Republic ("Syria"), Syrian Military Intelligence, Syrian President Bashar al-Assad and Syrian General Asif Shawkat, alleging they provided material support to the ZTO and thus were responsible for the murders of Pfc. Menchaca and SSgt. Keith Maupin, in Iraq, and Laurence Foley, Sr., in Jordan. ECF No. 1. Plaintiffs' Amended Complaint, and the one considered here, was filed on September 13, 2011. ECF No. 11.

Between June 2011 and January 2015, plaintiffs' attempts to serve the defendants were impeded by the ongoing Syrian civil war and the deterioration of diplomatic relations between Syria and the United States. On February 2, 2015, plaintiffs filed a Status Report, informing the Court they had effectively served all defendants on January 22. ECF No. 51. On April 23, 2015, plaintiffs moved for entry of default pursuant to Fed. R. Civ. P. 55(a), following defendants' failure to answer in a timely manner. ECF No. 48. Over Syria's objections, ECF No. 49, the Court granted plaintiffs' motion and ordered the Clerk of the Court to enter a default against the defendants. ECF No. 51. The Clerk did so on January 22, 2016, ECF No. 52, and, on November 16 and 17, 2016, the Court convened a hearing to determine liability with respect to each defendant.

Citing photographic, documentary, fact and expert testimony, and taking judicial notice of the findings set out in other FSIA cases brought against Syria, the Court found defendants liable for providing material support to the ZTO and thus accountable for the deaths of Pfc.

Menchaca, SSgt. Maupin and Laurence Foley, Sr.  (Memorandum Opinion dated April 13, 2017)

ECF No. 76.  The Court simultaneously issued an Order appointing the undersigned as Special

Master to consider evidence and recommend "findings of fact and conclusions of law as to each

Plaintiff's entitlement to damages, including the availability of causes of action for each

Plaintiff."  ECF No. 77 at 1-2.

In accordance with the Order, the Special Master presents his findings and

recommendations based on a review of the transcripts and exhibits from the November 16 and

17, 2016 liability hearings; the deposition transcripts (and Errata) of Carolyn Maupin, Keith

Maupin and Dr. Craig Mallak, MD (submitted on June 7, 2017); Plaintiffs' May 26, 2017

Motion and Memorandum for Damage Awards with Points and Authorities in Support;

Plaintiffs' July 20, 2017 Memorandum Regarding Inflation; and a copy of Plaintiffs' Brief in

Response to Court Order Dated July 11, 2017 (*Burks v. Islamic Republic of Iran*, CA No. 16-cv-

1102 (CRC)) (submitted on September 5, 2017).

**Testimony of Carolyn Maupin – Matt's Mother**

Carolyn Maupin testified during the November 16, 2016 liability hearing ("CM-LH").

She supplied additional testimony by deposition taken on April 24, 2017, ("CM-DT"), and in a

May 11, 2017 Errata ("CM-DE").  According to Letters of Administration issued on March 22,

2011 by the Probate Court of Clermont County, Ohio, Carolyn is the Administrator of the Estate

of Keith Matthew Maupin.  CM. Tr. Ex 1.

Carolyn was born on January 20, 1948 in Indiana and is a citizen of the United States.

CM-LH at 47.  She currently resides in Ohio.  *Id*.  Her son, Keith Matthew Maupin, known as

Matt, was born in Ohio on July 13, 1983.  *Id*. at 48.  Carolyn's first marriage to Jack Spencer

ended in divorce.  CM-DT at 4.  In 1983, Carolyn married Keith Maupin Sr. and the couple had

two children together – Matt and his brother Kent Micah, known to the family as Micah. CM-DE at 5. Carolyn and Keith divorced in 1990 when Matt was approximately seven years old. *Id.* at 8.

Carolyn remembers Matt growing up as "fun to be around and very easy going, laid back and very interested in sports." CM-LH at 49. Matt excelled both athletically and scholastically, receiving "quite a few scholarships before going to college." *Id*. In college, Matt initially studied aerospace engineering college, *id*. at 50, and then switched his major to nutritional science. CM-DT at 12. Carolyn fondly recalls spending time with Matt, sharing family dinners, watching television, playing board games, attending sporting events, and going to the movies. *Id*. at 15.

Matt enlisted in the Army Reserve in 2002, CM-DT at 13, telling Carolyn he wanted to serve his country and hoped the military would assist with his education. CM-LH at 51. After completing boot camp at Fort Jackson in Columbia, SC, Matt deployed to Iraq. CM-DT at 14.

Carolyn recounts how, upon returning home from visiting her mother over Easter weekend in 2004, there was a message on her answering machine asking whether she had "heard about Matt." CM-LH at 52. Carolyn did not understand the message, at first, but "it wasn't long after that, about five minutes, here comes the soldier," who had been trying, unsuccessfully, to locate her for several days. *Id.* The soldier informed Carolyn that "Matt was missing," *id*., specifically, that Matt's convoy was attacked and that the Army did not know "where he was or even if he was still alive at that time." *Id*. at 53. Her house quickly filled with soldiers – one who personally assisted her, another who liaised with the media "and some . . . just to be there in case whatever we might need." *Id.* Carolyn testified that the news her son was missing "was a total shock to me. And at first I thought you must not mean Matt. But I think I was in shock for

a while because thinking about someone taking my child is, like how could that happen?" CM-DT at 18.

Carolyn's other son, Micah, was serving in the Marine Corps at the time. The Army contacted the Marines so they could advise Micah of his brother's abduction. CM-DT at 19. Carolyn contacted Stephen and Lee Ann, her children with Jack Spencer, and told them the news. *Id*. at 20, 22. Stephen immediately went to Carolyn's home, Lee Ann arrived the next day, and Micah arrived shortly thereafter. *Id*. at 20-22; CM-DE at 23.

Carolyn recalls how she "right away started praying, and believing that he would come back and they would find him alive." CM-DT at 23. She "cried a lot, [] prayed a lot [] begged a lot." *Id.* Initially, she considered going to Iraq to look for her son but the Army advised her against it, telling her, "it wouldn't be too good to have the mother of the captured soldier on the front page that she is now captured." *Id*.

Carolyn contacted the Army on a daily basis for information on her son's whereabouts. CM-DT at 24. She also traveled to Washington, D.C. "about once a month or maybe even once every two weeks" to meet with "the general and a group of soldiers from Iraq." *Id.* She testified that this ordeal lasted for "years." *Id*.

Independent of the Army's efforts, Carolyn launched her own investigation to find Matt. She started a support group with a co-worker called "Yellow Ribbon Support Center," which sent care packages to troops. CM-DT at 26. In each package, Carolyn included "pictures of Matt" along "with a note saying who he was, and please help us find him." *Id*. Carolyn estimates distributing more than 90,000 photographs of Matt. *Id*. She also donated computers to a group called "Anaconda," each pre-programmed with Matt's picture as a screen saver. *Id*. Carolyn says she did so after the Army informed her they would not distribute Matt's photograph to assist

in their search efforts. *Id*. at 27. While the Army was generally supportive of her efforts, Carolyn was often frustrated, wondering why they were unable to locate her son and bring him home. *Id*. at 28. "I never imagined it would have been four years." *Id*.

Carolyn testified that, during the four years Matt was missing, "there wasn't a day went by that I didn't worry about him, about what they were doing to him, how they were treating him." CM-DT at 29. She returned to work to keep occupied, recalling that while she was home: "I would cry. I would pray. I would beg, I mean, just for my son to come home alive." *Id*. The Army "insisted" she see a counsellor, but Carolyn found "it didn't do much" to help. *Id*. at 30. Instead, she exercised, attended church and tried to "think positive." *Id*.

One morning, Carolyn received a call from her Army contact, specifically directing her not to turn on the television until he arrived at her home. CM-DT at 32. When he arrived, he informed her: "there's a video out of Matt, and I wanted to be here when it was shown on the TV." *Id*. "So they showed it on TV.[2] And my son was with me, he was sitting beside me, Stephen; Micah hadn't come in yet." *Id*. at 33. At one point, the Army officer pointed to the video and asked: "Carolyn, is this Matt? And I said no, it is not. I truly believe that in my heart. It was not him." After viewing the video, she went into Matt's room and prayed, staying there for some time. *Id*. During the November 16 liability hearing, Carolyn again viewed the video

---

[2] On April 16, 2004, the Al-Jazeera network aired the first of two videos depicting Matt. Carolyn did not describe the events depicted in the video either during the liability hearing or during her deposition, although a copy was supplied to the Special Master. Given the video's poor quality, the Special Master looked to various contemporaneous newspaper accounts for an accurate description. As described by one news source, the April 16 video showed Matt, "not visibly wounded but surrounded by five masked men armed with automatic weapons." Matt was heard to say: "My name is Keith Matthew Maupin. I am a soldier from the 1st Division." Matt's additional statements were obscured by a contemporaneous Arabic translation. According to the translator, Matt stated: "I am married with a 10-month-old child. I came to liberate Iraq, but I did not come willingly because I wanted to stay with my child." One of Maupin's captors vowed to hold Matt "to be exchanged for some of the prisoners captured by U.S.-led occupation forces." Still in his camouflage uniform, Matt bowed his head at times as his captors spoke. "Some of our groups managed to capture one of the American soldiers, and he is one of many others," one gunman said. *See* Paul H. B. Shin & Kenneth R. Bazinet, U.S. Reservist Held by Thugs Ohio Soldier Shown on Video, New York Daily News, http://www.nydailynews.com/archives/news/u-s-reservist-held-thugs-ohio-soldier-shown-video-article-1.570927 (last viewed on July 15, 2017).

and, in response to the question whether she recognized anyone, she responded: "Matt." CM-LH at 59.

Carolyn recalls reading a newspaper article suggesting there was a second video of her son. CM-DT at 33. Unable to reach her Army contact, she called her senator who, after receiving further information, advised Carolyn it was not Matt, "it was just a doll that they had made up and put in the paper." CM-DT at 34. After viewing the second video,[3] she cried and asked herself: "my poor baby what have they done?" *Id.* at 35. She testified: "I never imagined it would be 4 years. So every day I felt that; every day. And even though I may have gone to work, I would come home and it seemed like it all – it would all build up through the day. When I got home I would just cry and cry. And then there would be times too, that I would talk to Matt, just talk to him and say hey, I know you're out there somewhere." *Id.* at 36.

Carolyn continued her work with the Yellow Ribbon Support Center, holding vigils and responding to the many letters of support she received. CM-DT at 37.

In March 2008, Carolyn received a telephone call from her ex-husband, Keith, who asked if they could meet at the Yellow Ribbon Support Center, because "some generals were coming to visit us." CM. Tr. at 38. At the meeting, one of the generals informed her that Matt was dead. *Id.* Carolyn recalls "fe[eling] like I had been cut off at the knees. And he asked me several times

---

[3] In the Complaint, plaintiffs allege that, "on June 28, 2004, Al-Jazeera broadcast another video. It showed a blindfolded man on his knees before a hole in the ground. An off camera Arabic voice identified the man as Matt Maupin. In the next scene, the terrorists shot Matt in the back of the head. The off camera voice stated that Matt had been executed because the United States had not changed its Iraq policy." Amended Complaint, ECF No 11 at ¶ 65. According to contemporaneous accounts, the image quality of this second video was so poor that military investigators were not, at first, convinced that the serviceman being executed was, in fact, SSgt. Maupin. *See* http://www.nydailynews.com/archives/news/u-s-reservist-held-thugs-ohio-soldier-shown-video-article-1.570927 (last viewed on July 15, 2017). An unnamed senior military official, however, told ABC News about the tape, stating that, while "[p]ublicly the military remains very cautious" confirming that the murdered soldier was Matt, "because no body has been located," military officials believed it was Matt. *See* Official: Tape Seems to Show Pfc. Maupin's Execution, ABCNews.go.com, http://abcnews.go.com/WNT/story?id=131739&page=1 (last viewed on July 17, 2017).

did I want to sit down, and I don't think that – I don't think what he had said registered as much as it should have because that's one thing I do not believe was going to happen." *Id*. She remembers how she "cried a little bit, but then turned to him and asked him the question, okay, now my son is not a POW?" *Id*. at 39. The general appeared not to understand her question. *Id.*

Three weeks later, a funeral service was held for Matt. CM-DT at 40. When the Army asked who should escort Matt's remains home, Carolyn requested that her son Micah do so. *Id.* at 42. A visitation was held at the local civic center which reminded Carolyn of "someone being in the Rotunda, in Washington." *Id*. at 43. Matt's remains were then escorted to the stadium in Cincinnati and from the stadium to the cemetery. *Id*. During the ride, Carolyn was accompanied by an Army general. *Id*. She recalls people lining the streets of the funeral procession. *Id*.

Carolyn testified how she "miss[es] his great smile. I just – he's my baby, I love him. And I miss his character sometimes when he would kid around. And of course, on holidays when he would eat two or three plates heaping full of food. And I miss his company very much. I mean, whenever he would come home and say mom, I'm home. I don't hear anymore." CM-DT at 45. Carolyn dedicated one of the rooms in her house to Matt's memory. *Id.* It contains scrapbooks, photographs, a letter from college informing Matt that he made the dean's list, baby pictures, a jersey from his high-school football team as well as a Christmas tree decorated with assorted mementos. *Id*. at 46.

**Testimony of Keith Maupin – Matt's Father**

Keith Maupin was deposed on April 20, 2017 ("KM-DT"). Keith was born and raised in Ohio. KM-DT at 4. He has been married twice – the second time to Carolyn in 1983, with whom he had two children, Matt and Micah. *Id*. at 5-6.

Keith describes Matt as "a daddy's boy. He liked to hang around with me a lot." KM-DT at 6. Keith remembers Matt and Micah enjoying a close relationship, *id*., and although Keith and Carolyn divorced when Matt was eight years old, he and his sons "still spent a lot of time together," *id*. at 7, including holidays. *Id*. at 11.

Keith recalls how Matt enjoyed fishing, playing soccer, riding his bike and spending time with his friends. KM-DT at 11. He remembers Matt as a diligent student who earned "a scholar athletic award every year." *Id*. at 12. He described how Matt graduated high school in 2001, studied aerospace engineering while a freshman at the University of Cincinnati, *id*. at 13; and enlisted in the military in 2002 after "watching the towers fall." *Id*. at 14.

Keith, who completed two tours of duty in the Marine Corps, was not particularly happy that both his sons enlisted in the military. KM-DT at 14. Keith believes Matt excelled at his military training, noting how, in the last 24-hour long exercise, Matt "jumped in a hole and cut a big gash in his leg and [] never said nothing about that." KM-DT at 15. He recalls how Matt was unable to attend his graduation ceremony from boot camp as he was hospitalized at the time, receiving treatment for the cut on his leg. *Id*. Keith is proud of Matt's accomplishments. *Id*. at 16.

Keith and Carolyn drove Matt to the airport when he deployed to Iraq. KM-DT at 17. Keith testified that, "on the way back, I told his mom, I said this is not going to be good for Matt. She said she felt the same way but didn't want to say anything." *Id*. Keith never spoke to Matt directly while he was overseas. *Id*. at 17-18. Instead, they communicated online. *Id*. at 18. During one of those communications, Matt told his father: "this place sucks." *Id*.

The day Matt was abducted, Keith was fishing with his friend when he inexplicably felt the need to return home. KM-DT at 18. Twenty minutes after he arrived, Carolyn telephoned

and asked Keith to contact his friend Larry, an Army officer. *Id.* at 19. Keith called Larry, who insisted they speak face to face. When he arrived at Keith's home, Larry informed him that "Matt's convoy was captured and he's missing." *Id.* Keith recalls asking: "what the hell do you mean he's missing. Hell, he's six foot two, 220 pounds. How can you miss somebody like that? *Id.* Keith testified: "It never dawned on me what he was talking about until a few seconds later. He said his convoy was attacked and when they did a head count Matt was missing. *Id.* Keith remembers how the news "broke my heart." *Id.*

The following Friday, the Al Jazeera network broadcasted a video of an American soldier surrounded by gunmen, KM-DT at 19-20. While others in the family who saw it said "well, that's not Matt," Keith "knew that was Matt." *Id.* at 20. Keith describes feeling "helpless." *Id.* The Army assured him they would do whatever was necessary to return Matt home safely. *Id.* at 21.

During the time Matt was missing, he and Carolyn,

continued to send care packages to anywhere in Iraq that we could get a new zip code because – the ZIP code, meaning a new section in Iraq. If we got an address, we would send at least 50 small-sized pictures of Matt and put inside that box. And on the back of the pictures it says place me in your Bible and prayers can set me free. So we probably sent, I don't know, 150,000 of those pictures to Iraq at different locations.

KM-DT at 21-22. This effort was undertaken by the Yellow Ribbon Support Center, the group founded by Carolyn and her friend. *Id.* at 24-25. They sent care packages to any soldier they could identify. *Id.* at 25. During the four years Matt was missing, Keith and Carolyn conferred constantly with members of the military, who would explain the steps they were taking to find their son. *Id.* at 26.

Keith's conviction that Matt would be found never wavered, KM-DT at 27, despite being told that more time that elapsed, "the less chance that Matt is going to walk out of there." *Id.* He

found it "hard to describe" his feelings during those four years. He slept little and ate when he could but knew "there was just no way they were going to leave Matt in Iraq." *Id*. at 28.

Keith's meetings with Pentagon officials convinced him that the military had formulated no strategy to secure Matt's return. KM-DT at 30. Keith found that working at the Yellow Ribbon Support Center was his "way of coping with Matt." *Id.* He and Carolyn convened numerous press conferences where Keith would write and Carolyn would deliver the statements. *Id.* at 31. Keith could not personally address the cameras, concerned he would become too emotional. *Id*. at 32. He hoped that their news conferences would appeal to Matt's captors. *Id.*

When asked if the Army ever brought Matt home, Keith replied, "[n]ot all of Matt. They had told us that they – they found Matt's remains, but they needed to do that really micro DNA stuff to make – to make sure that it was Matt because we only got a jawbone, some vertebrae and a piece of arm is all we got back of Matt. We never saw Matt." KM-DT at 34.

Keith misses Matt's "company and his demeanor. He was just – he was just good to be around." *Id*. at 36. Keith is "heartbroken" over the loss of his son. *Id*. at 37.

**Testimony of Craig Thomas Mallak, M.D.**

Craig Mallak, M.D., is a forensic pathologist currently serving as Chief Medical Examiner and Chief Trauma Officer for Broward County, Florida. Dr. Mallak testified during the November 16, 2017 liability hearing, ("Mallak T1"), at the conclusion of which the court qualified him as an expert in the field of forensic pathology. Mallak T1 at 129, 130. His testimony continued to the following day. ("Mallak T2"). Dr. Mallak supplied additional testimony by deposition taken on April 13, 2017 ("Mallak DT").

Between 2002 and 2012, Dr. Mallak served as Chief of the Armed Forces Medical Examiner System, responsible for investigating military deaths. Mallak T1 at 113, Ex. 17. Dr.

Mallak performed more than 3,000 autopsies in his career, Mallak T2 at 37, and was present when Matt's autopsy was performed. Mallak T1 at 122.

During the liability hearing, Dr. Mallak referenced an anthropological report, the official autopsy report as well as several diagrams. Dr. Mallak explained the autopsy was not "an autopsy in the classical sense of the word," as Matt's complete skeleton was never found – "it was several bones that were found in the area, along with an army blouse, a shirt, and they were all the bones in the area." Mallak T1-148. Ten of the bones tested matched Matt's DNA profile. *Id*. at 154.

An examination of those bones revealed,

an injury that occurred at the time of his death on his mandible, and it was a fracture on the right-hand side, and the posterior portion of the jaw bone is missing, but it's a jagged, irregular fracture with the same color and decompositional processes, as we saw in the rest of the bones. And to break that part, the back of the jaw there would take significant force, and that was the major – that was the single real injury that we could see on the bone, on the skeletal structure.

*Id*. at 156.

Reading directly from the autopsy report, Dr. Mallak testified: "None of the rest of the bones identified as Staff Sergeant Maupin showed any evidence of perimortem trauma." Mallak T1 at 157. He explained that this lack of evidence "makes an exact determination as to the cause of death difficult. However, there's no evidence to support that he did not die at the hands of another. Given the totality of the circumstances, the cause of death is best ruled homicide, by unspecified means, and the manner of death homicide." *Id*. at 157-158.

Referencing the photographs of Matt's jawbone, Dr. Mallak explained that the injury Matt sustained was "most likely blunt force that impacted with a very significant amount of force to snap it off." Mallak T1 at 160. Dr. Mallak concluded the injury occurred "at the time of death," *id*. at 161, which transpired "definitely closer to the time of his disappearance." *Id*. at

162.  Based on the information available, Dr. Mallak stated it would be "impossible" for him to determine whether Matt was conscious at the time the injury was inflicted.  *Id*. at 163.

Dr. Mallak supported his deposition testimony with three diagrams.  The first diagram illustrates a cross-section of a brain, "laying it out in a fairly simplistic manner to look at what part of the brain do what"  Mallak DT at 18-19.  The second diagram depicts "a slice of the brain to that area where pain is, where the receptors of the brain are.  And then there's an overlay of a human body . . . to show what percentage that area is devoted to which areas of the body that receive pain perception."  Mallak DT at 19-20.  Dr. Mallak explained that, although "that part of the brain that's used for pain receptors of the face, basically makes up about 4 percent of the body, it encompasses about a quarter of all of the pain receptors from the entire body."  *Id*. at 20.  As such, "an injury to the face, [] causes much greater pain than, say, an injury to the arm or leg or other areas of the body that have fewer pain receptors."  *Id*.

The third diagram is a representation of a human head which Dr. Mallak used to explain how "the muscles under the skin which have significant number of sensory fibers in them that would have been torn when the jaw was broken."  Mallak DT at 21.  The bottom part of the diagram indicates the "blunt force injury" to the jaw, and the nerves such an injury would impact.  *Id*.  Those pain receptors "will continue to fire as long as he was alive and causes a great deal of pain."  *Id*. at 21-22.

With respect to the time blunt force was applied, Dr. Mallak testified that the "discoloration and the breakdown of the [jaw]bone is the same as the rest of the jaw, the rest of the mandible, and so it would be at the same time as the fatal injury occurred"  Mallak T1 at 162.

Dr. Mallak was certain Matt suffered both mental and physical torture.  Mallak T2 at 13. He based his conclusion on "the regular briefings about the types of actions [the ZTO] was

taking against our troops," *id.* at 14, coupled with his "experience with all these cases," *id.* at 13, and the specific "videos of [Matt] alone, unarmed, surrounded by insurgents who were holding weapons, and . . . verbally and mentally abusing him throughout that time," *Id.*

The court credited Dr. Mallak's testimony as well as that offered up by Daveed Gartenstein-Ross – "a certified expert in the evolution of the history of terrorist organizations and their claims of responsibility for acts of terrorism," Memorandum Opinion at 8 n.4. In Mr. Gartenstein-Ross' expert testimony, "Zarqawi was known for 'absolutely extreme acts of brutality and torture." Gartenstein-Ross T2 at 61. Based on Dr. Mallak's experience with similar victims of terror and the testimony of Mr. Gartenstein-Ross, the court "conclude[d] that Maupin was physically tortured and then killed." *Id.* at 25.

## ANALYSIS

Plaintiffs seek damages under 28 U.S.C. § 1605A(c) for the "kidnapping, torture and execution" of Matt Maupin. Amended Complaint, ECF No. 11 at 29. In addition to their statutory claims, plaintiffs allege defendants are liable for the common-law torts of assault, battery, false imprisonment, kidnapping and intentional infliction of emotional distress. ECF No. 11.

It is beyond the remit of the Special Master to consider the viability of plaintiffs' common-law claims, much less ascribe damages for any breaches thereof. Rather, the Special Master's inquiry is confined to analyzing plaintiffs' entitlement to those damages specifically delineated in the Foreign Sovereign Immunities Act ("FSIA"), namely, pain and suffering, solatium and those arising due to economic loss. *See* 28 U.S.C. § 1605A(c) (4). Before doing so, however, some preliminary observations are in order.

To recover under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent as any other default winner." *Hill v. Republic of Iraq,* 328 F.3d 680, 683-84 (D.C. Cir. 2003) (citation omitted). In the context of a default judgment, courts in this

jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages." *Rhodes v. U.S.*, 967 F.Supp.2d 246, 313 (D.D.C. 2013) (emphasis in original) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)). For future damages, plaintiffs must prove entitlement to a "reasonable certainty," or by a preponderance of the evidence, and must prove the amount of damages by a "reasonable estimate." *Hill*, 328 F.3d at 684. For past losses, a plaintiff must "prove the *fact* of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (emphasis added), yet need only "reasonably prove" the amount of damages. *Hill*, 328 F.3d at 684.

Upon consideration of the testimonial and documentary evidence presented, and in light of the legal framework set out below, the Special Master considers those damages for pain and suffering, solatium and loss of accretions available to Matt Maupin's estate and to his parents.

### a. Pain and Suffering

Claims "for the conscious pain and suffering" inflicted on victims of terrorism are "actionable through their estates." *Gates v. Syrian Arab Republic*, 580 F.Supp.2d 53, 72 (D.D.C. 2008). And while "[p]utting a number on these kinds of harms can be difficult," *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F.Supp.2d 120, 134 (D.D.C. 2005), courts "will not simply award what it abstractly finds to be fair." *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 34 (D.D.C. 2002). Rather, they "will look at damage awards for pain and suffering in other cases brought under the FSIA." *Id.* In other words, "precedence guides its calculations." *Id.* The evidentiary gaps in this case, however, render it difficult to apply these precedents formulaically. It is therefore necessary to explicate some of the methodologies courts

in this jurisdiction have employed when calculating pain and suffering damages to victims who have been held captive, tortured, and/or killed.

Where the duration of a victim's detention can be ascertained, courts have calculated pain and suffering by multiplying a *per diem* amount – usually $10,000 – by the number of days of captivity. *See, e.g., Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 88 (D.D.C. 2002) (Jackson, J.) (finding $10,000 to be "a useful benchmark for beginning the damages calculus in a manner that is both just and consistent with previous awards"); *Daliberti v. Republic of Iraq*, 146 F.Supp.2d 19, 26 (D.D.C. 2001) (Oberdorfer, J.) (finding $10,000 per day of incarceration to be "reasonable and appropriate"); *Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d 107, 114 (D.D.C. 2000) (awarding hostage Terry Anderson $24,540,000 for 2,454 days in captivity). The court in *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27 (D.D.C. 2001), explained that Congress, "by declining to take issue with judgments of approximately $10,000 per day of captivity by the United States Treasury in the Victims of Trafficking and Violence Protection Act of 2000, had tacitly approved approach to awarding damages for pain and suffering in these cases." *Id.* at 37.

Other courts have "adjusted the amount of the *per diem* award based on the severity of the maltreatment suffered by the plaintiff." *Cronin v. Islamic Republic of Iran*, 238 F.Supp.2d 222, 234-35 (D.D.C. 2002), *abrogated on other grounds by, Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004). *See, e.g., Hill v. Republic of Iraq*, 175 F.Supp.2d 36, 48 (D.D.C. 2001) (Jackson, J.), *rev'd on other grounds, Hill v. Republic of Iraq*, 328 F.3d 680 (D.C. Cir. 2003) (awarding soldiers held captive in Iraq between $3,000 and $5,000 per day of captivity).

A *per diem* formula has been rejected in those circumstances where the award "would not adequately compensate for the unique and egregious harms resulting from the captives' status as POWs," *Acree v. Republic of Iraq*, 271 F.Supp.2d 179, 219-220 n.10 (D.D.C. 2003) (Roberts, J.), *vacated on other grounds*, 370 F.3d 41 (D.C. Cir. 2004). In *Acree*, for example, Judge Roberts awarded sums ranging between $10-20 million depending on severity of treatment and length of confinement. In *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62, 69-70 (D.D.C. 1998), Judge Jackson awarded between $3-19 million in damages, while in *Higgins v. Islamic Republic of Iran*, Civ. A. No. 1:99cv00377 (CKK), 2000 WL 33674311 *8 (D.D.C. Sept. 21, 2000), the court awarded $30 million in compensatory damages for the pain and suffering endured by Colonel William Higgins, who was held for 529 days "in cruel and primitive conditions" and was tortured prior to being executed. *Id.* at *2. And in *Estate of Bayani v. Islamic Republic of Iran*, 530 F.Supp.2d 40 (D.D.C. 2007), Judge Kennedy awarded $22,331,500 in compensatory damages for the "detention, torture, and execution" of Siavash Bayani. *Id.* at 45, 46.

*Per diem* approaches have similarly been overruled in favor of lump sums "because of the brevity of the captivity." *Cronin*, 238 F.Supp.2d at 234. In *Cronin*, the court awarded $1.2 million to John Cronin, a student at the American University in Beirut, who was held for three days, while in *Stethem*, 201 F.Supp.2d at 87–89, the court awarded compensatory damages in the amount of $500,000 to the estate of Navy petty officer Richard Stethem for his pain and suffering after he was severely beaten over a fifteen hour period.

Finally, some courts have combined methodologies, enhancing the *per diem* amount with a lump sum award. *See, e.g., Price*, 384 F.Supp.2d at 135-36 (Lamberth, J.) (lump sum of $7 million added to $10,000 *per diem*); *Surette v. Islamic Republic of Iran*, 231 F.Supp.2d 260, 269

(D.D.C. 2002) (Friedman, J.) (supplementing $10,000 *per diem* award with lump sum of $1 million); *Hill*, 175 F.Supp.2d 36 (adding lump sum ranging between $100,000 and $500,000 to *per diem* calculation).

As discussed below, the evidence presented here precludes strict application of any one methodology.

In the first instance, there is no evidence specifying the length of time Matt was in captivity. The only known dates are April 9, 2004, when Matt was captured and March 20, 2008, when his remains were uncovered. And while there is evidence that one Al Jazeera video showing Matt was aired on April 16, 2004 and another on June 28, 2004, the record is silent with respect to the date either was filmed. Determining these dates would have allowed a calculation of the minimum days Matt was in captivity and assist with any *per diem* application.

Dr. Mallak's testimony offers no additional insight in this respect, as he was only able to determine that the brutal injury sustained to Matt's jaw occurred "at the time of death," Mallak TR1 at 161, which he believes transpired "definitely closer to the time of his disappearance." *Id.* at 162. *See also* Examination and Positive Identification of SSG Keith Matthew Maupin, USA (April 8, 2008) ("Autopsy Report") ("The advanced degree of environmental degradation exhibited by the identified skeletal remains is consistent with a post mortem interval *dating approximately to a time period after the capture of SSG*"). ECF No. 76 at 12 (emphasis added). Approximate dating does not, however, assist in the creation of a timeline. And with respect to Matt's mandibular trauma and the concomittant pain it may have caused, neither Dr. Mallak nor the Autopsy Report indicated whether that it was inflicted while Matt was conscious, much less alive.

These evidentiary blanks make it equally difficult to draw direct comparisons to those cases where courts have awarded lump sums. In *Acree*, for example, the torture endured by 17 surviving servicemen who were captured by Iraqi forces in 1991was bolstered by the "affidavits filed by each plaintiff, the affidavits filed by plaintiff's experts, plaintiffs' medical records, and videotaped depositions of certain plaintiffs." 271 F.Supp.2d at 183 n.1. Based on the level of detail supplied by this corroborative information, the court was able to populate three groups ordered hierarchically depending on the severity of the torment of each of the captives and then to fashion awards in the amounts of $20 million, $15 million and $10 million to each serviceman commensurate with the group to which they were assigned. *Id.* at 220.

The difficulty comparing the evidence available in this case to those cited above does not, however, end the inquiry, as the Special Master, in fashioning an award, may consider any "special problems of proof arising from the defendant's absence." *Hill*, 383 F.3d at 685.

The Special Master must consider, in the first instance, that any lack of evidence is directly attributable to the actions of the defendants. Moreover, these evidentiary gaps do not diminish the significance of what already is known. For example, it has been established that the ZTO, the organization responsible for the capture, torture and murder of SSgt. Maupin, is the same group that beheaded Pfc. Thomas Tucker; mercilessly tortured and murdered Pfc. Kristian Menchaca; and gunned down Laurence Foley in front of his house. It is a matter of historical record that the ZTO is the organization that "conducted numerous deadly terrorist attacks against U.S. and coalition forces, as well as Iraqi civilians, using suicide bombers, car bombs and executions," *Smith v. Obama*, 217 F.Supp.3d 283, 287 (D.D.C. 2016), and whose members, "planned an attack on several Jordanian and American targets in Amman, including the U.S. embassy, involving detonation of a truck bomb laden with chemicals that . . . would create a

chemical plume with the capability of kill[ing] over 100,000 people." *Thuneibat v. Syrian Arab Republic*, 167 F.Supp.3d 22, 29 (D.D.C. 2016) (internal quotation marks and citations omitted). One court described the ZTO as "capable of barbarism after the brutal and public acts of terrorism," which they "transform[]" into "heinous acts into infamous and indelible propaganda." *Gates*, 580 F.Supp.2d at 74. The "propaganda" in that instance consisted of a video graphically depicting the decapitation of two American civilians "by a technique not fit for the slaughter of animals because of its clumsiness and abject viciousness." *Id.* at 75.

This case is not unique for its difficulty piecing together evidence obscured by terrorist actors. In *Kilburn v. Islamic Republic of Iran*, 699 F.Supp.2d 136, 152 (D.D.C. 2010), the court confronted similar evidentiary difficulties. There, "the precise circumstances of Peter Kilburn's [16-month] captivity [were] not known because of his subsequent murder." *Id.* at 152. Notwithstanding these gaps, the court credited the expert testimony of Dr. Patrick Clawson, Deputy Director of the Washington Institute for Near East Policy, and found "no reason to believe that the circumstances of Peter's time as a hostage were any different from other captives of Hizbollah, such as Thomas Sutherland, Terry Anderson, or William Buckley" – circumstances which were "extraordinarily unpleasant and included, *inter alia*, beatings, unsanitary conditions, inadequate food and medical care, and mock executions." *Id*. (internal quotation marks and citations omitted).

It requires no leap of faith to infer from the evidence supplied in *Thuneibat* and *Gates*, as well as the record describing Kristian Menchaca's ordeal, that the torture Matt suffered was equally horrific. Stated alternatively, it would defy common sense to assume Matt was treated more humanely than Pfc. Kristian Menchaca or to limit Matt's award for pain and suffering because he was unable to personally render a detailed account of his torment.

The Special Master finds that the evidence concerning the captivity, torture and murder of Matt Maupin militates in favor of a lump sum award as any other methodology cannot "adequately compensate" for the savage treatment he must have suffered at the hands of his captors. *Acree*, 271 F.Supp.2d at 219-220 n.10. The Special Master therefore recommends that that the Estate of Keith Matthew Maupin receive $10 million in compensatory damages for pain and suffering.

### b. Economic Damages

28 U.S.C. § 1605A, like its statutory predecessor 28 U.S.C. § 1605(a) (7), establishes a cause of action for economic damages resulting from an act of state-sponsored terrorism. As a general rule, loss of accretion damages are calculated by estimating a decedent's future earning potential based on the individual's work and education and adjusting that amount to account for inflation, rise in productivity, job advancement, and personal consumption. *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 87 (D.D.C. 2002).

In support of her prayer for economic losses, Carolyn Maupin, the administrator of her son's estate, submitted evidence in the form of a report dated May 25, 2017, prepared by the Center for Forensic Economic Studies ("Maupin CFES Report"). The CFES estimated the present value of Matt's cumulative economic losses to be $1,087,294. Maupin CFES Report at 7.

The economists who generated the report arrived at that number after reviewing the April 8, 2011 Complaint, Matt's U.S. Army Enlistment Document, the April 15, 2008 Report of Casualty, Matt's University of Cincinnati Transcript as well as Matt's W-2 Wage and Tax Statements covering the years 1999 through 2004. They proceeded to overlay the information gleaned from those sources onto data supplied by the National Center for Health Statistics, the

U.S. Department of Defense Finance and Accounting Service, the U.S. Census Bureau, the U.S. Department of Labor, Bureau of Labor Statistics, other professional and governmental documentation, and information submitted by members of Matt's immediate family.

Based on this information, the CFES assumed Matt's period of active duty would end on June 3, 2005, after which "he would transition to the Army reserves and fulfill the rest of his eight year military obligation, through August 1, 2010." Maupin CFES Report at 2. The calculations were further premised on the assumption that, following his discharge from the Army, Matt would have secured employment with earnings consistent with the average high school diploma holder by September 1, 2005. The economists projected Matt's potential income stream based on the average earnings of similarly situated holders of a Bachelor's degree by July 1, 2006. They arrived at their final figure after factoring an average 2.9% annual future earnings growth, federal and state taxes between 8.6% and 21.4%, personal maintenance expenditure deductions ranging between 52.2% and 87.0% and retirement benefits equal to 5.7% of annual earnings between 2006 and 2044. To arrive at "present value," the CFES, using high-grade municipal bonds, assumed a 3.61% return on principal investments and a 4.49% return on reinvested interest.

The Special Master finds the methodology employed by the CFES in calculating economic loss to be appropriate, including its assumptions as to inflation, taxes, personal consumption, and net earnings. The Special Master finds further that the assumption that Matt would have worked until he was 61 years old to be conservative considering the U.S. Census Bureau puts that number at 63. Similarly reasonable is the CFES' use of high-grade municipal bonds to calculate present value.

The Special Master therefore recommends that this Court award the estate of Keith Matthew Maupin $1,087,294 in economic damages, in accordance with the recommendation of the Maupin CFES Report.

### c. Solatium Damages

Plaintiffs seeking damages for loss of solatium include Matt's mother, Carolyn and his father, Keith.

It is well established that, "[a]cts of terrorism by their very definition are extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran,* 667 F.Supp.2d 8 (D.D.C. 2009) (*citing Stethem,* 201 F.Supp.2d at 89). When a terrorist act results in death, that emotional distress, "with its attendant horrific surrounding circumstances, prevents the anguish [felt by a relative of the deceased] from subsiding." *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 31 (D.D.C. 1998). Solatium damages are therefore available as compensation for the "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort." *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F.Supp.2d 48, 83 (D.D.C. 2011) (internal quotation marks and citation omitted). Entitlement to these damages are available to plaintiffs not "present at the place of outrageous conduct." *Heiser v. Islamic Republic of Iran,* 659 F.Supp.2d 20, 27 (D.D.C. 2009) ("*Heiser II*") (citing *Jenco,* 154 F.Supp.2d at 36).

Where the victim of a terrorist act was killed, the courts consider several factors, including: "(1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature

(i.e., closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimant's mental anguish in excess of that which would have been experienced following the decedent's natural death." *Stethem*, 201 F.Supp.2d at 89-90.  Of these, courts place particular emphasis on the cause of death in terrorism cases, reasoning that "the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time." *Elahi*, 124 F.Supp.2d at 111.

Even with these guideposts, claims for solatium, unlike those for lost wages, are "undeniably difficult to quantify," *Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229, 254 (D.D.C. 2006) (*Heiser I*), and not readily susceptible to "models and variables." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000) (citations omitted).  Accordingly, courts are often guided by remedial approaches and formulas employed in similar cases. And in cases where solatium damages are sought, the vast majority of courts in this jurisdiction employ the damages model articulated in *Heiser I*.  In accordance with that framework, "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a spouse approximately $5 million to a parent whose child was killed and approximately $2.5 million to a plaintiff whose sibling was killed." *Heiser I*, 466 F.Supp.2d 269.  Children of a deceased victim typically receive an award of $3 million.  *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 47 (D.D.C. 2012) (citing *Stern v. Islamic Republic of Iran*, 271 F.Supp.2d 286, 301 (D.D.C.2003)).

These baseline awards, while instructive, are "not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010), as "strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009) (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d

40, 59 (D.D.C. 2006)).  Recognizing the flexibility inherent in these awards, courts have deviated from these numbers where circumstances dictated.

Deviations in an upward direction, for example, have been warranted: (1) in the face of "aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering, such as cases involving torture or kidnaping of a spouse," *Greenbaum v. Islamic Republic of Iran*, 451 F.Supp.2d 90, 108 (D.D.C. 2006); (2) where the "evidence establish[es] an especially close relationship"; (3) in the presence of "medical proof of severe pain, grief or suffering on behalf of the claimant"; or (4) where the "circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 26-27 (D.D.C. 2011).  Conversely, downward departures may be provident where the evidence suggests an attenuated relationship between the victim and his family members.  *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 86 (D.D.C. 2010).  Indeed, solatium awards have been denied "where no evidence is offered to show injury that an award of solatium damages might compensate."  *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379, 405 (D.D.C. 2015).

The torment Carolyn Maupin underwent is amply documented.  Not only was Carolyn unaware if her son was alive or dead for four years, she was compelled to watch videos of Matt kneeling in front of his armed captors and then being shot in the head.  These constitute the "aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering." Similarly, Carolyn's "especially close relationship" with Matt is readily inferred from her actions, which include founding a support group, distributing close to 100,000 photographs of Matt in care packages throughout Iraq, distributing computers bearing a Matt's picture, conferring constantly with the military and holding press conferences.  And while the record

contains no medical records formally diagnosing Carolyn's condition, the terrorists who abducted her son certainly made Carolyn's suffering "more acute or agonizing."

In light of this evidence, the Special Master recommends that Carolyn receive a $2 million enhancement to the $5 million baseline award set out in *Heiser I*, for a total of $7 million in compensatory damages for her loss of solatium.

Keith Maupin did not live with Matt since his divorce from Carolyn, when Matt was seven or eight years old. Nonetheless, the record indicates that he and Matt spent considerable time together while Matt was growing up. Like Carolyn, Keith watched the terrorist propaganda videos of his captured son and joined Carolyn's tireless efforts to bring Matt home safely. For these reasons, the Special Master finds that an enhancement is warranted and recommends that Keith Maupin receive $7 million in compensatory damages for loss of solatium.

### d. Prejudgment Interest

Plaintiffs also seek prejudgment interest on their damages awards. On May 25, 2017, plaintiffs filed with the Special Master a Motion and Memorandum for Damage Awards with Points and Authorities in Support ("Motion for Damages") asking that prejudgment interest be added to any damage awards. Motion for Damages at 59-61. The Motion for Damages represents the first instance in which plaintiffs have asked for prejudgment interest. Notably, plaintiffs neither specify the damages for which they are seeking prejudgment interest nor do they indicate the time period for which this enhancement should be added. More significantly, the Motion for Damages was not filed with the Court and the requested relief was not prayed for in the Amended Complaint. For the reasons set out more fully below, plaintiffs' motion is procedurally and, for the most part, substantively infirm and the Special Master recommends it be denied.

Plaintiffs' failure to seek prejudgment interest in its pleadings runs afoul of the rules of civil procedure and precludes them from relief.

Fed. R. Civ. P. 54(c) provides, in relevant part, that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." *See Boland v. Yoccabel Const. Co*., 293 F.R.D. 13, 17 (D.D.C. 2013) ("the relief available on default [should] be such as is within the fair scope of the allegations of the complaint and, when money judgment is sought, the specific amount demanded") (citation omitted)). Two months ago, a court in this jurisdiction denied a party's request for prejudgment interest raised solely in its proposed findings of fact and conclusions of law. *See Cohen v. Islamic Republic of Iran*, CA No. 12–cv–01496 (CRC), --- F.Supp.3d ---, 2017 WL 3207693 at *3 n.2 (July 27, 2017). Citing Rule. 54(c), the court explained that it "will consider only the relief requested in the Complaint and will not award prejudgment interest on the compensatory damages award." *Id.* at. Similarly, in a case decided only six months ago, the court in *Gill v. Islamic Republic of Iran*, CA No. 15–2272 (RBW), --- F.Supp.3d ---, 2017 WL 1289938 (D.C. Apr. 6, 2017), declined an award of prejudgment interest prayed for in plaintiffs' proposed findings of fact and conclusions of law. *Id.* at *10 n.7. Citing Rule 54(c), the court held it could "consider only the damages requested in the plaintiff's Complaint." *Id.*

Plaintiffs did not request prejudgment interest in any of their filings before the court. As stated, the only document requesting such relief was in plaintiffs' Motion for Damages filed only with the Special Master. Plaintiffs "could easily have drafted a complaint that included a distinct claim . . . in the demand clause . . . . [their] failure to do so, intentional or not, ran the risk that his damages would be limited in the event of default." *Salmeron v. District of Columbia*, 77 F.Supp.3d 201, 212 (D.D.C. 2015), *judgment vacated on other grounds by*, *Salmeron v. District*

*of Columbia*, 113 F.Supp.3d 263 (D.D.C. 2015) (quoting *Silge v. Merz*, 510 F.3d 157, 159, 160 (2d Cir.2007)).

For each of the nine causes of action pressed in the Amended Complaint, plaintiffs ask compensation "for the damages they suffered, *including, but not limited to*, pain, suffering, mental anguish, and pecuniary losses all other relief the Court deems just." (Emphasis added.) Even according the phrase "including but not limited to" its broadest possible construction, its "formulaic language cannot substitute for the meaningful notice called for by Rule 54(c)." *Silge*, 510 F.3d at 160. *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1277 n. 6 (9th Cir. 2006) ("language ... seeking 'such other and further relief as the court may deem proper' is mere boilerplate, meant to cover all bases as to the claims asserted in the complaint").

In the final analysis, "[i]t would be fundamentally unfair to have the complaint lead defendant to believe that only a certain type and dimension of relief was being sought and then, should defendant attempt to limit the scope and size of the potential judgment by not appearing or otherwise defaulting, allow the court to give *a different type of relief* or *a larger damage award*." *Boland v. Yoccabel Const. Co.*, 293 F.R.D. at 19 (emphases added). Plaintiffs' request for prejudgment interest "differ[s] in kind from" their asserted claims for compensatory damages. As such, the "amended complaint's demand for compensatory damages, without specifically requesting pre-judgment interest, does not provide adequate notice to [defendants], as an award for compensatory damages will not necessarily include pre-judgment interest." *ExxonMobil Oil Corporation v. Black Stone Petroleum Inc.*, 221 F. Supp. 3d 755, 767-68 (E.D. Va. 2016). Keeping in mind that prejudgment interest does not fall within of the scope of FSIA damages and that the decision whether to award and the amount of such an award is always "discretionary," *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997), there is no

guarantee that adding prejudgment interest to the compensatory damage calculus will not "exceed in amount" plaintiffs' individual prayers for relief.

In addition to the aforementioned infirmities, plaintiffs' request fails to demonstrate an entitlement to prejudgment interest for punitive, economic and solatium damages, as a matter of law. Should plaintiffs overcome the aforementioned procedural hurdles, the Special Master finds, for the reasons set out below, they would be entitled only to receive prejudgment interest for the award of pain and suffering.

Prejudgment interest is intended "to compensate the plaintiff for any delay in payment resulting from the litigation," *Price*, 384 F.Supp.2d at 135, and to avoid the unsupportable circumstance of [a defendant] profiting from its terrorist acts." *Pugh*, 530 F.Supp.2d at 264. Here, plaintiffs presumably seek an enhancement for all remedies allowed under the FSIA, namely, "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). The Special Master will address each in turn.

An award of prejudgment interest apropos of economic damages is inappropriate as the Special Master's recommendation has already been discounted to present value, rendering, "a separate award of prejudgment interest . . . duplicative." *Thuneibat*, 167 F.Supp.3d at 54-55. *See Roth*, 78 F.Supp.3d at 407 ("The Court concludes, however, that it cannot award such interest . . . . the economic loss damages awarded to the estate of [the deceased] have already been discounted to present value"); *Amduso v. Republic of Sudan*, 61 F.Supp.3d 42, 53 (D.D.C. 2014) ("Because some of the economic loss figures recommended by the special masters have already been adjusted to reflect present discounted value, . . the Court will not apply the prejudgment interest multiplier to the economic loss amounts") (internal citation omitted); *Doe v.*

*Islamic Republic of Iran*, 943 F.Supp.2d 180, 185 (D.D.C. 2013) ("Because the figure is already in 2012 dollars, no further award of prejudgment interest is appropriate").

Similarly, prejudgment interest is not warranted with respect to solatium damages in light of the Special Master's express reliance on the guidelines established in *Heiser I* in formulating his recommendation. In *Oveissi*, the court determined that "values set by [the *Heiser*] scale represent the appropriate level of compensation, regardless of the timing of the attack." 768 F.Supp.2d at 30 n. 12. Responding to the plaint that "such interest is necessary to fully compensate Mr. Oveissi for the enormous loss he sustained," the court observed" that the upward adjustments from the *Heiser* valuation fulfill this very function." *Id.* (internal quotation marks omitted).

This holding and its underlying rationale enjoy considerable support in this jurisdiction. *See, e.g., Harrison*, 882 F.Supp.2d at 51 (rejecting prejudgment interest request on the grounds there was not only no evidence of delay but it conflicted with the court's use of the *Heiser* framework); *Wultz v. Islamic Republic of Iran*, 864 F.Supp.2d 24, 43 (D.D.C. 2012) ("Because this Court has applied the framework in *Heiser* to its calculation of solatium damages, prejudgment interest is not appropriate for these awards"); *Brown*, 872 F.Supp.2d at 45 ("When this Court applies the *Heiser* and *Peterson II* damages framework, it does not typically award prejudgment interest"); *Roth*, 78 F.Supp.3d at 407 ("the Court does not award prejudgment interest on solatium damage awards that are based on the *Heiser* framework").

To the extent plaintiffs seek an enhancement for punitive damages, their request is unsustainable in light of *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), barring punitive damages for conduct preceding the enactment of the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"). *Id.* at 817*, rehearing denied*, October 3, 2017. Here, the

underlying conduct took place in 2004 – four years before the NDAA was enacted. Even in the absence of a statutory bar, "prejudgment interest does not apply to punitive damages because prejudgment interest is an element of complete compensation and punitive damages are non-compensatory." *Thuneibat*, 167 F.Supp.3d at 55 (internal quotation marks and citation omitted).

Plaintiffs may, however, have a colorable claim for prejudgment interest for the award of pain and suffering, provided they demonstrate their procedural entitlement to assert such a claim

In the context of the FSIA, prejudgment interest purports to redress those situations "where plaintiffs were delayed in recovering compensation for their injuries – including, specifically, where such injuries were the result of targeted attacks perpetrated by foreign defendants." *Pugh*, 530 F.Supp.2d at 263. As one court explained:

> Awards for pain and suffering and solatium are calculated without reference to the time elapsed since the attacks. Because plaintiffs were unable to bring their claims immediately after the attacks, they have lost use of the money to which they were entitled upon incurring their injuries. Denying prejudgment interest on these damages would allow defendants to profit from the use of the money over the last fifteen years. Awarding prejudgment interest, on the other hand, reimburses plaintiffs for the time value of money, treating the awards as if they were awarded promptly and invested by plaintiffs.

*Khaliq v. Republic of Sudan*, 33 F.Supp.3d 29, 34-35 (D.D.C. 2014).

As the decision to award prejudgment interest is a question resting exclusively with each court's "discretion, subject to equitable considerations," *Pugh*, 530 F.Supp.2d at 263, courts have applied different formulas for computing the "delay" necessary to trigger an enhancement. In *Price*, the court held that "[t]he purpose of such awards is to compensate the plaintiff for any delay in payment *resulting from the litigation*." 384 F.Supp.2d at 135 (emphasis added). In that spirit, several courts have focused on whether plaintiffs were obstructed in any way in prosecuting the claims. *See, e.g., Pugh*, 530 F.Supp.2d at 265 (awarding prejudgment interest "because of the substantial delay in judgment for these plaintiffs caused by Libya's *persistent*

*delay tactics over the course of this litigation*") (emphasis added); *Wultz*, 864 F.Supp.2d at 43 (denying prejudgment interest after finding that since the case was filed, "Iranian Defendants, having never even appeared in this case, *have not prolonged the litigation*" and any delay on the part of Iran "was not unreasonable for a complicated case involving a number of sovereign foreign entities and banks") (emphasis added); *Harrison v. Republic of Sudan*, 882 F.Supp.2d 23, 51 (D.D.C. 2012) (denying prejudgment interest, noting that, since plaintiffs filed their claim "Sudan, having never even appeared in this case, *has not prolonged the* litigation") (emphasis added); *Brown v. Islamic Republic of Iran*, 872 F.Supp.2d 37, 45–46 (D.D.C. 2012) (refusing prejudgment interest, finding the delay attributable not to defendants but to plaintiffs' failure to tender timely submissions).

Other decisions define delay by calculating the time between the date of the injury and the date of judgment. *See Amduso v. Republic of Sudan*, 61 F.Supp.3d 42, 53 (D.D.C. 2014) ("Because plaintiffs were unable to bring their claims immediately after the attacks, they lost use of the money to which they were entitled upon incurring their injuries"); *Onsongo v. Republic of Sudan*, 60 F.Supp.3d 144, 154 (D.D.C. 2014) (same); *Khaliq*, 33 F.Supp.3d at 34-35 (awarding prejudgment interest for the 15 year period between August 7, 1998, the date the United States embassies in Nairobi, Kenya and Dares Salaam, Tanzania were bombed and the date of judgment); *Belkin,* 667 F.Supp.2d at 224 (awarding prejudgment interest to compensate for the time period between a March 4, 1996 bombing and a Sept. 30, 2009 final judgment); *Ben–Rafael v. Islamic Republic of Iran*, 540 F.Supp.2d 39, 59 (D.D.C. 2008) (awarding an interest enhancement for the period between a March 17, 1992 attack and a Feb. 25, 2008 judgment); *Dammarell v. Islamic Republic of Iran*, CA No. 01-22242006 (JDB), WL 2583043 *1 n. 2

(D.D.C. Sept.7, 2006) (awarding interest for injuries "sustained over the course of more than two decades").

The Special Master finds those decisions which look back to the date the claimants' causes of action accrued more compelling. To award an enhancement solely on the basis of what transpired during litigation appears to conflict with the proposition that "[p]rejudgment interest is an element of complete compensation." *West Virginia v. United States*, 479 U.S. 305, 310 (1987). Beyond this, none of the cases defining delay with respect only to what transpired since the commencement of litigation offer up any rationale for imposing this limitation.

Here, Matt's parents waited four years to discover what happened to their son. Should they demonstrate a procedural entitlement to press their claim, the Special Master finds no precedent or equitable consideration that might justify denying them prejudgment interest for their son's pain and suffering from the date their cause of action accrued. In that event, the Special Master recommends that "[a]n appropriate measure of what rate to use when calculating prejudgment interest is the prime rate." *Baker*, 775 FSupp2d. at 86 (citing *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997)).

### e. Inflation

In their Motion for Damages, plaintiffs ask the Special Master to increase any recommended solatium award by an appropriate amount to account for inflation. They press the position that, in looking to prior judgments for comparative purposes, the Special Master should be mindful that past awards should be adjusted upwards for inflation. In other words: "A $1 million award in 2008 would be worth a great deal more money than a $1 million award today." Motion for Damages at 61-62.

On July 20, 2016, plaintiffs supplemented their argument in a subsequent filing captioned Memorandum Regarding Inflation ("Inflation Memorandum"). Repeating their request for an upward inflationary adjustment, plaintiffs argue: "Courts across the United States have routinely adjusted awards made in prior cases for the effects of inflation when using prior awards comparatively for the purpose of making their own damages determination, and also in other procedural context." Inflation Memorandum at 1. They urge that "[t]he practice is so routine, and often mentioned only in passing or in a footnote, that one could surmise that the inflationary adjustments are calculated without any official mention. *Id.* at n.1. In support, Plaintiffs cite no fewer than 12 cases from various jurisdictions for the proposition that courts "ma[ke] sure to account and adjust for the impact of inflation in [their] evaluation of prior comparable cases." *Id.* at 1.

The Special Master disagrees and finds plaintiffs' arguments in favor of prejudgment interest unpersuasive.

In the cases cited by plaintiffs, individual defendants formally challenged jury awards they believed excessive. And in each, the courts undertook a comparative analysis of the disputed award with previous damage awards, adjusting the dollar value of the older decisions by inflation to arrive at a "present value." *See, e.g., Wells v. City of Chicago*, 896 F. Supp. 2d 725, 742 n.1 (N.D. Ill. 2012) (comparing 2012 and 1990 jury awards after adjusting the latter "using the inflation calculator provided at the Bureau of Labor Statistics website"); *Bravo v. United States*, 532 F.3d 1154, 1163 n.5 (11th Cir. 2008) (noting a case cited by the dissent in which the court considered a number of verdicts and settlements, took the average dollar award and adjusted that amount for inflation); *DiSorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003) (when comparing jury awards rendered 10 years apart, the court held "we must take into account

inflation"); *Dixon v. Agbai*, No. 15 Civ. 850 (AT) (AJP), 2016 WL 3702749 at *5 n.3 (S.D.N.Y.

July 8, 2016) (When comparing awards in 16 cases, the court "note[d] that it has considered all

of the awards at their present dollar value adjusted for inflation"); *Jean-Baptiste v. District of

Columbia*, 931 F.Supp.2d 1, 17 (D.D.C. 2013) (finding jury verdict excessive "[e]ven adjusting

for inflation"); *Menghi v. Hart*, 745 F.Supp.2d 89, 109 (E.D.N.Y. 2010) (comparing jury's $1

million award with a 2001 decision for $275,000 after adjusting for inflation); *Ocampo v. Paper

Converting Machine Co.*, No. 02 C 4054 (JN), 2005 WL 2007144 at *4 n. 10 (N.D. Ill. August

12, 2005) (comparing awards after adjusting for inflation); *Ruhlmann v. Smith*, 323 F. Supp.2d

356, 364 (N.D.N.Y. 2004) (comparing case before it to four decided 1983, 1986, 1990 and 2001,

adjusting the original dollar amount in each "only for inflation" to arrive at a "present-day

value[]"; *Wade v. Colaner*, No. 06-3715 (FLW), 2010 WL 5479629 at *29 (D.N.J. December 28,

2010) (comparing $500,000 jury award to 2001 Third Circuit decision upholding a $375,000

compensatory damages award which, "when adjusted for inflation, is approximately equal to

$462,000 in current dollars").

      Unlike these cases, however, the Special Master is not determining whether a jury award

"is beyond all reason, so as to shock the conscience" or whether a verdict "is so inordinately

large as to obviously exceed the maximum limit of a reasonable range within which the jury may

properly operate." *Jean-Baptiste*, 931 F.Supp.2d at 12-13 (citation omitted). The Special Master

is similarly not striving for uniformity between the solatium recommendations in this case and

those awarded in other terrorist actions. Rather, the Special Master's remit is to analyze the

unique circumstances in this case and decide whether an entitlement to damages exists and, if so,

in what amount.

With respect to solatium, the Special Master adopted the formula set out in *Heiser* and adjusted those baselines to accommodate the particular circumstances of this case. Applying the same rationale courts have adopted when denying prejudgment interest to *Heiser*-based solatium awards, the Special Master finds the inherent flexibility of the *Heiser* formula more than adequate to compensate for any inflationary variable. Apropos of plaintiffs' request for an inflationary enhancement to the recommended award of pain and suffering, it must be noted that, unlike the courts in those cases cited by plaintiffs, the Special Master did not arrive at a dollar amount simply by comparing awards. To the contrary, the instant recommendation for pain and suffering is grounded on information unique to this case, such as trial and deposition transcripts, declarations, source documents and expert testimony. In short, the recommended damage award is unique to this action as it is grounded on a constellation of factors of which prior awards is only one. Accordingly, the Special Master denies plaintiffs' request to impose an inflationary enhancement to the recommended award for pain and suffering.

**CONCLUSION**

In light of the foregoing, the Special Master recommends that the Estate of Keith Matthew Maupin receive Ten Million Dollars ($10,000,000) in compensatory damages for pain and suffering and One Million Eighty-Seven Thousand Two Hundred and Ninety-Four Dollars ($1,087,294) in economic damages; and that Carolyn Maupin and Keith Maupin each be awarded Seven Million Dollars ($7,000,000) in compensatory damages for loss of solatium. Finally, the Special Master recommends that plaintiffs' requests for prejudgment interest and an inflationary adjustment be denied.

Dated: October 6, 2017                                   Respectfully submitted,


                                        By:*/s/ Alan L. Balaran*
                                             Alan L. Balaran, Esq.
                                             Special Master