**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————
VIRGINIA L. FOLEY, et al.,         )
                                 )
        **Plaintiffs,**         )
                                 )
v.                               )     **Case No. 11-00699 (CKK)**
                               )
SYRIAN ARAB REPUBLIC, et al.,    )
                               )
        **Defendants.**      )
———————————————————————)

**REPORT OF SPECIAL MASTER**
**RE: PRIVATE FIRST CLASS KRISTIAN MENCHACA**

This action is brought pursuant to 28 U.S.C. § 1605A. The estate and family members of Private First Class Kristian Menchaca seek damages for his kidnapping, torture and execution. Pursuant to the Administrative Plan Governing Special Masters and the provisions of Federal Rule of Civil Procedure 53, the Special Master has reviewed testimonial and documentary evidence to assist in determining any damages to which the claimants may be entitled.

**BACKGROUND AND PROCEDURAL HISTORY**

On June 16, 2006, Pfc. Kristian Menchaca ("Kristian" or "Pfc. Menchaca") and two other soldiers of the 1st Battalion, 502nd Infantry Regiment, 2nd Brigade, 101st Airborne Division were on deployment in Iraq. They were manning an observation post in their Humvee, when they were attacked by members of the Zarqawi Terrorist Organization ("ZTO"). ECF No. 76. One of the soldiers, Specialist David J. Babineau, was killed in the attack. The other two soldiers, Pfc. Menchaca and Pfc. Thomas Tucker were abducted. *Id*. Their remains were recovered three days later by members of their platoon. *Id*. at 17.

On April 8, 2011, Plaintiffs filed a complaint against the Syrian Arab Republic ("Syria"), Syrian Military Intelligence, Syrian President Bashar al-Assad and Syrian General Asif Shawkat,

alleging they provided material support to the ZTO and thus were responsible for the murders of Pfc. Menchaca and SSgt. Keith Maupin, in Iraq, and Laurence Foley, Sr., in Jordan.  ECF No. 1. Plaintiffs' Amended Complaint, and the one considered here, was filed on September 13, 2011. ECF No. 11.

Between June 2011 and January 2015, plaintiffs' attempts to serve the defendants were impeded by the ongoing Syrian civil war and the deterioration of diplomatic relations between Syria and the United States.  On February 2, 2015, plaintiffs filed a Status Report, informing the Court they had effectively served all defendants on January 22.  ECF No. 51.  On April 23, 2015, plaintiffs moved for entry of default pursuant to Fed. R. Civ. P. 55(a), following defendants' failure to answer in a timely manner.  ECF No. 48.  Over Syria's objections, ECF No. 49, the Court granted plaintiffs' motion and ordered the Clerk of the Court to enter a default against the defendants.  ECF No. 51.  The Clerk did so on January 22, 2016, ECF No. 52, and, on November 16 and 17, 2016, the Court convened a hearing to determine liability with respect to each defendant.

Citing photographic, documentary, fact and expert testimony, and taking judicial notice of the findings set out in other FSIA cases brought against Syria, the Court found defendants liable for providing material support to the ZTO and thus accountable for the deaths of Pfc. Menchaca, SSgt. Maupin and Laurence Foley, Sr.  (Memorandum Opinion dated April 13, 2017) ECF No. 76.  The Court simultaneously issued an Order appointing the undersigned as Special Master to consider evidence and recommend "findings of fact and conclusions of law as to each Plaintiff's entitlement to damages, including the availability of causes of action for each Plaintiff."  ECF No. 77 at 1-2.

In accordance with the Order, the Special Master presents his findings and recommendations based on a review of the transcripts and exhibits from the November 16 and 17, 2016 liability hearings; the deposition transcripts of Christina Menchaca (and Errata), Isaac Javier Murillo, Julio Cesar Vasquez Menchaca, Maria Guadalupe Vasquez, Pedro Acuna Menchaca, Julietta Vasquez MacKenzie, Kenneth MacKenzie and Craig Mallak, MD, and exhibits thereto; Declaration of Christina Menchaca, dated May 17, 2017; Declaration of Maria Vasquez, dated May 25, 2017; Declaration of Julio Menchaca, dated May 25, 2017; Plaintiffs' May 26, 2017 Motion and Memorandum for Damage Awards with Points and Authorities in Support; Plaintiffs' July 20, 2017 Memorandum Regarding Inflation; and Plaintiffs' Brief in Response to Court Order Dated July 11, 2017 (*Burks v. Islamic Republic of Iran*, CA No. 16-cv-1102 (CRC)) (submitted on September 5, 2017).

**Testimony of Christina Menchaca – Kristian Menchaca's Wife**

Christina Menchaca testified during the liability hearing on November 16, 2016. ("CM-LH").  She supplied additional testimony by deposition taken on April 11, 2017, ("CM-DT"), to which she attached Exhibits 58 and 59.  Exhibit 58 is a copy of the Letters of Dependent Administration issued by the Clerk of County Court of Cameron County Texas on January 12, 2012, naming Christina Menchaca and Julio Cesar Velasquez Menchaca as Dependent Co-Administrators of Kristian Menchaca's estate.  CM-DT at 9.  Exhibit 59 is a copy of Kristian's birth certificate, verifying he was born on May 29, 1983 in Harris County, Texas, to Pedro Menchaca and Maria Guadalupe Vasquez.  CM-DT at 7-8.  In addition, Christina provided a signed Declaration dated May 17, 2017, attached to which was a letter from Michael Downing, Ph.D., a clinical psychologist.

Christina was born on April 5, 1988 in Texas.  CM-LH at 76; CM-DT at 6.  She has two siblings, one of whom, Conrad, "passed away in Iraq in 2008."  CM-LH at 78.  Conrad and Kristian trained together at boot camp, in Fort Benning, Georgia, and later at Fort Campbell, Kentucky.  *Id*.  Christina was first introduced to Kristian in 2005, during a webcam call with her brother.  *Id*.  Christina soon travelled to Fort Benning and visited her brother and Kristian.  *Id.* at 79.

Christina's son, Isaac Javier Murillo, was born on March 9, 2002.  CM-DT at 11.  According to Christina, Isaac's biological father "has never been around.  It's only been Kristian."  *Id*. at 12.  Christina and Isaac attended Kristian's graduation from boot camp.  CM-LH at 80.  She testified that "Kristian has always been known as Isaac's father," and compares their relationship to that shared by "a father-and-son."  CM-DT at 12-13.  According to Christina, Isaac "only knew Kristian as his father, and their bond was inseparable."  *Id.*  Isaac referred to Kristian as "Dad," and Kristian referred to Isaac as "Son."  *Id*.  Kristian always provided for Isaac, even in Iraq, sending his "personal debit card" to Christina to purchase "essential things Isaac needed."  *Id*. at 14.

After boot camp, Kristian spent "three to four months" at Fort Campbell before deploying to Iraq. CM-LH at 82.  While at Fort Campbell, he and Christina were married.  *Id.* at 81.  Approximately six months into his deployment, he returned home on leave for approximately a week.  *Id*. at 86.  Christina recalls Kristian telling her he did not want to return to Iraq.  *Id*. at 88.

Christina recalls when two soldiers appeared at her door at 3 a.m. and informed her that Kristian's vehicle was attacked and that the Army was "unaware of his whereabouts."  CM-LH at 89.  She turned on the television only to discover that the "media already had coverage of him being captured" somewhere "along the Euphrates River, which borders the Triangle of Death in

Iraq." CM-DT at 17. The news reports showed "a black-and-white printed flag" identified as "the insurgents' flag." *Id*. Christina testified that news of Kristian's capture "made me very afraid. I was scared, not knowing more information of the insurgents and their acts, what they may do." *Id*.

Three days passed before Christina was informed that Kristian "had passed away and that they found his body with bombs tied to him." CM-DT at 25. The Army told her that positive identification of the body would take time because Kristian "had been burned" and "dragged through a road." *Id*. Upon hearing the news, Christina felt "very nauseous. I had a rollercoaster feeling, emotion. I was afraid, sick, nervous. I was in a deep, black hole." *Id*. at 18. In the days that followed, she could not eat and did not leave her house. *Id*. at 19. Isaac, witnessing his mother's anguish, "was very afraid, also." *Id*. at 22. "He observed all of the crying, and many times he cried with me as well." *Id*.

Christina filed a Freedom of Information Act request to obtain additional information. From the records she received in response, Christina learned that, on June 16, three soldiers were manning an observation position when they were attacked by small arms fire. CM-LH at 91. When support arrived one-half hour later, one soldier was dead and two soldiers, "Private First Class Menchaca, Kristian, and PFC Tucker, Thomas" were missing. *Id*. at 92. Among the documents received was Kristian's death certificate confirming that he died on June 19, 2006. *Id*. at 93.

During the liability hearing, Christina requested that a propaganda video released by the terrorists who killed her husband, be played. Christina identified the dead body in the video as belonging to her husband. The video also contained footage of a terrorist "holding Thomas Tucker's head." CM LH 97. During her deposition, Christina described Kristian's "body had

been mutilated, and that he had wounds, gashes in his clothing, and it looked like his body, maybe his arm and his leg were detached from his body, and a large amount of blood." CM-DT at 38. She explained her reason for requesting the courtroom airing of the video: "I want you to know what we're dealing with. I want you to know the evil that they are, and I want the world to see how they killed him, and so it doesn't happen to anyone else. So no one has to go through the pain that I'm going through." CM-LH at 100.

Christina is "scared of the people who captured him. I was scared for Kristian and what kind of pain he had to go through before they found him dead." CM-DT at 27. For "six to eight months after" Kristian's death, Christina was unable to sleep. She continues to have difficulty sleeping, although she has been prescribed medication, *id*. at 28, and suffers from "nightmares during which she feels like she is choking." *Id*. at 33. In 2006, Christina was diagnosed with clinical depression for which she was prescribed antidepressants. *Id*. at 30. She explains: "[T]here are times when I'm feeling okay, and then I go back into the black hole that I described to you." *Id*. at 30. Christina describes how deeply she misses her husband and how "there are times where I remember him" and how "some days are easier than others." *Id*. at 31. She admits that without her medication, she invariably starts "thinking about Kristian and the 'what-ifs' of our lives that could have been, and I began to get sad and depressed again." *Id*.

In 2016, Christina was diagnosed with post-traumatic stress disorder – a condition she was told "was indefinite . . . the reason for my depression." CM-DT at 32. Christina was unable to return to work "until about 2008," when she attended college and got a job. *Id*. at 34. She admits being incapable of "a relationship with anyone, because I miss [Kristian], and I look for him in other people." *Id*. at 35.

Kristian was buried in Brownsville, Texas, "maybe a 17-hour drive" from where Christina currently resides.  CM-LH at 100.  She has not visited the gravesite finding it "very heartbreaking to go back.  I cannot make myself go back."  *Id*. at 101.

**Testimony of Isaac Javier Murillo – Christina Menchaca's Son**

Isaac Murillo was deposed on April 11, 2017 ("IM-DT").  Isaac was born on March 9, 2002.  IM-DT at 5.  He testified that, although Kristian Menchaca was his step-father and "someone that didn't conceive me," he viewed him as a man who "t[ook] the role of the biological father."  IM-DT at 7.  Isaac describes a "strong bond," with Kristian, admitting that he "loved him even more than my real dad.  We were like – I don't know.  I looked up to him, and I wanted to be like him."  *Id*. at 8.  Isaac recalls meeting his biological father "probably like once or twice . . . . There's not that much communication."  *Id*. at 9.

Isaac was the ring bearer at Christina and Kristian's wedding.  IM-DT at 10.  He remembers feeling both "happy" and "glad" at the time because it "was something that my mom wanted, and like he had been part of my life so much."  *Id*. at 11.

Isaac recalls how he and his mother drove Kristian to and from the airport and how Kristian always hugged the two of them, saying "he missed us."  IM-DT at 14.  Isaac testified that when Kristian came home on leave that one time, he "lived" with Isaac, his mother, "and my Gramma and my uncle, I believe."  *Id*. at 15.

Isaac keeps a photograph of Kristian in his room.  A commemorative plaque from the military sits in the hallway.  IM-DT at 17-18.  On Kristian's birthday, Isaac and his mom "send flowers to his grave and eat cake at the house."  *Id*. at 19.  Isaac remembers Kristian's funeral – "seeing the casket and sitting there and seeing like people cry and stuff for him, and like being sad and stuff, because like we were there."  *Id*. at 20.

Isaac feels "sad" as well as "angry" that "they took my role model away and . . . he's not here for me . . . . [l]ike he was an important part of my life."  IM-DT at 21.  "I

**Testimony of Julio Cesar Vasquez Menchaca – Kristian Menchaca's Brother**

Julio Menchaca was deposed on April 11, 2017 ("JM-DT").  In addition to his testimony, Julio produced a signed declaration dated May 25, 2017, in which he attests to being the "biological son of Maria Guadalupe Vasquez, who is the biological mother of Kristian Menchaca." Julio Declaration at ¶ 2.  The declaration states further that Julio's mother has requested his "assistance to ensure the proper management" of "any funds" she collects as a result of "this proceeding."  *Id.*

Julio was born on April 7, 1981 to Maria Vasquez and Pedro Menchaca, JM-DT at 5, 7, and is Kristian's older brother.  Julio recalls his parents divorcing when he was approximately 3 or 4 years old, *id.* at 8, and that he and Kristian lived with their mother, *id.* at 37, for approximately "20 years."  *Id.* at 32.

Julio remembers his brother as "a good person" who "was always there to help me, help out in our family.  He wasn't a troublemaker.  He always did the right thing, and, you know, he was very trustworthy, too."  JM-DT at 13.  He recalls how Kristian, after graduating high school, enrolled in a trade school and then enlisted in the Army.  *Id.* at 14.

Julio was living in Houston, Texas when he received a telephone call from a cousin informing him that soldiers had visited his mother's house and "that my brother and another soldier had been taken by the insurgents over there."  JM-DT at 14.  Despite his efforts to get additional information from news broadcasts, Julio "wasn't a hundred percent sure" it was his brother who was captured.  *Id.* at 15.  "Two or three days later," his stepfather telephoned to say that Kristian had been killed.  *Id.* at 16.  Julio recalls hearing his mother "crying and screaming

in the background." *Id*. at 15-16.  Upon hearing the news, Julio "came right away down to

Brownsville to be with my mother, and after the funeral, we were here." *Id*. at 18.  He

remembers friends and relatives staying with the family after the funeral.  *Id*.

The news of Kristian's death "really affected" Julio. JM-DT at 16.  He testified: "I had

mixed emotions.  I was angry, I was, I was sad, and I was heartbroken at the news, you know.

Those feelings were just circulating within me, and I didn't sleep the next few days."  *Id*.  Julio

subsequently learned through news reports that Kristian's captors "had mutilated the body . . . . I

heard that they were beheaded. *Id*. at 17.

Julio does not recall exactly when Kristian's body returned for the funeral. JM-DT at 17.

He does, however, remember it being a closed-casket service because the body was "mutilated,

in pieces." *Id*.

Describing how he coped with the loss of his brother, Julio testified:

[O]nce I was alone with my thoughts, I started getting sick emotionally,
physically.  I went into a depression.  I lost a lot of weight.  I couldn't sleep, and I
just didn't feel right at all.  Mentally I wasn't there.  I went through depression for
about a year, year and a half or so where I wasn't sleeping.  I was sad every day.
I'd cry myself to sleep.  I'd seek out help, but I really didn't find any.  I was
looking for medication.  Maybe antidepressants would help.  I remember one
doctor did prescribe me an antidepressant one time, and I said that it – I felt like it
wasn't going to help me.  I just felt worse, so I stopped taking the antidepressants.

JM-DT at 18-19.

Julio recalls losing his appetite to the point where he "was just skin and bones.  I looked

sick." JM-DT at 20.  Julio testified that he never suffered from depression prior to Kristian's

death. *Id*. at 21.  He remembers suffering from anxiety and depression for "a good year," and

describes how, to this day, he "gets anxious at times throughout the day." *Id*.  Julio admits

feeling "very, very guilty for what happened to my brother, because I was, I was a big influence

- 9 -

on him to join the Army.  I would always tell him to go infantry if you are going to go Army."
*Id*. at 25.

In 2008, Julio enlisted in the Army.  He attributes his decision to guilt about over Kristian's death: "I felt like it should have been me and not him.  He was always a good person, a good kid.  I don't feel like he deserved that, so I joined, and I joined with the intention of not coming back."  JM-DT at 25-26.  Julio remembers hoping the Army would deploy him to Iraq or Afghanistan so he would "be killed over there and not make it back."  *Id*. at 26.  At the time he enlisted, Julio believed he was no longer depressed and had come to terms with his grief.  Once he began training, however, he "realized I still had problems with depression.  I got sick while I was there.  I got depressed again."  *Id*.  He recalls having thoughts about hurting his fellow soldiers and going AWOL.  *Id*. at 27.

Julio conveyed his feelings to his commanding officer and was "eventually discharged."
*Id*. at 26.  The Certificate of Release or Discharge from Active Duty reveals that Julio served only six weeks in the military.

To this day, Julio suffers from "anxiety more than anything.  Depression not so much, and that's because I have the support of my, my girlfriend," whom he thanks for "helping me through all of this."  JM-DT at 29.

Julio and his brother "were very close"; he describes Kristian as his "best friend."  JM-DT at 32.  He testified: "I miss speaking to him about things that I can't speak to no one else about, because I don't have many friends.  I miss hanging out with him, playing basketball with him, and just his companionship and him being here."  *Id*. at 35.  Julio displays many photographs of Kristian in his home.  *Id*. at 35-36.

Julio concluded his testimony by noting that his mother was "heartbroken," as she and Kristian were "particularly close." JM-DT at 36. According to Julio, his mother still has difficulty sleeping at night and "locks herself in her room for hours sometimes and doesn't really talk too much about it." *Id*. at 37.

**Testimony of Maria Guadalupe Vasquez – Kristian Menchaca's Mother**

Maria Vasquez was deposed on April 12, 2017 ("MV-DT"). In addition to her deposition testimony, Maria signed a declaration dated May 25, 2017, attesting to the fact that she is the "biological mother of Kristian Menchaca" and that she has asked her other son, Julio, to "ensure the proper management of any funds" she collects "as a result of any judgment entered in my favor in this proceeding." Maria Declaration at ¶2.

Maria was born on September 24, 1956 in Mexico. MV-DT at 5. She became a United States citizen in 2013 and currently lives in Brownsville, Texas. *Id*. Maria has two children – Kristian and Julio Cesar. *Id*.

Maria describes Kristian as "very kind, very noble, very loving and very happy." MV-DT at 6. She testified that Kristian "lived with me most of his life, as sometimes he would visit my sister, but he wouldn't stay very long, it was just a visit, he would always come home." *Id*. at 7.

Maria recalls Kristian deploying to Iraq "not even a year" after enlisting. MV-DT at 7. She remembers when Kristian was on leave and returned home to celebrate Mother's Day, first stopping in Houston to "visit with some of his cousins and then he came here to – he came home." *Id*. Maria recalls Kristian telling her that "he did not want to return. He was afraid. And he expressed that he was very fearful. It's as if he knew that something was going to happen to him. And it wasn't very long after he left when he went missing in Iraq." *Id*. at 7-8

Maria learned "the Iraqis had taken him hostage, that they had gone missing and that [Kristian] couldn't be found."  MV-DT at 8-9.  She recalls the Army notifying her that the bodies of three men were discovered and that they would conduct DNA tests to determine if one was her son.  *Id*. at 9.  Maria believes a week passed from the time she first learned Kristian was missing to the time Kristian's death was confirmed.  *Id*.  The Army transported Kristian's body to Brownsville, although she was not allowed to see his corpse.  *Id*. at 10.  Maria was told of a video showing showed her son "being tortured, which they also did not allow me to see."  *Id*.

Asked how she was affected by Kristian's murder, Maria responded, "very bad.  Very painful.  Very sad.  I to this day cannot understand why this happened.  Even though it's been a few years, I still battle with not understanding why."  MV-DT at 10.  She testified that she still suffers from "depression, from anxiety" and "cannot sleep."  *Id*.  For a year following her son's death, she was unable to work and "would cry all day long."  *Id*.  She lost a considerable amount of weight.  *Id*.  To this day, Maria remains fearful and anxious, "as if something is going to happen."  *Id*. at 12.

Maria admitted how difficult it was to talk about the loss of her son, MV-DT at 6, and how she suffers "a pain that will never leave me."  *Id*. at 15.

**Testimony of Pedro Acuna Menchaca – Kristian Menchaca's Father**

Pedro Menchaca was deposed on April 12, 2017 ("PM-DT").  Pedro was born on July 29, 1958 and currently resides in Houston, Texas. PM-DT at 4.  Pedro's marriage to Maria Vasquez ended in divorced in 1984, when Kristian "wasn't even a year old."  *Id*. at 5.  Kristian lived with his mother following the separation.  *Id*.  Pedro testified that, after the divorce, he maintained contact with Kristian: "I would pick him up every two weeks" and would spend the day with

him.  *Id*. at 6.  He recalls how he and Kristian would go to the park, "play ball, play on the swings, [and go] to the movies."  *Id*.

The last time Pedro saw his son was "approximately five weeks before he was murdered," PM-DT at 6, when Kristian "came and stayed with me for two days in Houston because he also, of course, had to come and visit his mother who lives in Brownsville."  *Id*. at 7.  During that visit father and son "went out to dinner . . . . shared a few drinks and spoke a lot."  *Id*.  Pedro was "very happy" to have his son home with him.  *Id*.  When Kristian left, Pedro told him to "take care of himself, to always be on the lookout, that we wanted him home as soon as possible, safe and sound, and [] to take care of himself.  *Id*.

Pedro first learned that Kristian was killed from news broadcasts.  PM-DT at 8.  His other son, Julio, confirmed that Kristian was taken hostage, tortured and killed.  *Id*.  Pedro testified that Kristian's death "affected me terribly.  It hurt me deeply.  I was in disbelief."  *Id*. at 9.  He states that he suffered from nightmares "for probably a year," *id*., and that his son's death, "has had a great effect on me," which continues to this day.  *Id*. at 9-10.

### Testimony of Julietta Vasquez MacKenzie – Kristian Menchaca's Aunt

Julietta Vasquez MacKenzie was deposed on April 12, 2017 ("JVM-DT").  Julietta was born on July 30, 1955 in Mexico, and is Maria Vasquez's sister and Kristian's aunt.  JVM-DT at 4-5.  She moved to Brownsville, Texas when she was "19, 20 years old," became a U.S. citizen, *id*. at 6, gave birth to a son in 1977, and married Kenneth MacKenzie on April 23, 1993.  *Id*. at 7.  Julietta currently resides in Houston, Texas.  *Id.* at 4.

When Kristian was growing up, Julietta saw him "all the time" as the MacKenzies lived only "ten minutes away" in Brownsville.  JVM-DT at 7, 8.  Julietta recounts how she and Kristian "would get together and they would come to my mother's home and play with my kid

and hang around with us while the mother was at work and we [Julietta and Kenneth] used to take them back home and say goodbye and see them again the next day." *Id*. at 9. Julietta and Kristian often went together to the beach at South Padre Island, to McDonald's, to birthday parties and to visit family in Mexico. *Id*. at 9-10.

When Kristian was "five, six, seven years old," Maria and her sons moved to Houston. JVM-DT at 10. Julietta and her husband followed about ten years later, when Kristian was in high school. *Id*. at 11. In Houston, the two families lived "about a hundred feet apart," and Julietta would see Kristian "all the time." *Id*. Julietta testified that she and Kenneth "were like parents for him, because he loved to come here and stay around and chat with Kenny." *Id*. at 12. "Almost every day he stop[ped] by my house because we're neighbors." *Id*.

Julietta tried unsuccessfully to dissuade Kristian from enlisting in the Army, concerned "there's going to be a war." JVM-DT at 13. She last saw Kristian when he returned stateside on leave – "he made several stops in Houston and then he joined me and my sister in Brownsville, Texas on Mother's Day." *Id*. at 14. She recalls Kristian being "very sad" at the time – he was afraid and did not want to go back to Iraq. *Id*. at 14-15.

Julietta first became aware that something had happened to Kristian when soldiers "came to my house and ask me for Maria Vasquez." JVM-DT at 17. She informed them that Maria "moved to Brownsville" and immediately called her sister and told her that "Kristian disappeared, he's been kidnapped." *Id*. Maria began to "scream, cry very loud and keep saying, no, no, my son, where's my son." *Id*. "[A] day or two later," the family learned that Kristian had been killed. *Id*. at 18.

Julietta testified that the news of her nephew's death was "very painful." She recalls being "very sad" and "crying all the time." JVM-DT at 18. Julietta quit her job, "hardly ate"

and began taking melatonin to help her sleep.  JVM-DT at 19-20.  Julietta testified that, to this

day, she suffers from "fear from anxiety, depression."  *Id*. at 21.  She suffers from nightmares,

having seen "the tape how he was murdered," and how "Kristian and his fellow soldier, Tucker

were kidnapped and tortured. *Id*. at 23-24.

Julietta attended the funeral service which she recalls as being "closed-casket."

JVM-DT at 25.

Julietta observed that, since Kristian's murder, her sister has been a "different

person.  She's crazy.  She's laughing all the time.  She's not normal like she used to be,"

*id*. at 27, and she's "always drinking."  *Id*. at 26.  Julietta recalls Maria telling her that,

"she doesn't care for life.  She says my son isn't with me, why should I care?"  *Id*. at 28.

Julietta observed that Kristian's brother, Julio, was so grief stricken that he "passed out

several times."  *Id*. at 29.  Her husband, Kenneth, also suffered and "now, he's drinking –

and he drinks so he can sleep but Ken don't sleep."  *Id*. at 30.

**Testimony of Kenneth MacKenzie – Kristian Menchaca's Uncle**

Kenneth MacKenzie was deposed on April 12, 2017 ("KM-DT").  Kenneth was

born on December 19, 1942 and is a retired member of the Los Angeles Sheriff's

Department.  KM-DT at 4-5.  Kenneth married Julietta Vasquez in 1992, *id*. at 5-6, and

moved to Brownsville, Texas, when Kristian was "about four years old," to be closer to

Julietta's family."  *Id*. at 6.

Kenneth estimates that saw Kristian "probably anywhere from three to five times

a week."  KM-DT at 8.  Kristian and Julio would visit Kenneth and Julietta at their house

which had "a lot of farm acreage around it" and "a lot of things for a kid like Kristian to

do with his brother."  *Id*. at 9.  Kenneth testified: "I loved [Kristian] like a son or brother

and my intentions towards him and Cesar [Julio] were . . . [to] help them in any way, I would." *Id*. at 10.

When Kristian was "in high school," the MacKenzies moved to Houston and "bought a house right next door" to Maria's – about 100 feet away." KM-DT at 11. Kenneth testified that he and Kristian spent time together working on Kristian's car and discussing Kenneth's ambition to write screenplays and make movies. KM-DT at 12. Kenneth offered to assist Kristian with college tuition and to help him apply for grants and educational loans. *Id*. at 13. Kenneth recalls that Kristian was "interested to work in the border patrol. He thought that service in the Army would be a good asset for signing up." *Id*. at 14.

Kenneth recalls Kristian joining the U.S. Army Airborne in 2005, being deployed to Iraq, and visiting the MacKenzies when he was on leave. KM-DT at 16. Kenneth, having served in Vietnam, warned Kristian to be careful in Iraq. *Id*. at 17, 18.

Kenneth first became aware that something had happened to Kristian "from neighbors who told me that the Army was knocking on doors looking for his mother." KM-DT at 21. By that time, Maria "had moved to Brownsville." *Id*. at 21. Kenneth subsequently learned that Kristian and Pfc. Thomas Tucker had been "captured," which conjured up "all kinds of images of him being tortured because the terrorists were known for that and then also my own experiences in Vietnam and I wanted to do what I could to protect him in any way that I could." *Id*. Kenneth "started calling the news – US news media and the government suggesting that a prisoner exchange could be made for Kristian and Thomas Tucker to be exchanged for US held terrorists in Guantanamo Bay." *Id*. at 22.

Two or three days later, Kenneth was informed that Kristian had been killed. KM-DT at 22.  During that interim period, Kenneth suffered flashbacks to his experiences in Vietnam where he "had witnessed several atrocities perpetrated by the South Vietnamese army" against prisoners of war.  *Id*. at 23.  Kristian's death caused Kenneth to seek help from the Veterans Administration in 2014, where he was diagnosed with "post-traumatic stress syndrome as a consequence of my Vietnam experience and my experience with Kristian."  *Id*. at 28.

Kenneth recalls watching the video showing "a man holding up a head, which had blonde hair, and I assumed that was Tucker's head.  And then I saw another image, another soldier laying across his back, large cut down the side of his leg, and I assumed that was Kristian."  KM-DT at 31.  As a result, Kenneth is fearful that "essentially [] we're vulnerable" because any terrorist could come to their home and "just start shooting."  *Id*. at 33.  He admits "it's impossible to sleep unless I take a sleeping pill, which has severe side effects such as a stroke."  *Id*. at 35.

Kenneth always believed that when Kristian was growing up, he "could have been my small, young son" and as Kristian got older, saw him "like a brother."  *Id*.  KM-DT at 39.

Kenneth testified that Kristian and his mother "were very close"; that Kristian "loved her very much"; and that Maria "was catastrophically devastated" by her son's death to the point that she "started drinking and using drugs and visiting cantinas and bars."  *Id*. at 41, 42.  Kenneth believes Kristian's mother suffered "a nervous breakdown, I guess you could say, and she had counselling for that."  *Id*. at 44.  He also believes

Julio, "suffered an emotional breakdown," recalling how he would "lay[] on the floor in the shower crying." *Id*.

**Testimony of Craig Thomas Mallak, M.D.**

Dr. Craig Mallak is a forensic pathologist currently serving as Chief Medical Examiner and Chief Trauma Officer for Broward County, Florida. Dr. Mallak testified during the November 16, 2017 liability hearing at the conclusion of which the court qualified him as an expert in the field of forensic pathology. ("Mallak T1") at 129 and 130. Dr. Mallak's testimony continued to the following day. ("Mallak T2"). Dr. Mallak supplied additional testimony by deposition taken on April 13, 2017. ("Mallak DT")

Between 2002 and 2012, Dr. Mallak served as Chief of the Armed Forces Medical Examiner System, responsible for investigating military deaths. Mallak T1, at 113. Dr. Mallak performed more than 3,000 autopsies in his career, Mallak T2 at 37, and was present when the autopsy was performed on Pfc. Menchaca at the Dover Port Mortuary in Delaware on June 22, 2006. Mallak T1 at 122.

Dr. Mallak explained that Kristian's remains were identified using fingerprint, dental and DNA testing, Mallak DT at 20-2. He confirmed that Kristian died from "multiple blunt force injuries." *Id*. at 22.

Referring to the autopsy report, Dr. Mallak testified that Kristian's right eye socket was empty, evidenced by the "incised or cut wounds of the eyelid where a sharp instrument was put into the eye to cut – actually cut it out." Mallak T2-26. As to Kristian's left eye, Dr. Mallak testified "there's still some soft tissue in there, but there are also sharp force injuries next to the nose where the eyelid had been cut and the eyeball has been rendered indistinguishable from the other soft tissue, if it is still there." *Id.* Dr. Mallak explained how "difficult" it is "to remove the

eye because it is attached by multiple muscles," *id.*, and how, in Kristian's case, removal was effected by "several stab wounds to cut from the right side, the left side, the top and the bottom and to get the entire lobe of the eye out." CM-DT at 32. Dr. Mallak concluded that these injuries would have been "extraordinarily painful" both during and after removal. *Id.* at 34.

Dr. Mallak testified that Kristian also sustained a "gaping four-by-four inch defect of the left cheek and the mandibular region of the left side of the face exposing comminuted fractures of the mandible and maxilla." Mallak T2-27. It was his professional opinion that these injuries did not result from "a simple application of force," but rather from a "very significant force to break all those bones" CM-DT at 23-24 – bones that were "shattered into dozens or hundreds of pieces." *Id.* at 28.

Dr. Mallak noted a "right-sided fracture of the hyoid bone," which "sits at the top of your airway," the fracture of which indicates "a very violent strangulation." CM-DT at 28-29. He observed how "[t]he anterior half of the tongue is traumatically absent," indicating "that somebody used a sharp force instrument and cut the tongue out of his mouth." *Id.* at 29. Because of Kristian's facial injuries, his tongue was visible to his torturers, "making it very easy to grab and cut." *Id.* Referring to a diagram he prepared in advance of his deposition, Dr. Mallak testified that, in the tongue, "there's just branch after branch of nerve fibers that are there." CM.-DT at 28. Dr. Mallak stressed that the presence of "clotted blood" found amongst these injuries indicates that Kristian "was alive at the time that this occurred," Mallak T2 at 27; CM-DT at 30, and because the "face has the most pain receptors, [] a blow like this to the face, [] produces extreme amounts of pain, and it would be continuing pain due to the extensive nature of the injuries." CM-DT at 24.

Dr. Mallak testified that, in Kristian's "right lower abdomen," there is an "area one and a half inch penetrating defect with evisceration or coming out of loops of bowel," indicating that Kristian's captors used a "a small dagger" or "small sword" to stab "him in the abdomen and . . . the defect was large enough for loops of bowel to protrude from the abdomen." Mallak T2-30.

In addition to these traumas, Dr. Mallak testified to the presence of "an eight-by-four inch defect" in the "region of the left flank and appears continuous with the abraded defect of the left buttock," and a "ten-by-nine-and-a-half inch abraded defect of the upper back exposing muscles and left scapula." Mallak T2-30. Dr. Mallak explained that these wounds were caused after "that skin has been systematically sanded away from those areas causing defects exposing the underlying either soft tissue, bone or other viscera." *Id*. at 30-31. He also noted the presence of a "boot imprint" on the "mid central portion" of Kristian's back. *Id*. at 31. According to Dr. Mallak, "you don't bruise after death, so it's another injury of someone who kicked him with an enormous amount of force in the back," *id*., while Kristian "was alive." *Id*. at 32.

Dr. Mallak testified that Kristian suffered other "deep abrasions" going "straight through his scalp and through his back, through his leg, exposing muscle, bone, even right through the skull." Mallak T2-32. Dr. Mallak opined that these injuries were "the result of being dragged over a very rough surface," which "could have" occurred when Kristian was alive, at least for part of it." *Id*. The back of Kristian's head revealed "a circular, flattened, abraded area three inches in diameter," that exposed "the skull and cranial bowl, which means it abraded right through the bone." *Id*. at 33. Dr. Mallak noted how, "it would take quite a bit of very abrasive material being run over or being dragged to get through the occipital bone on the back of your head." *Id*.

Dr. Mallak then addressed that portion of the autopsy report revealing a "partial thickness thermal injury" to the "top of the head and chin and lower lip." Mallak T2-35.  In Dr. Mallak's view that injury indicated that Kristian "was on fire at one time."  Dr. Mallak attributed the blotchiness present on Kristian's face to "an accelerant, meaning, gasoline, kerosene or other flammable material being thrown on him and then set on fire.  *Id* at 36.  Finally, Dr. Mallak noted that "[t]he fourth through the ninth ribs and the lateral aspect of the seventh and eight ribs" showed "fracture, costochondral separation," which would require "a large amount of force."  *Id*. In Dr. Mallak's professional view, Kristian was alive when he received the injuries to his face which "must have been extremely painful," *id*., as there was no evidence Kristian received any medical care for his injuries.  *Id*. at 39. He testified that "Kristian Menchaca had continuing – after the facial injuries, many – he had many, many other injuries that essentially killed him, but it was certainly minutes, maybe hours, later before he died."  CM-DT at 38.

Dr. Mallak concluded: "In my entire career, over 20 years now, I've never seen these types of injury in a post-mortem state."  Mallak T2-38.  Dr. Mallak testified that Kristian was "torture[d]" in a manner calculated to "bring incredible pain and suffering to his family, and go well beyond just total disregard for PFC Menchaca."  *Id*.

## ANALYSIS

Plaintiffs seek damages under 28 U.S.C. § 1605A(c) for the "kidnapping, torture and execution" of Kristian Menchaca.  Amended Complaint at 29, ECF No. 11.  In addition to their statutory claims, plaintiffs allege defendants are liable for the common-law torts of assault, battery, false imprisonment, kidnapping and intentional infliction of emotional distress.  ECF No. 11. It is beyond the remit of the Special Master to consider the viability of plaintiffs' common-law claims, much less ascribe damages for any breaches thereof.  Rather, the Special Master's inquiry is confined to analyzing plaintiffs' entitlement to those damages specifically delineated

in the Foreign Sovereign Immunities Act ("FSIA"), namely, pain and suffering, solatium and those arising due to economic loss.  *See* 28 U.S.C. § 1605A(c) (4).  Before doing so, however, some preliminary observations are in order.

To recover under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent as any other default winner."  *Hill v. Republic of Iraq,* 328 F.3d 680, 683-84 (D.C. Cir. 2003) (citation omitted).  In the context of a default judgment, courts in this jurisdiction carve a "'clear distinction' in the standard of proof necessary to establish a plaintiff's *entitlement* to damages and to assess the *amount* of those damages."  *Rhodes v. U.S.*, 967 F.Supp.2d 246, 313 (D.D.C. 2013) (emphasis in original) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)).  For future damages, plaintiffs must prove entitlement by a "reasonable certainty," or by a preponderance of the evidence, and must prove the amount of damages by a "reasonable estimate."  *Hill*, 328 F.3d at 684.  For past losses, a plaintiff must "prove the *fact* of injury with reasonable certainty," *Samaritan Inns, Inc. v. District of Columbia*, 114 F.3d 1227, 1235 (D.C. Cir. 1997) (emphasis added), yet need only "reasonably prove" the amount of damages.  *Hill*, 328 F.3d at 684.

 Upon consideration of the testimonial and documentary evidence presented, and in light of the legal framework set out below, the Special Master considers those damages for pain and suffering, solatium and loss of accretions available to Kristian Menchaca's estate and to members of his family.

### a. Pain and Suffering

Claims "for the conscious pain and suffering" inflicted on victims of terrorism are "actionable through their estates."  *Gates v. Syrian Arab Republic*, 580 F.Supp.2d 53, 72 (D.D.C. 2008).  And while "[p]utting a number on these kinds of harms can be difficult," *Price v.*

*Socialist People's Libyan Arab Jamahiriya*, 384 F.Supp.2d 120, 134 (D.D.C. 2005), courts "will not simply award what it abstractly finds to be fair." *Weinstein v. Islamic Republic of Iran*, 184 F.Supp.2d 13, 34 (D.D.C. 2002).  Rather, they "will look at damage awards for pain and suffering in other cases brought under the FSIA." *Id.*  In other words, "precedence guides its calculations." *Id.*  Before recommending an award, it is necessary to explicate some of the methodologies courts in this jurisdiction have employed when calculating pain and suffering damages to victims who have been held captive, tortured, and/or killed.

Where the duration of a victim's detention can be ascertained, courts have calculated pain and suffering by multiplying a *per diem* amount – usually $10,000 – by the number of days of captivity.  *See, e.g., Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 88 (D.D.C. 2002) (Jackson, J.) (finding $10,000 to be "a useful benchmark for beginning the damages calculus in a manner that is both just and consistent with previous awards"); *Daliberti v. Republic of Iraq*, 146 F.Supp.2d 19, 26 (D.D.C. 2001) (Oberdorfer, J.) (finding $10,000 per day of incarceration to be "reasonable and appropriate"); *Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d 107, 114 (D.D.C. 2000) (awarding hostage Terry Anderson $24,540,000 for 2,454 days in captivity).  The court in *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27 (D.D.C. 2001), explained that Congress, "by declining to take issue with judgments of approximately $10,000 per day of captivity by the United States Treasury in the Victims of Trafficking and Violence Protection Act of 2000, had tacitly approved approach to awarding damages for pain and suffering in these cases." *Id.* at 37.

Other courts have "adjusted the amount of the *per diem* award based on the severity of the maltreatment suffered by the plaintiff." *Cronin v. Islamic Republic of Iran*, 238 F.Supp.2d 222, 234-35 (D.D.C. 2002), *abrogated on other grounds by*, *Cicippio-Puleo v. Islamic Republic*

*of Iran*, 353 F.3d 1024 (D.C. Cir. 2004). *See, e.g., Hill v. Republic of Iraq*, 175 F.Supp.2d 36, 48 (D.D.C. 2001) (Jackson, J.), *rev'd on other grounds*, *Hill v. Republic of Iraq*, 328 F.3d 680 (D.C. Cir. 2003) (awarding soldiers held captive in Iraq between $3,000 and $5,000 per day of captivity).

A *per diem* formula has been rejected, however, in those circumstances where the award "would not adequately compensate for the unique and egregious harms resulting from the captives' status as POWs." *Acree v. Republic of Iraq*, 271 F.Supp.2d 179, 219-220 n.10 (D.D.C. 2003) (Roberts, J.), *vacated on other grounds*, 370 F.3d 41 (D.C. Cir. 2004). In *Acree*, for example, Judge Roberts awarded sums ranging between $10-20 million depending on severity of treatment and length of confinement. In *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62, 69-70 (D.D.C. 1998), Judge Jackson awarded between $3-19 million in damages, while in *Higgins v. Islamic Republic of Iran*, Civ. A. No. 1:99cv00377 (CKK), 2000 WL 33674311 *8 (D.D.C. Sept. 21, 2000), the court awarded $30 million in compensatory damages for the pain and suffering endured by Colonel William Higgins, who was held for 529 days "in cruel and primitive conditions" and was tortured prior to being executed. *Id.* at *2. Similarly, in *Bayani v. Islamic Republic of Iran*, 530 F.Supp.2d 40, 45, 46 (D.D.C. 2007), Judge Kennedy awarded $22,331,500 in compensatory damages for the "detention, torture, and execution" of Siavash Bayani, while in *Gates*, 580 F.Supp.2d at 74, the court awarded $50 million each to the estate of two men who were decapitated while alive.

*Per diem* awards have similarly been overruled in favor of lump sums "because of the brevity of the captivity." *Cronin*, 238 F.Supp.2d at 234. In *Cronin*, the court awarded $1.2 million to John Cronin, a student at the American University in Beirut, who was held for three days, while in *Stethem*, 201 F.Supp.2d at 87–89, the court awarded compensatory damages in the

amount of $500,000 to the estate of Navy petty officer Richard Stethem for his pain and suffering after he was severely beaten over a fifteen hour period.

The Special Master finds that the evidence concerning the captivity, torture and murder of Kristian Menchaca militates in favor of a lump sum award. Calculating damages based solely on Kristian's brief period of captivity, *Cronin*, 238 F.Supp.2d at 234, cannot "adequately compensate" for the savage treatment Kristian suffered at the hands of his captors. *Acree*, 271 F.Supp.2d at 219-220 n.10. Accordingly, after taking into consideration the indescribable torture and mindless savagery Kristian was forced to endure, the Special Master recommends that the Estate of Kristian Menchaca receive $30 million in compensatory damages for pain and suffering.

### b. Economic Damages

28 U.S.C. § 1605A, like its statutory predecessor 28 U.S.C. § 1605(a) (7), establishes a cause of action for economic damages resulting from an act of state-sponsored terrorism. As a general rule, loss of accretion damages are calculated by estimating a decedent's future earning potential based on the individual's work and education and adjusting that amount to account for inflation, rise in productivity, job advancement, and personal consumption. *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 87 (D.D.C. 2002).

Christina Menchaca and Julio Menchaca, "Dependent Co-Administrators" of Kristian Menchaca's estate, support their prayer for economic losses with a report dated May 19, 2017 prepared by the Center for Forensic Economic Studies ("Menchaca CFES Report"). The Menchaca CFES Report calculated the loss of accretions to Kristian Menchaca's estate to be to $2,382,658. Menchaca CFES Report at 7.

The economists who generated the Menchaca CFES Report arrived at that number after reviewing the April 8, 2011 Complaint, Kristian's Transcript of Military Record, "various records relating to Kristian Menchaca's certification/training" and "excerpts of relevant testimony." Menchaca CFES Report at 1. They proceeded to overlay the information gleaned from these sources onto statistical data supplied by the United States Office of Personnel Management; the United States Department of Homeland Security, the United States Customs and Border Protection; the United States Department of Defense Finance and Accounting Service; the United States Census Bureau; the United States Department of Labor, Bureau of Labor Statistics; the United States Federal Retirement Thrift Investment Board as well other professional and government publications.

The CFES based their calculation on several assumptions. They assumed Kristian's period of active duty would end on December 31, 2007 after which he would "transition into a reserve role in order to satisfy his eight year military obligation through December 28, 2012." Menchaca CFES Report at 2. The economists assumed further that, after Kristian was discharged from the military, he would have secured employment as a Border Patrol Agent. This information allowed them to project Kristian's potential income stream based on the average earnings of similarly situated government employees. To determine Kristian's total loss of accretions, the CFES factored an average 2.39% annual future earnings growth; assumed federal pension benefits and contributions based on Kristian retiring at 62 years and living until he was 80; deducted federal taxes ranging between 8.6% and 113% (Texas imposes no state tax on its residents); and deducted personal maintenance expenditures between 11.5% and 47.2%. Finally, to arrive at a "present value," the CFES assumed a 3.61% return on principal investments and a 4.49% return on reinvested interest.

The Special Master finds the methodology employed by the CFES in calculating economic loss to be appropriate, and finds further its assumptions with respect to inflation, taxes, personal consumption, and future earnings to be commensurate with available data.  The Special Master also finds that the CFES, when evaluating Kristian's military pay, were conservative in their estimation of his earning capacity "by excluding additional allowances he may have received while on active duty."  Menchaca CFES Report at 3.  The CFES were similarly conservative in their assumption that Menchaca would have worked until he was 62– a year less than 2017 U.S. Census Bureau estimates.  Equally conservative was the CFES' use of high-grade municipal bonds to calculate present value.

The Special Master therefore recommends that this Court award the estate of Kristian Menchaca economic damages in the amount $2,382,658, in accordance with the recommendation of the Menchaca CFES Report.

### c. Solatium Damages

Plaintiffs seeking damages for loss of solatium include Kristian's wife, "stepson," parents, brother, aunt and uncle.

It is well established that, "[a]cts of terrorism by their very definition are extreme and outrageous and intended to cause the highest degree of emotional distress."  *Belkin v. Islamic Republic of Iran,* 667 F.Supp.2d 8 (D.D.C. 2009) (*citing Stethem,* 201 F.Supp.2d at 89).  When a terrorist act results in death, that emotional distress, "with its attendant horrific surrounding circumstances, prevents the anguish [felt by a relative of the deceased] from subsiding."  *Flatow v. Islamic Republic of Iran*, 999 F.Supp. 1, 31 (D.D.C. 1998).  Solatium damages are therefore available as compensation for the "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the

- 27 -

harm caused by the loss of the decedent, society and comfort." *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F.Supp.2d 48, 83 (D.D.C. 2011) (internal quotation marks and citation omitted).  Entitlement to these damages are available to plaintiffs not "present at the place of outrageous conduct." *Heiser v. Islamic Republic of Iran,* 659 F.Supp.2d 20, 27 (D.D.C. 2009) ("*Heiser II*") (citing *Jenco,* 154 F.Supp.2d at 36).

Where the victim of a terrorist act was killed, the courts consider several factors including: "(1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e., closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimant's mental anguish in excess of that which would have been experienced following the decedent's natural death." *Stethem*, 201 F.Supp.2d at 89-90.  Of these, courts place particular emphasis on the cause of death in terrorism cases, reasoning that "the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time." *Elahi*, 124 F.Supp.2d at 111.

Even with these guideposts, claims for solatium, unlike those for lost wages, are "undeniably difficult to quantify," *Heiser v. Islamic Republic of Iran*, 466 F.Supp.2d 229, 254 (D.D.C. 2006) (*Heiser I*), and not readily susceptible to "models and variables." *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97, 111 (D.D.C. 2000) (citations omitted).  Accordingly, courts are often guided by remedial approaches and formulas employed in similar cases. And in cases where solatium damages are sought, the vast majority of courts in this jurisdiction employ the damages model articulated in *Heiser I*.  In accordance with that framework, "courts typically award between $8 million and $12 million for pain and suffering resulting from the death of a

spouse approximately $5 million to a parent whose child was killed and approximately $2.5 million to a plaintiff whose sibling was killed." *Heiser I*, 466 F.Supp.2d 269.  Children of a deceased victim typically receive an award of $3 million. *O'Brien v. Islamic Republic of Iran*, 853 F.Supp.2d 44, 47 (D.D.C. 2012) (citing *Stern v. Islamic Republic of Iran*, 271 F.Supp.2d 286, 301 (D.D.C.2003)).

These baseline awards, while instructive, are "not set in stone," *Murphy v. Islamic Republic of Iran*, 740 F.Supp.2d 51, 74 (D.D.C. 2010), as "strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009) (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).  Recognizing the flexibility inherent in these awards, courts have deviated from these numbers where circumstances dictated.

Deviations in an upward direction, for example, have been warranted: (1) in the face of "aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering, such as cases involving torture or kidnaping of a spouse," *Greenbaum v. Islamic Republic of Iran*, 451 F.Supp.2d 90, 108 (D.D.C. 2006); (2) where the "evidence establish[es] an especially close relationship"; (3) in the presence of "medical proof of severe pain, grief or suffering on behalf of the claimant"; or (4) where the "circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi v. Islamic Republic of Iran*, 768 F.Supp.2d 16, 26-27 (D.D.C. 2011).  Conversely, downward departures may be provident where the evidence suggests an attenuated relationship between the victim and his family members. *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 86 (D.D.C. 2010). Indeed, solatium awards have been denied "where no evidence is offered to show injury that an

award of solatium damages might compensate." *Roth v. Islamic Republic of Iran*, 78 F.Supp.3d 379, 405 (D.D.C. 2015).

For the reasons set out below, the Special Master finds that Christina Menchaca, Julio Menchaca, Maria Vasquez and Pedro Menchaca are entitled to compensatory damages for their loss of solatium. The Special Master finds further that Julietta MacKenzie, Kenneth MacKenzie and Isaac Murillo are not entitled to solatium damages, as a matter of law.

Christina Menchaca

The evidence compels a finding that Christina Menchaca is entitled not only to receive $12 million, representing the upper end of the *Heiser* scale of awards for spouses of deceased victims of terrorism, but is entitled to an enhancement of $5 million. The vicious and inhumane manner in which Kristian was treated by his captors defies description. The evidence suggests that, notwithstanding their brief marriage, Kristian and Christina enjoyed an "especially close relationship"; that Christina was diagnosed with "permanent" "post-traumatic stress disorder" as a result of her husband's torture and murder; that Christina's suffering was particularly "acute" and "agonizing" given the propaganda video depicting her husband's mutilated body and the severed head of a fellow soldier. *Oveissi*, 768 F.Supp.2d at 26-27. Together, these factors constitute "aggravating circumstances that appreciably worsen the surviving spouse's pain and suffering," *Greenbaum*, 451 at 108 (D.D.C. 2006), that militate in favor of an enhancement. The Special Master recommends, therefore, that Christina Menchaca receive $17 million for loss of solatium.

Maria Vasquez

Maria Vasquez was Kristian's biological mother. Her testimony amply describes her torment as a result of Kristian's murder. The Special Master recommends Maria receive an

award commensurate with the *Heiser* formula, namely, $5 million in compensatory damages for loss of solatium.

Pedro Menchaca

Pedro Menchaca was Kristian's biological father.  Pedro did not reside with Kristian since he and his wife divorced.  Kristian was "less than one year old" at the time.  Pedro testified that he and Kristian would spend a day every two weeks together and that Kristian was an integral part of his life.  With the exception of the inconclusive testimony given by Kenneth MacKenzie, the record supplies little support for Pedro's insistence that he and his son enjoyed a loving relationship.  Moreover, the Special Master finds it telling that, unlike Kristian's mother, Maria, who was informed of Kristian's kidnapping from soldiers who visited her home, Pedro learned of his son's fate via CNN.  It is equally telling that every member of Kristian's family attested to the grief borne by the others yet none volunteered any testimony concerning Pedro. The Special Master finds, therefore, that the relationship between Pedro and his son was sufficiently attenuated to warrant a downward departure of $1.5 million from the *Heiser* formula. The Special Master therefore recommends that Pedro Menchaca receive $3.5 million in damages for loss of solatium.

Julio Menchaca

Julio Menchaca was Kristian's older brother.  Two years older than Kristian, Julio recounts in detail his anguish and guilt dealing with Kristian's death which led to his being discharged from the army and which persists to this day.  Had Julio supported the panoply of his described problems with medical reports, an enhancement might have been considered.  Based on the evidence presented, the Special Master recommends that Julio Menchaca receive solatium damages in accordance with the *Heiser* formula, in the amount of $2.5 million.

Julietta and Kenneth MacKenzie

Julietta and Kenneth MacKenzie were Kristian's aunt and uncle.  Although actual dates are not supplied, the evidence indicates that between May 29, 1983, when Kristian was born and the time he was "five, six, seven years old," according to Julietta, or "about four years old," according to Kenneth, the MacKenzies lived "ten minutes away" from the Menchaca family in Brownsville.  Sometime between 1997 and 2000, Kristian and his mother moved to Houston.  Depending on whose testimony is credited, the MacKenzies followed "ten years later," according to Julietta, or while Kristian was "in high school" according to Kenneth, moving within "about a hundred feet" of the Menchaca household.  Both Julietta and Kenneth agree that Kristian was between 16 and 18 years old when they moved to Houston.  Unfortunately, the relationship between Julietta and Kenneth MacKenzie and Kristian Menchaca does not support an award of solatium damages.

In the context of the FISA, this jurisdiction adopts a "strict" definition of "immediate family" to include "one's spouse, parents, siblings, and children."  *Heiser II,* 659 F.Supp.2d at 28.  This strict definition is rooted in "the realities of tort law and the necessity of limiting recovery to a definable scope of individuals."  *Id.* at 29 (quoting *Jenco*, 154 F.Supp.2d at 36–37).  Those in "direct lineal relationships," *Roth*, 78 F.Supp.3d at 403, or "immediate family members," *Braun*, 228 F.Supp.3d at 80, of the victims of terrorism are presumed to suffer damages for mental anguish as "acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror[.]" *Stethem*, 201 F.Supp.2d at 89.

In *Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003), the D.C. Circuit addressed the boundaries of the "immediate family" in the context of the FSIA.  There, the court

acknowledged "a few limited circumstances" where "some courts have allowed relatives who either *resided in the same household* with the victim or were *legal guardians* to recover for negligent infliction of emotional distress." *Id.* at 337 (emphases in original).  The court reasoned that, "[i]n th[o]se cases, the parties in issue were members of the victim's household, and they were viewed as the functional equivalents of immediate family members." *Id.*  The court went on to caution, however, that "[t]o define 'immediate family' to embrace nieces and nephews who do not live in the immediate household or have any legal obligation to the victim would stretch the term too far." *Id*.

Indeed, decisions according FSIA standing to the "functional equivalents of immediate family members" are "rare cases in which the parties at issue had *lived in the victim's immediate household* and had been in other important respects like a spouse, parent, sibling, or child to the victim." *Heiser II*, 659 F.Supp.2d at 29 (emphasis added).  Even in *Valore*, where solatium damages were awarded to a stepfather and stepbrother, the court took pains to note that, "[t]he mere existence of a 'close relationship' between a claimant who is a non-immediate family member and the victim. . . falls 'far short of what [the Restatement (Second) of Torts] § 46(2)(a) requires.'" 700 F.Supp.2d at 79 (quoting *Bettis*, 315 F.3d at 337).

The MacKenzies were not "immediate family members" in accordance with the *Bettis* criteria.  They neither "resided in the same household with the victim" nor were they Kristian's "legal guardians."  Living "one hundred feet" apart for a few years is not the legal equivalent of residing in the same household.  And however close their relationship with Kristian may have been, the fact that they lived in separate cities during Kristian's formative years cannot be ignored.

That the MacKenzies suffered deeply as a result of Kristian's death cannot be disputed. The Special Master, however, is constrained to follow the rules of law enunciated in *Bettis* and *Heiser II* and "draw [] a line at immediate family members in order 'to prevent a potentially unlimited number of plaintiffs who were not present at the site of the attack from seeking redress.'"  *Peterson v. Islamic Republic of* Iran, 515 F. Supp. 2d 25, 45 (D.D.C. 2007) ("*Peterson II*") (*quoting Heiser II*, 466 F.Supp.2d at 329).  The Special Master recommends that neither Julietta nor Kenneth be awarded solatium damages.

<u>Isaac Murillo</u>

Isaac Murillo, Kristian's "stepson," was four years old when Kristian was killed.  And while the Special Master does not question Isaac's feeling of loss at Kristian's death, the record does not support a finding that Isaac meets the criteria of being a member of Kristian's immediate family.  There is no evidence that Kristian formally adopted Isaac.  And while that fact alone is not dispositive, it takes on significance given the lack of testimony that Isaac "*resided in the same household* with the victim" apart from the one week Kristian was on leave from Iraq.  *Bettis*, 315 F.3d at 337 (D.C. Cir. 2003) (emphasis in original).  Unlike the record in *Heiser II* which established that the victims were the "functional equivalents of fathers" having "lived in the same household" and having "treated them as their own sons in every sense (e.g., financially, emotionally, socially)," 659 F.Supp.2d at 29, there is no indication that a similar relationship existed here.  The evidence indicates that Kristian and Christina met when Kristian was already in the military.  Considering that Kristian enlisted on December 28, 2004, when Isaac was just two years and nine months old, the bond between them could only have developed during the brief time between Kristian's training in Fort Campbell and his deployment to Iraq in

March 2005 and during Kristian's one week leave period – not enough to cast Isaac as the "functional equivalent" of Kristian's son.

### d. Prejudgment Interest

Plaintiffs also seek prejudgment interest on their damages awards.  On May 25, 2017, plaintiffs filed with the Special Master a Motion and Memorandum for Damage Awards with Points and Authorities in Support ("Motion for Damages") asking that prejudgment interest be added to any damage awards.  Motion for Damages at 59-61.  The Motion for Damages represents the first instance in which plaintiffs have asked for prejudgment interest.  Notably, plaintiffs neither specify the damages for which they are seeking prejudgment interest nor do they indicate the time period for which this enhancement should be added.  More significantly, the Motion for Damages was not filed with the Court and the requested relief was not prayed for in the Amended Complaint.   For the reasons set out more fully below, plaintiffs' motion is procedurally and, for the most part, substantively infirm and the Special Master recommends it be denied.

Plaintiffs' failure to seek prejudgment interest in its pleadings runs afoul of the rules of civil procedure and precludes them from relief.

Fed. R. Civ. P. 54(c) provides, in relevant part, that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."  *See Boland v. Yoccabel Const. Co.*, 293 F.R.D. 13, 17 (D.D.C. 2013) ("the relief available on default [should] be such as is within the fair scope of the allegations of the complaint and, when money judgment is sought, the specific amount demanded") (citation omitted)).  Two months ago, a court in this jurisdiction denied a party's request for prejudgment interest raised solely in its proposed findings of fact and conclusions of law.  *See Cohen v. Islamic Republic of Iran*, CA No. 12–cv–01496 (CRC), ---

F.Supp.3d ---, 2017 WL 3207693 at *3 n.2 (July 27, 2017).  Citing Rule. 54(c), the court

explained that it "will consider only the relief requested in the Complaint and will not award

prejudgment interest on the compensatory damages award."  *Id.* at.  Similarly, in a case decided

only six months ago, the court in *Gill v. Islamic Republic of Iran*, CA No. 15–2272 (RBW), ---

F.Supp.3d ---, 2017 WL 1289938 (D.C. Apr. 6, 2017), declined an award of prejudgment interest

prayed for in plaintiffs' proposed findings of fact and conclusions of law.  *Id.* at *10 n.7.  Citing

Rule 54(c), the court held it could "consider only the damages requested in the plaintiff's

Complaint."  *Id.*

Plaintiffs did not request prejudgment interest in any of their filings before the court.  As

stated, the only document requesting such relief was in plaintiffs' Motion for Damages filed only

with the Special Master.  Plaintiffs "could easily have drafted a complaint that included a distinct

claim . . . in the demand clause . . . . [their] failure to do so, intentional or not, ran the risk that his

damages would be limited in the event of default."  *Salmeron v. District of Columbia*, 77

F.Supp.3d 201, 212 (D.D.C. 2015), *judgment vacated on other grounds by*, *Salmeron v. District

of Columbia*, 113 F.Supp.3d 263 (D.D.C. 2015) (quoting *Silge v. Merz*, 510 F.3d 157, 159, 160

(2d Cir.2007)).

For each of the nine causes of action pressed in the Amended Complaint, plaintiffs ask

compensation "for the damages they suffered, *including, but not limited to*, pain, suffering,

mental anguish, and pecuniary losses all other relief the Court deems just." (Emphasis added.)

Even according the phrase "including but not limited to" its broadest possible construction, its

"formulaic language cannot substitute for the meaningful notice called for by Rule 54(c)." *Silge*,

510 F.3d at 160.  *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1277 n. 6 (9th Cir. 2006)

("language ... seeking 'such other and further relief as the court may deem proper' is mere boilerplate, meant to cover all bases as to the claims asserted in the complaint").

In the final analysis, "[i]t would be fundamentally unfair to have the complaint lead defendant to believe that only a certain type and dimension of relief was being sought and then, should defendant attempt to limit the scope and size of the potential judgment by not appearing or otherwise defaulting, allow the court to give *a different type of relief* or *a larger damage award.*" *Boland v. Yoccabel Const. Co.*, 293 F.R.D. at 19 (emphases added).  Plaintiffs' request for prejudgment interest "differ[s] in kind from" their asserted claims for compensatory damages.  As such, the "amended complaint's demand for compensatory damages, without specifically requesting pre-judgment interest, does not provide adequate notice to [defendants], as an award for compensatory damages will not necessarily include pre-judgment interest." *ExxonMobil Oil Corporation v. Black Stone Petroleum Inc.*, 221 F. Supp. 3d 755, 767-68 (E.D. Va. 2016).  Keeping in mind that prejudgment interest does not fall within of the scope of FSIA damages and that the decision whether to award and the amount of such an award is always "discretionary," *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997), there is no guarantee that adding prejudgment interest to the compensatory damage calculus will not "exceed in amount" plaintiffs' individual prayers for relief.

In addition to the aforementioned infirmities, plaintiffs' request fails to demonstrate an entitlement to prejudgment interest for punitive, economic and solatium damages, as a matter of law.  Should plaintiffs overcome the aforementioned procedural hurdles, the Special Master finds, for the reasons set out below, they would be entitled only to receive prejudgment interest for the award of pain and suffering.

Prejudgment interest is intended "to compensate the plaintiff for any delay in payment resulting from the litigation," *Price*, 384 F.Supp.2d at 135, and to avoid the unsupportable circumstance of [a defendant] profiting from its terrorist acts." *Pugh*, 530 F.Supp.2d at 264. Here, plaintiffs presumably seek an enhancement for all remedies allowed under the FSIA, namely, "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). The Special Master will address each in turn.

An award of prejudgment interest apropos of economic damages is inappropriate as the Special Master's recommendation has already been discounted to present value, rendering, "a separate award of prejudgment interest . . . duplicative." *Thuneibat*, 167 F.Supp.3d at 54-55. *See Roth*, 78 F.Supp.3d at 407 ("The Court concludes, however, that it cannot award such interest . . . . the economic loss damages awarded to the estate of [the deceased] have already been discounted to present value"); *Amduso v. Republic of Sudan*, 61 F.Supp.3d 42, 53 (D.D.C. 2014) ("Because some of the economic loss figures recommended by the special masters have already been adjusted to reflect present discounted value, . . the Court will not apply the prejudgment interest multiplier to the economic loss amounts") (internal citation omitted); *Doe v. Islamic Republic of Iran*, 943 F.Supp.2d 180, 185 (D.D.C. 2013) ("Because the figure is already in 2012 dollars, no further award of prejudgment interest is appropriate").

Similarly, prejudgment interest is not warranted with respect to solatium damages in light of the Special Master's express reliance on the guidelines established in *Heiser I* in formulating his recommendation. In *Oveissi*, the court determined that "values set by [the *Heiser*] scale represent the appropriate level of compensation, regardless of the timing of the attack." 768 F.Supp.2d at 30 n. 12. Responding to the plaint that "such interest is necessary to fully compensate Mr. Oveissi for the enormous loss he sustained," the court observed" that the upward

adjustments from the *Heiser* valuation fulfill this very function." *Id.* (internal quotation marks omitted).

This holding and its underlying rationale enjoy considerable support in this jurisdiction. *See, e.g., Harrison*, 882 F.Supp.2d at 51 (rejecting prejudgment interest request on the grounds there was not only no evidence of delay but it conflicted with the court's use of the *Heiser* framework); *Wultz v. Islamic Republic of Iran*, 864 F.Supp.2d 24, 43 (D.D.C. 2012) ("Because this Court has applied the framework in *Heiser* to its calculation of solatium damages, prejudgment interest is not appropriate for these awards"); *Brown*, 872 F.Supp.2d at 45 ("When this Court applies the *Heiser* and *Peterson II* damages framework, it does not typically award prejudgment interest"); *Roth*, 78 F.Supp.3d at 407 ("the Court does not award prejudgment interest on solatium damage awards that are based on the *Heiser* framework").

To the extent plaintiffs seek an enhancement for punitive damages, their request is unsustainable in light of *Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), barring punitive damages for conduct preceding the enactment of the National Defense Authorization Act for Fiscal Year 2008 ("NDAA"). *Id.* at 817*, rehearing denied*, October 3, 2017.  Here, the underlying conduct took place in 2006 – two years before the NDAA was enacted.  Even in the absence of a statutory bar, "prejudgment interest does not apply to punitive damages because prejudgment interest is an element of complete compensation and punitive damages are non-compensatory." *Thuneibat*, 167 F.Supp.3d at 55 (internal quotation marks and citation omitted).

Plaintiffs may, however, have a colorable claim for prejudgment interest for the award of pain and suffering provided they demonstrate their procedural entitlement to assert such a claim.

In the context of the FSIA, prejudgment interest purports to redress those situations "where plaintiffs were delayed in recovering compensation for their injuries – including,

specifically, where such injuries were the result of targeted attacks perpetrated by foreign

defendants." *Pugh*, 530 F.Supp.2d at 263.  As one court explained:

> Awards for pain and suffering and solatium are calculated without reference to the time
> elapsed since the attacks. Because plaintiffs were unable to bring their claims
> immediately after the attacks, they have lost use of the money to which they were entitled
> upon incurring their injuries. Denying prejudgment interest on these damages would
> allow defendants to profit from the use of the money over the last fifteen years. Awarding
> prejudgment interest, on the other hand, reimburses plaintiffs for the time value of
> money, treating the awards as if they were awarded promptly and invested by plaintiffs.

*Khaliq v. Republic of Sudan*, 33 F.Supp.3d 29, 34-35 (D.D.C. 2014).

As the decision to award prejudgment interest is a question resting within the court's

"discretion, subject to equitable considerations," *Pugh*, 530 F.Supp.2d at 263, courts have

applied different formulas for computing the "delay" necessary to trigger an enhancement.  In

*Price*, the court held that "[t]he purpose of such awards is to compensate the plaintiff for any

delay in payment *resulting from the litigation*."  384 F.Supp.2d at 135 (emphasis added).  In that

spirit, several courts have confined their inquiry to whether plaintiffs were obstructed in any way

in prosecuting the claims.  *See, e.g., Pugh*, 530 F.Supp.2d at 265 (awarding prejudgment interest

"because of the substantial delay in judgment for these plaintiffs caused by Libya's *persistent*

*delay tactics over the course of this litigation*") (emphasis added); *Wultz*, 864 F.Supp.2d at 43

(denying prejudgment interest after finding that since the case was filed, "Iranian Defendants,

having never even appeared in this case, *have not prolonged the litigation*" and any delay on the

part of Iran "was not unreasonable for a complicated case involving a number of sovereign

foreign entities and banks") (emphasis added); *Harrison v. Republic of Sudan*, 882 F.Supp.2d 23,

51 (D.D.C. 2012) (denying prejudgment interest, noting that, since plaintiffs filed their claim

"Sudan, having never even appeared in this case, *has not prolonged the* litigation") (emphasis

added); *Brown v. Islamic Republic of Iran*, 872 F.Supp.2d 37, 45–46 (D.D.C. 2012) (refusing

prejudgment interest, finding the delay attributable not to defendants but to plaintiffs' failure to tender timely submissions).

Other decisions define delay by calculating the time between the date of the injury and the date of judgment. *See Amduso v. Republic of Sudan*, 61 F.Supp.3d 42, 53 (D.D.C. 2014) ("Because plaintiffs were unable to bring their claims immediately after the attacks, they lost use of the money to which they were entitled upon incurring their injuries"); *Khaliq*, 33 F.Supp.3d at 34-35 (awarding prejudgment interest for the 15 year period between August 7, 1998, the date the United States embassies in Nairobi, Kenya and Dares Salaam, Tanzania were bombed and the date of judgment); *Belkin,* 667 F.Supp.2d at 224 (awarding prejudgment interest to compensate for the time period between a March 4, 1996 bombing and a Sept. 30, 2009 final judgment); *Ben–Rafael v. Islamic Republic of Iran*, 540 F.Supp.2d 39, 59 (D.D.C. 2008) (awarding an interest enhancement for the period between a March 17, 1992 attack and a Feb. 25, 2008 judgment); *Dammarell v. Islamic Republic of Iran*, CA No. 01-22242006 (JDB), WL 2583043 *1 n. 2 (D.D.C. Sept.7, 2006) (awarding interest for injuries "sustained over the course of more than two decades").

The Special Master finds those decisions which look back to the date the claimants' causes of action accrued more compelling. In the first instance, awarding an enhancement based solely on what transpired during litigation appears in direct conflict with the proposition that "[p]rejudgment interest is an element of complete compensation." *West Virginia v. United States*, 479 U.S. 305, 310 (1987). Beyond this, none of the cases defining delay as "litigation delay" offer up any rationale for imposing this limitation.

Here, members of Kristian's family have waited more than a decade to receive compensation for their loss. Should they demonstrate a procedural entitlement to press their

claim, the Special Master finds no precedent or equitable consideration that might justify

denying them prejudgment interest for Kristian's pain and suffering from the date their cause of

action accrued.  In that event, the Special Master recommends that "[a]n appropriate measure of

what rate to use when calculating prejudgment interest is the prime rate."  *Baker*, 775 FSupp2d.

at 86 (citing *Oldham v. Korean Air Lines Co*., 127 F.3d 43, 54 (D.C. Cir. 1997)).

### e. Inflation

In their Motion for Damages, plaintiffs ask the Special Master to increase any

recommended solatium award by an appropriate amount to account for inflation.  They press the

position that, in looking to prior judgments for comparative purposes, the Special Master should

be mindful that past awards should be adjusted upwards for inflation.  In other words, "[a] $1

million award in 2008 would be worth a great deal more money than a $1 million award today."

Motion for Damages at 61-62.

On July 20, 2016, plaintiffs supplemented their argument in a subsequent filing captioned

Memorandum Regarding Inflation ("Inflation Memorandum").  Repeating their request for an

upward inflationary adjustment, plaintiffs argue: "Courts across the United States have routinely

adjusted awards made in prior cases for the effects of inflation when using prior awards

comparatively for the purpose of making their own damages determination, and also in other

procedural context."  Inflation Memorandum at 1.  They urge that "[t]he practice is so routine,

and often mentioned only in passing or in a footnote, that one could surmise that the inflationary

adjustments are calculated without any official mention.  *Id.* at n.1.  In support, Plaintiffs cite no

fewer than 12 cases from various jurisdictions for the proposition that courts "ma[ke] sure to

account and adjust for the impact of inflation in [their] evaluation of prior comparable cases."

*Id.* at 1.

The Special Master disagrees and finds plaintiffs' arguments in favor of prejudgment interest unpersuasive.

In the cases cited by plaintiffs, individual defendants formally challenged jury awards they believed excessive.  And in each, the courts undertook a comparative analysis of the disputed award with previous damage awards, adjusting the dollar value of the older decisions by inflation to arrive at a "present value."  *See*, *e.g.*, *Wells v. City of Chicago*, 896 F. Supp. 2d 725, 742 n.1 (N.D. Ill. 2012) (comparing 2012 and 1990 jury awards after adjusting the latter "using the inflation calculator provided at the Bureau of Labor Statistics website"); *Bravo v. United States*, 532 F.3d 1154, 1163 n.5 (11th Cir. 2008) (noting a case cited by the dissent in which the court considered a number of verdicts and settlements, took the average dollar award and adjusted that amount for inflation); *DiSorbo v. Hoy*, 343 F.3d 172 (2d Cir. 2003) (when comparing jury awards rendered 10 years apart, the court held "we must take into account inflation"); *Dixon v. Agbai*, No. 15 Civ. 850 (AT) (AJP), 2016 WL 3702749 at *5 n.3 (S.D.N.Y. July 8, 2016) (When comparing awards in 16 cases, the court "note[d] that it has considered all of the awards at their present dollar value adjusted for inflation"); *Jean-Baptiste v. District of Columbia*, 931 F.Supp.2d 1, 17 (D.D.C. 2013) (finding jury verdict excessive "[e]ven adjusting for inflation"); *Menghi v. Hart*, 745 F.Supp.2d 89, 109 (E.D.N.Y. 2010) (comparing jury's $1 million award with a 2001 decision for $275,000 after adjusting for inflation); *Ocampo v. Paper Converting Machine Co.*, No. 02 C 4054 (JN), 2005 WL 2007144 at *4 n. 10 (N.D. Ill. August 12, 2005) (comparing awards after adjusting for inflation); *Ruhlmann v. Smith*, 323 F. Supp.2d 356, 364 (N.D.N.Y. 2004) (comparing case before it to four decided 1983, 1986, 1990 and 2001, adjusting the original dollar amount in each "only for inflation" to arrive at a "present-day value[]"; *Wade v. Colaner*, No. 06-3715 (FLW), 2010 WL 5479629 at *29 (D.N.J. December 28,

2010) (comparing $500,000 jury award to 2001 Third Circuit decision upholding a $375,000 compensatory damages award which, "when adjusted for inflation, is approximately equal to $462,000 in current dollars").

Unlike these cases, however, the Special Master is not determining whether a jury award "is beyond all reason, so as to shock the conscience" or whether a verdict "is so inordinately large as to obviously exceed the maximum limit of a reasonable range within which the jury may properly operate." *Jean-Baptiste*, 931 F.Supp.2d at 12-13 (citation omitted). The Special Master is similarly not striving for uniformity between the solatium recommendations in this case and those awarded in other terrorist actions. Rather, the Special Master's remit is to analyze the unique circumstances in this case and decide whether an entitlement to damages exists and, if so, in what amount.

With respect to solatium, the Special Master adopted the formula set out in *Heiser* and adjusted those baselines to accommodate the particular circumstances of this case. Applying the same rationale courts have adopted when denying prejudgment interest to *Heiser*-based solatium awards, the Special Master finds the inherent flexibility of the *Heiser* formula more than adequate to compensate for any inflationary variable. Apropos of plaintiffs' request for an inflationary enhancement to the recommended award of pain and suffering, it must be noted that, unlike the courts in those cases cited by plaintiffs, the Special Master did not arrive at a dollar amount simply by comparing awards. To the contrary, the instant recommendation for pain and suffering is grounded on information unique to this case, such as trial and deposition transcripts, declarations, source documents and expert testimony. In short, the recommended damage award is unique to this action as it is grounded on a constellation of factors of which prior awards is

only one.  Accordingly, the Special Master denies plaintiffs' request to impose an inflationary

enhancement to the recommended award for pain and suffering.

## CONCLUSION

In light of the foregoing, the Special Master recommends that the Estate of Kristian

Menchaca receive Thirty Million Dollars ($30,000,000) in compensatory damages for pain and

suffering and Two Million Three Hundred Eighty-Two Thousand Six Hundred and Fifty-Eight

Dollars ($2,382,658) in economic damages; that Christina Menchaca be awarded $17 Million

Dollars ($17,000,000) in compensatory damages for loss of solatium; that Maria Vasquez be

awarded $5 Million Dollars ($5,000,000) in compensatory damages for loss of solatium; that

Pedro Menchaca be awarded $3.5 Million Dollars ($3,500,000) in compensatory damages for

loss of solatium; and that Julio Menchaca be awarded $2.5 Million Five Hundred Thousand

Dollars ($2,500,000) in compensatory damages for loss of solatium.   The Special Master further

recommends that no damages for loss of solatium be awarded to Julietta Mackenzie, Kenneth

MacKenzie, or Isaac Murillo.  Finally, the Special Master recommends that plaintiffs' requests

for prejudgment interest and an inflationary adjustment be denied.

 Dated: October 6, 2017                                    Respectfully submitted,


                                                    By:*/s/ Alan L. Balaran*
                                                        Alan L. Balaran, Esq.
                                                        Special Master